**<u>Exhibit A-1</u>**

COMMONWEALTH OF KENTUCKY
COUNTY OF FRANKLIN CIRCUIT COURT
CASE NO. _____

TIA TAYLOR, ASHLEY HALL-NAGY and BOBBY                    PLAINTIFFS
ESTES, Derivatively as members and beneficiaries of
trust funds on behalf of the KENTUCKY RETIREMENT
SYSTEMS, its pension funds and insurance trusts

**VERIFIED COMPLAINT BY "TIER 3" MEMBERS
OF THE KENTUCKY RETIREMENT SYSTEMS**
v.          **PLEADING A MEMBER/BENEFICIARY DERIVATIVE
ACTION FOR THE KENTUCKY RETIREMENT
SYSTEMS AND ITS PENSION PLANS AND
TRUST FUNDS**

KKR & CO., L.P., HENRY R. KRAVIS, GEORGE R.              DEFENDANTS
ROBERTS, PRISMA CAPITAL PARTNERS, L.P., GIRISH
REDDY, BLACKSTONE GROUP L.P., BLACKSTONE
ALTERNATIVE ASSET MANAGEMENT, L.P., J. TOMILSON
HILL, STEPHEN A. SCHWARZMAN, PACIFIC
ALTERNATIVE ASSET MANAGEMENT COMPANY, LLC,
JANE BUCHAN, R.V. KUHNS & ASSOCIATES, INC., JIM
VOYTKO, REBECCA A. GRATSINGER, CAVANAUGH
MACDONALD CONSULTING, LLC, THOMAS J.
CAVANAUGH, TODD B. GREEN, ALISA BENNETT, ICE
MILLER, LLP, WILLIAM S. COOK, MICHAEL RUDZIK and
DOES 1–20

KENTUCKY RETIREMENT SYSTEMS                          NOMINAL DEFENDANT

## Table of Contents

I.  PROCEDURAL HISTORY OF THE *MAYBERRY* ACTION LEADING TO THE COMMENCEMENT OF THIS ACTION .................................................. 3

II. OVERVIEW OF THE KRS DISASTER AND THE INJURIES TO PLAINTIFFS AND ALL PLAN MEMBERS ...................................................... 6

III. WHAT HAPPENED TO KRS .............................................. 15

    A.   Summary of the Course of Wrongdoing and the Near Destruction of KRS .................................................. 15

    B.   The Trustees/Officers' and Defendants' Wrongful Course of Conduct ...................................................... 26

        1.   Investment Losses and False Actuarial Assumptions Plunge KRS into a Crisis in 2009–10 ................................ 26

        2.   The Forecasted Financial Catastrophe Followed the Trustees/Officers' Reckless Purchase of $1.5 Billion in High-Risk Black Box Hedge Funds ............................. 29

        3.   The Trustees/Officers, Their Advisors/Assistors and the Hedge Fund Sellers Lied to KRS's Members, the Public and the Legislature ........................................ 35

        4.   The $1.5-Billion Black Box Plunge Was a Financial Disaster, Helping Push KRS's Funds/Trusts to the Brink of Insolvency Where They Remain Today ............................ 37

    C.   The 2016–17 Disclosures and Near Collapse of the KRS Plans ............................................................ 40

IV. THE NAMED PLAINTIFFS ................................................ 50

V.  THE KRS PENSION AND INSURANCE PLANS AND THE TIER 1, TIER 2 AND TIER 3 BENEFITS ..................................... 51

VI. ALL OF THE NAMED TIER 3 PLAINTIFFS WHO ARE IN KRS PENSION AND INSURANCE TRUSTS/PLANS HAVE STANDING TO SUE .......................................................... 66

    A.   KRS Members' Personal Contributions to Help Fund the KRS Pension and Health Trusts Have Been Lost ................... 66

i

B. The Insurance Benefits Provided as Part of KRS's Pension Plans Are Not Covered by Inviolable Contract Statutory Provisions ................................................. 68

C. KRS Pension Tier 3 Plan Members Are Not in a Defined Benefit Plan, None of Their Benefits Is Protected by Inviolable Contract Statutes and Their Current Benefits Have Been Diminished ........................... 69

VII. THE DEFENDANTS AND OTHER IMPORTANT ACTORS ................................. 72

A. Nominal Defendant KRS ................................................. 72

B. Individual Defendants Cook and Rudzik ................................ 78

C. The KRS Trustees and Officers Who Were Important Actors .............................................................. 80

D. Hedge Fund Seller Defendants ........................................ 90

1. KKR, Kravis, Roberts, Prisma and Reddy ...................... 90

2. Blackstone, Schwarzman and Hill .............................. 99

3. PAAMCO and Buchan ............................................... 103

4. The Peculiar Partnership Structures of KKR and Blackstone ....... 109

E. Investment, Actuarial and Fiduciary Advisors ........................... 115

1. Investment Advisors RVK, Voytko and Gratsinger ...................... 115

2. Actuarial Advisors Cavanaugh Macdonald, Cavanaugh, Green and Bennett ................................................ 117

3. Fiduciary Advisor Ice Miller ........................................ 119

VIII. DUTIES OF THE T/OS AND DEFENDANTS TO KRS AND ITS FUNDS IN OVERSEEING, OPERATING AND DEALING WITH KRS ................................. 122

A. Kentucky Pension, Trust and Other Laws ................................ 122

B. Trustees' Operation and Oversight of the KRS Pension Funds ................................................................ 129

C. Hedge Fund Sellers' Duties to KRS ..................................... 136

ii

D.      Duties of Investment, Actuarial and Fiduciary Advisors .......... 140

IX.   DEFENDANTS' AND THE KRS TRUSTEES/OFFICERS' SCHEME,
CONSPIRACY AND CONCERTED COMMON COURSE OF CONDUCT
THAT DAMAGED KRS AND ITS FUNDS AND GREATLY INCREASED
THE RISK OF FAILURE OF ITS FUNDS/TRUSTS ............................................141

A.      The Black Box Fund of Hedge Funds Debacle, the
Hidden/Excessive Fees and the True Risks and
Nature of the Black Boxes ...................................................141

1.      The 2000s Bring Huge Losses, Horrible Investment
Performance and Funding Deficits...................................141

2.      The 2009–10 Financial/Actuarial Vice and KRS's
Board and Staff Personnel Crisis ................................... 144

3.      The KRS Trustees and the Defendants Choose to
Cover Up and Play Catch Up......................................... 146

4.      The KRS Trustees Are Targeted by the Hedge Fund Sellers..........147

B.      Accountability Required................................................... 151

1.      The KRS Trustees Are Sold the Black Box Fund of
Hedge Funds .................................................................152

2.      The Hidden/Excessive Fees ........................................... 158

3.      The True Risks and Nature of the Black Boxes ............................ 160

C.      In 2015–16, KKR, Cook and Rudzik Working with
Peden Get Inside KRS, Take over Its Absolute Return
Portfolio and Exploit KRS for Their Own Gain........................... 164

D.      Defendants' False and Misleading Statements and
Reassurances — and Obfuscations — to KRS Members.............179

X.    JURISDICTION, VENUE, NONREMOVABILITY AND
STATUTE OF LIMITATIONS/LACHES............................................. 186

XI.   CAUSES OF ACTION FOR THE BENEFIT OF KRS .......................... 194

XII.  PRAYER FOR RELIEF ....................................................................204

DEMAND FOR JURY TRIAL...................................................................206

iii

*"[T]he trillions of dollars held in pension plans are an enticing target for intermediaries and service providers who are opportunistic, desperate or just plain greedy."*[1]

1.      Members and beneficiaries of the Kentucky Employees Retirement Systems ("KRS"), on behalf of KRS, bring this derivative[2] action, seeking compensatory and punitive damages and equitable, injunctive and declaratory relief.  The relief sought includes (a) damages or equitable monetary relief for the losses incurred by — and damage to — KRS and its pension and insurance trusts as a result of breaches of fiduciary trust and other duties, including unsuitable investments, the use of unrealistic and improper actuarial assumptions, the loss of trust assets, the loss of prudent higher return investment opportunities and positive investment returns; (b) accounting for and disgorgement of fees from the sellers of unsuitable hedge fund products and from KRS's investment, actuarial and fiduciary advisors; and (c) declaratory and other relief, including disclosure of, accounting for and disgorgement of all improper self-dealing benefits, in connection with a secret and unlawful contract entered into by KKR Prisma and KRS, entitled "Advisory Services Agreement."[3]

---

[1] Dana M. Muir, *Decentralized Enforcement to Combat Financial Wrongdoing in Pensions; What Type of Watchdogs Are Necessary to Keep the Foxes out of The Henhouses*, 53 AM. BUS. L.J. 33, 34 (2016).  All emphases are added.

[2] A derivate action is an equitable action giving the court its full powers of equity in a proceeding providing plaintiffs with a jury trial.  Thomas E. Rutledge, *Who Will Watch the Watchers?: Derivative Actions in Nonprofit Corporations*, 103 KY. L.J. ONLINE 4 (2015); T. Leigh Anenson, *Public Pension and Fiduciary Law: A View From Equity*, 50 UNIV. OF MICH. J. OF L. REFORM 251 (2016).

[3] As explained in detail below, this action aims to protect the interests of the Plaintiffs on behalf of KRS, serving as a "backstop" to ensure the prosecution of the identical claims they attempt to bring in *Mayberry v. KKR & Co. L.P.*, No. 17-CI-1348 (Ky. Circ. Ct. Cnty. of Franklin) (the "*Mayberry* Action").  While the First Amended Complaint ("FAC") in the *Mayberry* Action was dismissed at the motion-to-dismiss stage, limited discovery and Plaintiffs' ongoing investigation produced evidence that

2.      Defendants are (a) the Hedge Fund Sellers,[4] who created and sold unsuitable, high-risk, high-fee funds of hedge funds to KRS; and (b) KRS's investment, actuarial and fiduciary advisors.  Defendants and the other actors (i) directly participated in the transactions, actions and omissions complained of, (ii) aided and abetted one another and the KRS Trustees and Officers (T/Os)[5] and (iii) pursued a conspiracy and concerted common course of conduct and joint enterprise damaging KRS and its Funds and injuring each of the named Plaintiffs and all KRS Plan/Trust members. The claims made are based solely on Kentucky pension law, trust law, common law and other Kentucky statutory laws.  There are no federal claims asserted. And no individual recovery of damages for the injured named Plaintiffs is sought.

---

substantiated the Plaintiffs' allegations.  *See* Plaintiffs' Companion Memorandum in Opposition to Defendants' Motion to Dismiss ("PCM"); Plaintiffs' Supplemental Opposition to Further Stay and in Favor of Maximum Public Access to Discovery Materials (filed with the Circuit Court in the *Mayberry* Action on April 26, 2018 and April 4, 2018, respectively, which are incorporated herein by reference).

[4] "Hedge Fund Sellers" means KKR, Prisma, Blackstone, and PAAMCO, and their top officers.

[5] The Trustees and Officers are not named as defendants in this Complaint, despite their breaches of duties.  Few if any of them have substantial assets; none of them has assets that could provide or materially contribute to a meaningful recovery herein.  The KRS insurance policy covering them has been depleted and was completely inadequate coverage as it was mis-purchased due to the negligence of KRS's Trustees and its fiduciary advisors.  Not naming the T/Os as defendants allows KRS to avoid ongoing financial obligations, fees, indemnification obligations, *etc*.  William S. Cook remains a defendant, but the charging allegations against him, and the relief sought from him, are limited to his acts and omissions in connection with his employment by and/or ownership interest in Prisma and KKR.  The named Plaintiffs specifically disclaim any intention to sue Cook for his acts or omissions as a KRS Trustee (even though he did breach duties in that role).

## I.   PROCEDURAL HISTORY OF THE *MAYBERRY* ACTION LEADING TO THE COMMENCEMENT OF THIS ACTION

3.   This action is derived from the *Mayberry* Action — a related derivative action brought on KRS's behalf in the Circuit Court of Franklin County.

4.   The *Mayberry* Action was commenced in December 2017.  The FAC followed a few weeks later.  In May 2018, the KRS Board filed a notice of support for these claims being asserted on a derivative basis for KRS's benefit.  The FAC also sought relief for the Commonwealth and its taxpayers.  In November 2018, the Circuit Court upheld the FAC in virtually all respects.  In July 2020, the Kentucky Supreme Court reversed and directed dismissal of the FAC because the then-named *Mayberry* Plaintiffs lacked "standing."[6]  Upon remand, Plaintiffs moved to file a second amended complaint ("SAC"), which dropped the taxpayer claims, expanded the standing allegations for the then-existing *Mayberry* Plaintiffs and added three new plaintiffs, Tia Taylor, Ashley Hall-Nagy and Bobby Estes (the named plaintiffs in this Complaint) — KRS members hired after January 1, 2014, who receive Tier 3 benefits.  The Tier 3 Plaintiffs are part of a Hybrid plan with individually computed retirement benefits.  The Tier 3 Plaintiffs receive variable benefits impacted by Trustee stewardship, investment performance and/or mismanagement, with none of their benefits guaranteed.

5.   The Circuit Court denied the motion to amend on behalf of the original *Mayberry* Plaintiffs and dismissed their claims for failing to raise their new standing allegations earlier in the litigation.  The Circuit Court denied the motion to amend to add the claims of the Tier 3 Plaintiffs on behalf of KRS without prejudice.  The Circuit

---

[6] The *Mayberry* Plaintiffs include five of the original plaintiffs in the *Mayberry* Action: Jeffrey C. Mayberry, Hon. Brandy O. Brown, Martha M. Miller, Steve Roberts, and Teresa M. Stewart.

Court also permitted the Attorney General to intervene and assert claims for the

Commonwealth/taxpayers, stating:

> The intervening Complaint tendered by the Attorney General mirrors the original claims of the Plaintiffs that allege extremely serious violation of fiduciary and other common law duties on the part of certain KRS Board members and advisors and the defendant hedge fund managers engaged by the Board to manage these retirement investments. If those allegations are true, thousands of public employees have had their retirement savings depleted by investments that included self-dealing, exorbitant fees, conflicts of interest, and risky non-prudent investment strategies. Moreover, if the claims can be proven, then the state itself is now on the hook for replenishing the staggering losses of public funds that resulted from those alleged breaches of duties.
>
> Under the law, the hedge fund managers and officers, directors and advisors to the Kentucky Retirement Systems, who allegedly breached their fiduciary duties to the public, must be held accountable.  Any party that breached its fiduciary duties and engaged in reckless conduct, conflicts of interest or self-dealing should be held accountable under the law.  Those breaches of duty are unproven at this early stage of the litigation, but in ruling on the Motion to Intervene, the Court must assume the validity of the claims asserted.  These alleged breaches of duty potentially resulted in the depletion of hundreds of millions of dollars of public funds, which the taxpayers of the Commonwealth will be obliged to indemnify.
>
> This Court does not believe that the Kentucky Supreme Court intended its ruling in *Overstreet* to be applied so as to provide a free pass, or "get out of jail free" card, for fiduciaries who breached their duties to the public and the taxpayers.
>
> *        *        *
>
> With that in mind, the Court notes that while the Original Plaintiffs lack standing to pursue their claims by being members of defined benefit plans, each iteration of their Complaint contains allegations of severe misconduct and breaches of fiduciary duties of Defendants related to management of KRS assets.  The Kentucky Supreme Court observed as much in *Overstreet*, recognizing that "Plaintiffs allege significant misconduct." *Overstreet*, 603 S.W.3d at

266.  Fiduciary duties exist in all circumstances where there is a "special confidence reposed in one who in equity and good conscience is bound to act in good faith and with due regard to the interests of the one reposing confidence." *Steelvest, Inc. v. Scansteel Service Center, Inc.*, 807 S.W.2d 476, 485 (Ky. 1991) (quoting *Security Trust Co. v. Wilson*, 210 S.W.2d 336, 338 (Ky. 1948)).

Serious breaches of fiduciary duties have been alleged in this case, and the Court believes that statute, case law, the Civil Rules, as well as principles of equity and public interest, require that the factual allegations in this case — and the defenses asserted by all Defendants — ***should be adjudicated on the merits and not dismissed on a legal technicality***.

6.    On December 31, 2020, the Tier 3 members (the three named plaintiffs in this Complaint) sought leave in the Circuit Court to file a Proposed Third Amended Complaint to cure that "legal technicality" so that the important derivative claims on behalf of KRS — which are potentially worth billions of dollars — can be asserted and prosecuted on the merits, along with the overlapping claims for the Commonwealth taxpayers now to be prosecuted by the Attorney General.  Counsel for the named plaintiffs in this action are the "highly competent counsel who were aggressively litigating" the taxpayer claims when the prior Attorney General declined to become involved — a vigorous prosecution that excused the Attorney General's inaction then.  It was plaintiffs' counsel's work product, based on thousands of hours of investigation (using private investigators) of events spanning decades, with extensive analysis and drafting of the FAC — which the Circuit Court has upheld on the merits, and which the Supreme Court found to have pleaded "significant misconduct" that, as the Circuit Court stated, must be prosecuted on the merits to advance "public interest."

## II.   OVERVIEW OF THE KRS DISASTER AND THE INJURIES TO PLAINTIFFS AND ALL PLAN MEMBERS

7.      In 2000–2001, the KRS pension and  insurance plans (referred to variously as the "Pension Plans" or "Plans" or "Trusts," "Trust Funds" or "Funds") overseen and managed by KRS, for 390,000 present and former state and local government employees — police officers, clerks, janitors, prosecutors, correction officers, social workers, librarians, *etc.* — were over 100% fully funded, in part by mandatory employee contributions, with a $2 billion surplus (which included funds from years of mandatory employee contributions).  The retirement and health care benefits of those Kentucky's public workers were secure.  None of the plans/trusts was in danger of failing.  None of the pension or insurance benefits provided to all retirees was in danger of diminishment or elimination.

8.      Today, the KRS Funds/Plans are gravely impaired financially and in danger of failing. They are the worst-funded public pension plans in the United States. The largest of the Pension Plans (KERS non-hazardous), which was 139% funded in 2000, now has only 13% of the money it needs to pay the billions of dollars it owes. It now has a mere one-tenth of the funding it had. Its insurance trust has just 36% of the monies it needs to cover billions in insurance obligations.  This fund's assets have fallen to just $1.9 billion, yet it has to pay out almost $1.0 billion in benefits each year going forward for decades.  The current overall KRS funding deficit of $29 billion is much larger than the Funds' total assets of approximately $17 billion.  The collective KRS $2 billion surplus is gone and has been replaced by a $29 billion deficit.  It is very likely that one or more of the Plans/Funds will fail in the foreseeable future, and that spill-

over effects will further impair all KRS Plans, leading to a systemwide restructuring and curtailments for all unprotected benefits.

9.      One advisor has advised KRS that the largest Plan will be insolvent "***in very short order***."  KRS's executive director has admitted the KRS funds are in a "***death spiral***" which it "***cannot invest itself out of***."  Another official admitted in 2017 that absent a massive taxpayer bailout, "***the funds will fail*** … ***the run-out date — the date when the fund would be depleted*** … ***has shrunk to two years and 10 months***."  In 2019 the Kentucky Governor said the KRS Funds are "***essentially bankrupt***."

10.      The long course of egregious misconduct of the T/Os and Defendants alleged in this Complaint caused the gravely impaired financial condition — and severely underfunded status of — the KRS funds.  It substantially increased the risk that one or more of the KRS plans/trusts will fail, creating and enhancing the risk of the entire plan defaulting.  This in turn has caused the named Plaintiffs' "injuries in fact."  Every Named Plaintiff, who are all Tier 3 Members, have ***already suffered individual injuries in fact, and are suffering continuing injuries in fact***, ***due to the continuing damage Defendants*** ' ***alleged misconduct caused KRS well into 2018–20***.

11.      KRS currently administers plans with three differing benefit structures. Tier 1 and 2 Members were covered public employees hired before 2014.  Tier 3 Members were hired after January 1, 2014.  Persons who became KRS members after January 1, 2014 — some 80,000 individuals, 20% of all KRS plan participants — receive Tier 3 benefits.   The Plaintiffs in this action are all Tier 3 Members.  To the extent this Complaint refers to Tier 1 and Tier 2 Members, it is for context and clarity.  Today, ***all***

plan participants, including Tier 3 Members, face the risk of loss or diminishment of their insurance benefits, none of which are protected by "***inviolable contract***" statutes.  They face cuts in, or even the complete elimination of, ***all their pension and insurance benefits***, ***none of which are protected by*** "***inviolable contract***" ***statutes***, ***and they have been subjected to and suffered individual injury by poor investment returns*** (***involving inter alia hedge funds***) ***and wasteful expenses which have reduced/lowered their yearly*** "***upside***" ***credit and their ultimate pension benefits, all the result of the long ongoing scheme, conspiracy and common enterprise of all Defendants alleged herein***.

12.     All KRS Plan participants — including the Tier 3 Plaintiffs — have contributed to and continue to contribute thousands of dollars of their personal funds to help fund KRS's ongoing operations and the KRS pension and insurance trusts that pay and promise to pay them benefits.  They are ***required*** to contribute between 5–9% of their pay annually.  These employee contributions are comingled with KRS's other monies and used to pay KRS's operating expenses, including the T/Os' compensation, and to help fund ***all plan pension and insurance benefits***, ***none of which***, (***other than Tier 1 and Tier 2 monthly pension benefits***), ***are covered by an inviolable contract statute***.  Over the work career of a 20–30-year work life, these mandatory "contributions" (actually, confiscations) of their own monies amounts to many thousands of dollars.  *See* KY. REV. STAT. §§ 61.560(1), 61.691(1).  The retirement benefits provided to the public workers of Kentucky are not gifts.

| KRS Member Personal Contributions To Pension/Insurance Trusts Via Mandatory Payroll Deductions | | |
|---|---|---|
| Yearly Gross Salary | Personal Contribution Percentage | 30 Year Worker Total Personal Contribution |
| $40,000 | 5% $2,000 | $60,000 |
| | 7% $2,800 | $84,000 |
| | 9% $3,600 | $108,000 |
| | | |
| $80,000 | 5% $4,000 | $120,000 |
| | 7% $5,600 | $168,000 |
| | 9% $7,200 | $216,000 |
| | | |
| $120,000 | 5% $6,000 | $189,500 |
| | 7% $8,400 | $252,000 |
| | 9% $10,800 | $324,000 |

13.     These mandatory contributions made by the named Tier 3 Plaintiffs helped pay for fund benefits like the currently endangered insurance benefits, which are not protected by the inviolable contract provisions.  At least two of the insurance trusts (KERS/SPRS) are terribly underfunded and in danger of failing.  Thus, the KRS plan members' insurance benefits that the Tier 3 Plaintiffs help fund are in clear and present danger.

14.     None of the KRS pension plans' insurance benefits for any of the KRS members, including the Tier 3 Plaintiffs, are protected by inviolable contract provisions. Those benefits are expressly denied such protection.  All named Plaintiffs contribute (or contributed) 5–9% of their pay each year — which amounts to thousands of dollars annually and hundreds of thousands of dollars for long term workers, a portion of which personal monies fund insurance trusts and their benefits.  The KERS and SPRS insurance plans/funds are in grave danger of failure — grossly underfunded and illiquid.

9

15.     The Tier 3 Plan participants have no inviolable contract protection *for any of their benefits — pension or insurance or their unvested individual retirement account balance*.  Tier 3 Plan participants participate in a Hybrid Cash Balance Plan, which has characteristics of both a defined benefit plan and a defined contribution plan.  This plan resembles a defined contribution plan because it determines the value of benefits for each participant based on individual accounts.  However, the assets of the plan remain in the single, comingled investment pool like a traditional defined benefit plan.  Their final individual account balance, and thus their pension, depends on the stewardship of KRS's Trustees and KRS's investment returns over the years.  Tier 3 members receive a minimum 4% annual return, plus an annual "upside" of 75% of KRS's investment returns over 4% computed on a 5-year basis and credited to their accounts.  The "upside" credits of Tier 3 plan participants *have been diminished each year* since 2015 as a result of the poor performance and excessive fees attributable to the hedge funds, *i.e.*, the alleged wrongdoing.  The damage the T/Os and Defendants caused KRS also resulted in a major restructuring of KERS and SPRS investment portfolios in 2016 to adopt a much more conservative, cautious investment strategy.  This was required by the KERS/SPRS Funds' losses, low funding levels and serious liquidity issues.  This "preservationist" strategy caused diminished returns and curtailed the "upside" to the Tier 3 Plan participants compared to what they would get from a well-managed, well-funded liquid fund.  Using very conservative assumptions, Plaintiffs' consultant estimates the lost "upside" to measure in the many millions of dollars to Tier 3 plan participants and significant individual financial injury to the Tier 3 named Plaintiffs.

16.     The KRS Plans are not all defined benefit plans.  Nor are they fully funded plans.  Nor are they gifts of the state where all funding comes from the Commonwealth.  Nor are all benefits guaranteed by the Commonwealth via inviolable contract provisions.  All the Tier 3 Plaintiffs' personal contributions to KRS face a clear increasing risk, along with loss or curtailment of their benefits, when the KRS funds fail, likely as they will, in the foreseeable future.  The benefits they have helped fund via their mandatory contributions will be impaired or lost.  All Tier 3 members have ***already been injured due to the denial or diminishment of benefits as a result of the wrongdoing alleged***.

17.     On June 29, 2018 *Forbes* reported:

### Kentucky Retirement Systems:  A Case Study of Politicizing Pensions

Kentucky is in the midst of a financial crisis.  The Kentucky Retirement System (KRS), is responsible for the pensions of more than 365,000 current and retired state and local government employees, ... and at least one recent headline said it succinctly: "***Unfunded Pensions Could Spell Disaster for Kentucky***."

This is not new. The KRS Board of Trustees has been trying to deal with this looming pension crisis since the mid-2000s.

\*\*\*

Leaders of KRS are required through their fiduciary duty to provide "accurate and truthful information regarding KRS financial and actuarial condition."  Trustees instead took the moral low-ground and mislead pensioners — all for the sake of politics.  By hiding the true status of the fund, these officials were able to hold their offices and coerce the public into believing that they were acting in the best interest of the people.  ***In reality, KRS leadership acted only in self-interest, leaving future generations in the state to pay for their mistakes because of poor investment decisions***.

*This sort of irresponsible action must be stopped in American pension fund management* ….

18.     The injuries suffered by the named Plaintiffs are all traceable to the T/Os' and Defendants' breaches of duties to KRS and long course of "significant misconduct" resulting from — were caused by — that course of misconduct starting in or before 2008. Their misconduct and breaches of duty drove what had been fully funded pension and insurance funds into the ditch, so damaging their finances that they are in clear and present danger of failing and on the brink of insolvency — "***essentially bankrupt***." They purchased the $1.5 billion in high-risk, super-expensive Black Box hedge funds and put them in both the KRS pension and insurance trusts.  During this continuing course of conduct, the Consultant and Advisor defendants were constantly involved in the breaches of fiduciary duties and misconduct, feasting all the while on large fees. Along the way, the hedge fund sellers spotted the slow, desperate deer, moved in and, with the help of complicit and disloyal KRS insiders, plundered the KRS funds, sticking them with high-risk/low-return Black Box hedge funds while gorging on massive fees and returning to Wall Street and Newport Beach, after they had their way with them. The damage to KRS and its funds — and the injuries to the named Plaintiffs and KRS plan members — occurred repeatedly over the years.  Members' unprotected benefits were taken away, impaired or diminished.

19.     Now the Tier 3 Plaintiffs are stuck in the worst funded public retirement funds in the United States, and active members are ***forced to continue to*** "***contribute***" ***their own earnings into the smoldering remains of what were once fully funded plans***, which the T/Os and Defendants helped destroy and where many of the benefits they are forced to help fund are outside of the inviolable contract

protections.  The named Plaintiffs bring this action to expose the wrongdoing of those who betrayed their trust, and to recover, on behalf of KRS, as much money as possible to repair its prior losses and to improve KRS's current and ongoing financial condition and liquidity, which help protect Plaintiffs' existing and promised, ***but unguaranteed***, ***benefits***, ***as well as the safety of their past***, ***continuing and future personal contributions into the endangered funds***.  Whether as a result of COVID-19 or other factors, KRS's investment performance during the fiscal year ended 6/30/2020 was terrible, and may well portend of things to come as the U.S. economy slides toward recession or worse.  The most current figures available (contained in the KRS Monthly Performance Update for May 2020) reflect catastrophically low portfolio-wide returns for the pension trusts of only 0.20% for the 11 months ended 5/31/2020.  The portfolio-wide returns for the insurance trusts were even worse — a loss of (0.17)%.  And these figures almost certainly overstate the true returns, as they include reported "returns" on KRS's real estate investments in excess of 11%, when in reality the effects of the pandemic on most commercial real estate investments have been serious and negative, with deal-flow at a standstill and real valuations dropping.  The portfolio-wide figures also include positive reported returns on private equity investments, notwithstanding the negative effects of the pandemic; actual results were almost certainly far worse.  As KKR, one of the largest private equity firms in the world, stated in its Form 10-Q filed in May 2020:

> The scale and scope of the COVID-19 pandemic may heighten the potential adverse effects on our business, financial performance and operating results for the quarterly periods and full fiscal year of 2020 and possibly beyond, and may be material and affect us in ways that we cannot foresee at this time.  Many of the adverse ways in which COVID-19 may impact us have already materialized and adversely

> affected (or started to materialize and to adversely affect) our stock price, our portfolio valuations, and the operations of our business and the businesses of our portfolio companies, as well as the businesses of entities of which we or our funds are creditors, and our and their other counterparties, including suppliers and customers.  These risks may, in the future, become even more significant than is currently the case or than is currently anticipated.

The effects of the COVID-related downturn have further placed the already-weakened KRS portfolios (pension and insurance) in even greater and more immediate jeopardy.[7] Moreover, the tremendously deleterious effects of the pandemic on the Commonwealth, in terms of (among other things) public health, calls on public resources and tax collections, are hard to overstate.  As observed by KKR in connection with its own businesses, "[t]hese risks may, in the future, become even more significant than is currently the case or than is currently anticipated."

---

[7] The COVID-19 pandemic and associated economic distress have greatly increased risks to the KRS funds — and to public and quasi-public employers whose employees depend upon the various retirement benefits they earned and were promised.  The Commonwealth and these other public or quasi-public entities face unprecedented loss of tax and other revenue, while needs for public services and expenditures have spiked.  It is simply not possible to predict how deep the recession may become or how long it may last.  The past misconduct in connection with the KRS plans has left them in a very weakened position, just as the employers who must contribute large amounts in an attempt to "catch up" are being pressured by these economic conditions.  The net result is a significant possibility, even probability, that the funds will spiral downward and become depleted, and that the same economic conditions will result in a delay in payment of even those benefits protected by Inviolable Contract provisions, if not in fact benefit cuts notwithstanding those provisions.  While Kentucky has taxing power, it must operate on a balanced budget, and erstwhile taxpayers who have lost their jobs are unlikely to accept endless tax increases to fund a bottomless pit of pension obligations.  In other words, while the legal obligations created by the Inviolable Contracts must be recognized, the extraordinary economic times — and the possibility of unthinkable stresses on citizens and governments — cannot be ignored.

## III.    WHAT HAPPENED TO KRS

### A.    Summary of the Course of Wrongdoing and the Near Destruction of KRS

20.    Starting in 1956, to protect Kentucky workers (who from the beginning would be ***required*** to contribute their own monies to these pension trusts), Kentucky (i) created KRS to be overseen by Trustees via the Kentucky Pension Law ("KPL"), (ii) designated KRS's pension assets as "***trust funds***," KY. REV. STAT. § 386B.10-020;[8] (iii) established (in part) the ***legal duties*** of trustees, officers and other fiduciaries who dealt with KRS's funds, KY. REV. STAT. §§ 61.645(15), 61.650(1)(c)–(d); and (iv) ***set the standards of misconduct*** required in an action brought by "***any person***" against KRS's Trustees to recover "***monetary damages for KRS***" due to their breaches of statutory duties to KRS.  KY. REV. STAT. § 61.645(15)(e)–(f).  The original pension benefits from the defined benefit plan were protected by an inviolable contract provision benefit.  Later, insurance and COLA benefits were added.  Both of these benefits were expressly denied "inviolable contract" protections.  KY. REV. STAT. §§ 61.691(2)6), 61.702(8)(e).  In 2013, a new Hybrid Cash pension/insurance plan was created for post-January 1, 2014 hires/new members which involves a Hybrid Cash Balance Plan, individual retirement accounts with a retirement benefit that varies based on KRS's stewardship and investment performance over the working life of a member of the plan.  All of the benefits of the Hybrid Cash Balance Plan were expressly denied "inviolable contract" protection.  KY. REV. STAT. § 61.692(2)(a).

---

[8] This abbreviation is used in lieu of the more commonly used "KRS," to avoid confusion with the Kentucky Retirement System.  As used herein, the acronym "KRS" refers to the Kentucky Retirement System.

21.     The laudable idea behind the new pension plans was that if workers' savings and tax dollars were properly safeguarded and prudently invested, returns would provide the bulk of the funding.  With good faith trusteeship, the public pension fund concept works.  Hundreds of public pension funds around the country are over 85–90% funded today.

22.     Through economic good times and bad, bull and bear markets, terrorists attacks, the savings & loan debacle, the dot.com/IPO and telecommunications debacles and even the 2007–2009 financial crisis — despite people living longer, retiring earlier and the slowing in public employee hiring — through one political crisis after another — despite all the vagaries of the past decades — because the trustees, investment advisors, actuaries, fiduciary counsel of these other funds did their jobs and performed their statutory duties — they are well funded today.  The retirement savings of their beneficiaries are safe.

23.     There is no doubt that with proper, good faith trusteeship and pension fund management, assisted by competent and experienced staff and honest independent outside advisors, the public pension fund concept can work and does work.  Look no further than Tennessee, right next door, where the two large public pension plans are 95% funded today.  Those funds had competent trustees who obeyed the law and told the truth; they had honest, competent and non-self-interested advisors, who turned away sellers of speculative and unsuitable investments.

[The remainder of this page is deliberately left blank.]



24.     That is not what happened in Kentucky where the Funds/Plans are on the verge of failure, and all members including the Tier 3 have seen benefits diminished, curtailed and even eliminated due to the alleged misconduct of the Defendants and the T/Os.  Starting before 2009 and continuing through at least 2016, KRS's T/Os, its financial/actuarial advisors and the Hedge Fund Sellers colluded to breach their statutory and fiduciary duties to KRS, damaging its pension and insurance funds.  That damage continued to damage the funds well into 2020, injuring the Plaintiffs and other Plan Members.

25.     Disregarding and ignoring a 2010 warning that KRS "***fac[ed] an appreciable risk of running out of assets in the next few years***" *and could not invest its way out of the crisis by taking more investment risk*, the T/Os and the Defendants took the very action they had been warned "***risked the fastest depletion of the plan's assets***" and "***substantially increas[ed] the chances of***

*the catastrophic event of depleting all assets in the near future*.”  The T/Os and Defendants dramatically changed KRS's investment allocations to take on much more risk, and in 2010–2011, bet $1.5 billion on highly risky, extremely expensive and unsuitable hedge fund vehicles which were effectively “Black Boxes.”  The T/Os and their advisors had also been explicitly warned in 2009 of the need to conduct “*thorough*” and “*extensive due diligence*” into these new, exotic, untested vehicles *and* into the backgrounds of the sellers, including using “*private investigators*.” They ignored that warning as well.

26.     Instead, the KRS T/Os bet big, putting 10% of KRS's assets — twice the 5% originally authorized — into what they told KRS members and Kentucky taxpayers were “*absolute return*” investments that would be “long-term driver[s] of Fund performance,” with “*tremendous potential to exceed the Plan's actuarial return assumptions and historical returns*,” expected net long-term returns of 7.5% or more, which could “*lower* [*KRS's*] *risks*” through “equity-like returns with bond-like volatility.”⁹  In reality, these were highly risky and extremely expensive Black Box hedge fund bets.  And they lost big.  They never achieved the expected returns for KRS over any 5-year period (but did deliver spectacular returns for the Hedge Fund Sellers).  In just a few years terrible Black Box returns (and losses exceeding $100 million in one year), plus “exorbitant fees,” brought about the warned-against catastrophe, pushing KRS to the edge of insolvency.  The T/Os had handed over $1.5

---

⁹ When the outsized expected returns failed to materialize, the Hedge Fund Sellers revealed their bait-and-switch tactics by falsely claiming that in fact KRS had expected only “modest returns” from these hedge fund investments — that KRS was willing to pay 2+% in management fees and 20+% in incentive fees to realize expected returns in the range of 3.5% per year.

billion in trust funds to Wall Street hedge fund sellers with "checkered pasts" — littered with fraud and breach-of-duty lawsuits and a record of cheating their investors and partners.  This was directly contrary to the portentous 2009–10 warnings, and it was also a breach of the T/Os' duties to safeguard and prudently invest KRS's trust funds.

27.    During 2009–12, due to continuing large losses KRS caused by the alleged ongoing misconduct of the T/Os and Defendants, the financial condition of the plans continued to decline to the point where there was widespread concern the funds would collapse financially.  ***By 2012 the KRS funds were the worst funded in the United States,*** with funding ***deficits nearing $30 billion, a situation caused by the course of misconduct complained of***.  The existing COLA benefit became doomed by KRS's declining financial condition which threatened its survival.  On February 6, 2013, *Lanereport.com* reported:

### Kentucky Pension Shortfall A Potential Bankruptcy Bomb

Kentucky Retirement Systems (KRS) is underfunded by more than $30 billion ***and falling further behind***.

***

According to the Institute for Truth in Accounting, the funding gap for the retirement systems has grown by roughly $3 billion in the past year alone, and the shortfall for the Kentucky Retirement Systems' six groups is over $30 billion .... A recent Pew Center on the States study describes the commonwealth's pension situation as "***unsustainable***" due to this liability and because KRS is paying out more than it is taking in.

28.    The financial problems at, and the threat of failure of, KRS that required the elimination of existing benefits (including COLA) and the creation of a new Hybrid Cash Balance Plan (Tier 3) with lower and entirely unprotected benefits were laid out by the Pew Study:

> In 2012, Kentucky had one of the worst-funded retirement systems in the country.  The total unfunded liability in the pension plans covering employees other than teachers was $13.9 billion — more than the tax revenue the state collected that year.  ***If Kentucky did not adopt comprehensive reforms***, ***this growing liability would seriously jeopardize basic public services***, ***the security of worker benefits***, ***and the overall fiscal health of the state***.
>
> <div align="center">***</div>
>
> All told, Kentucky had accumulated more than $26 billion in pension debt.  In 2002, the pension plan for state workers not in hazardous positions was 111 percent funded.  Just a decade later, it was less than 30 percent funded, and it is currently one of the worst-funded state pension plans in the country.  The other Kentucky Retirement Systems pension plans – covering city and county employees as well as state police and state employees in hazardous positions – were also in bad shape, with billions of dollars in total additional unfunded liabilities.

Pew Trusts, Kentucky's Successful Public Pension Reforms, September 27, 2013.

29.     As a result of the impending failure of the KRS funds and ***at the request of the KRS Board***, the legislature enacted major legislation impacting KRS, the KRS Funds, and the existing benefits all Plan members were entitled to.  New state hires post-January 1, 2014 were placed in a new Hybrid Cash Balance Plan and ***denied inviolable contract protections for all of their benefits — pension and insurance***.  These legislative changes are described below:

> Kentucky has one of the worst funded government retirement systems in the nation.  Despite several attempts to fix the problem, as of June 2011, Kentucky's unfunded liability for public employee pensions and health benefits exceeded $30 billion.
>
> On April 4, 2013 Gov. Steve L. Beshear signed into law Senate Bill 2, which adopted hybrid "cash balance retirement plans" for certain new state and local public employees and officials participating in government pension plans on or after Jan. 1, 2014.

<div align="center">***</div>

> ***These legislative efforts*** *... **will significantly impact***
> ***public pension benefits in the years ahead***.

30.     The KRS members were assured these legislative enactments changing the KRS benefit structure would fix the problems.  After the 2013 Legislation was passed, then-Governor Steve Beshear referred to the new legislation as:

> ... a bipartisan agreement to solve the most pressing financial problem facing our state — ***our monstrous unfunded pension liability and the financial instability of our pension fund***.

<div align="center">***</div>

> "I thank the legislative Pension Reform Task Force for their hard work, which led to some critical changes in our pension system that will ensure its long-term reliability.  I also thank our legislative leaders for their efforts to forge an agreement on funding that protects critical services like education from near — certain cuts due to the ballooning pension liability.

> "As a result of this legislation, we fully honor the commitments made to state workers and retirees; address the financial uncertainty that threatened our state's credit rating.

31.     Despite those assurances, the finances and funding of the KRS Plans continued to erode – an erosion caused by the T/Os and Defendants' continued course of misconduct. These legislative changes eliminating the existing COLA benefit and denying inviolable contract protection to post-January 1, 2014 members failed to halt the financial decline of the KRS Funds/Plans.

32.     The ongoing misconduct of the KRS T/Os and the Defendants badly damaged KRS and, by 2013, had so badly impaired the financial condition of its Funds/Trusts that it took them to the brink of failure.  KRS requested the legislature to cut or eliminate existing benefits and created a new tier of benefits for new hires — none of which would be protected or available by inviolable contract statutes *i.e.* Tier 3.

<div align="center">21</div>

Despite the actions of KRS and the legislature in providing post January 1, 2014 members lower benefits while denying them the protection of "inviolable contract provisions," the financial condition of the KRS funds continued to decline, due to the T/Os and Defendants' continuing misconduct and damage to KRS, inflicting injury on the named plaintiffs and all Tier 3 Plan members.

33.   The 2013 actions did not halt the financial decline of KRS.  In 2014, *Leoway.com* reported:

### Abandon Ship!  Kentucky's Underfunded Public Pension System Threatens to Drown the Commonwealth

On March 26 of last year, the most powerful elected officials in Frankfort were effusive in their backslapping and self-congratulations over their bipartisan feat. Kentucky's General Assembly had just beat the deadline for their session to pass the much-debated Senate Bill 2, a public pension reform bill that supposedly cured what ailed the deeply troubled Kentucky Retirement Systems (KRS), and champagne corks were popping.

"***The reforms will make Kentucky's pension system one of the healthiest in the country***," said Gov. Steve Beshear.  "***I think we have done a heck of a job for the people of this state because it gets a financial burden out of the way***."

Democratic House Speaker Greg Stumbo claimed that "we have brought stability to our system and adequate funding that ***will ensure a safe and secure pension for those covered***," adding, "***we have honored our commitment, we have accomplished our mission, we have solved a huge problem***, and ***we have earned our pay***."

\*\*\*

***Eighteen months later***, *a growing number of critics find those rosy sentiments to be an absurd showcase of denial*, *as Kentucky is still widely seen by many experts as having one of the worst funded — and most secretive — public pension systems in the country*.

22

\*\*\*
> *According to some experts*, **Kentucky's pension system is already entering into a "*death spiral*," where more benefits are paid out every year than contributions taken in**, *while investment returns from a dwindling asset pool are outpaced by increasing costs*.

34.     Due to the then-ongoing misconduct inside KRS, its funded status continued to decline in 2013–16.  Rating agencies cut Kentucky's credit rating and journalists exposed improprieties regarding excessive fees in KRS's investments.[10]  In 2016, the roof caved in as it came out that KRS's "absolute return" [Black Box] investments had **lost over $100 million in less than 12 months**.  These funding declines, credit rating cuts, huge losses and fees prompted public outcry, political upheaval and intervention by government officials. An independent investigation found false actuarial assumptions for future investment returns, plan participant growth, longevity and inflation, and that KRS's financial situation was far worse than had been disclosed. Next came a house-cleaning. Independent eyes came on the KRS Board of Trustees and in late 2016 disrupted the course of misconduct, curtailed the hedge fund misadventures and exposed years of deliberate manipulation of KRS's financial and actuarial assumptions, which had long masked its true financial condition and resulted in

---

[10] *See, e.g.*, John Cheves, *Kentucky Retirement Systems Pays Millions in Fees to Money Managers But Keep the Details in Secret*, LEXINGTON HERALD-LEADER, June 14, 2014; James McNair, *When It Comes to Investments, Kentucky Keeps Pension Holders in the Dark*, KY. CTR. FOR INVESTIGATIVE REPORTING, July 24, 2014; McNair, *Kentucky Pension Fees Much Higher Than Previously Reported,* KY. CTR. FOR INVESTIGATIVE REPORTING, Sept. 15, 2015; Tom Loftus, *Pension Debt Lowers Kentucky Credit Rating*, COURIER JOURNAL, Sept. 4, 2015; Cheves, *State Pension Level Drops Again, to 17 Percent*, LEXINGTON HERALD-LEADER, Dec. 3, 2015.

government-sponsor contributions far below those required to properly fund KRS's pension funds.[11]

35.     As part of the 2016 house-cleaning, the new trustees conducted a "***deep dive***" into what had been going on inside KRS and were "***shocked***" by what they discovered. State officials and new trustees confirmed the years of misconduct alleged in the FAC.

- that "***payroll growth, investment return and inflation assumptions***" were "***ridiculously high***, ***blatantly incorrect or wildly overstated***";

- that "***fantasyland numbers***" helped "***hide the true pension costs and liability from Kentucky taxpayers***" as the "lack of realistic and rational actuarial assumptions ***helped obscure the distressed financial status of the plans***";

- that "***past assumptions were often manipulated***" and "[t]he result was to provide a ***false sense of security*** and justify smaller than necessary contributions to the pension plan — ***a morally negligent and irresponsible thing to do***";

- that "[w]e have been aggressive in our assumptions for many, many years — ***aggressively wrong***," which "led to this, accumulation of billions in unfounded liability" because the prior Board "***was too afraid of the political consequences to use the accurate numbers for these assumptions***"; and

- that "[***w***]***hat has been done in our pension system has been criminal*** … ***irresponsible and it is shameful***."

---

[11] As discussed in more detail below, the 2016 "deep-dive" unfortunately missed the continuing misconduct and significant wrongdoing by KKR Prisma and its associated Defendants — along with former Chief Investment Officer Peden, former Executive Director Thielen and current Executive David Eager — in connection with the secret and unlawful Advisory Services Agreement ("ASA"), which purported to allow KKR Prisma and KKR to self-deal with KRS assets for their own profit.



## AFTER OUSTER OF CULPABLE TRUSTEES
## *DEEP-DIVE, FRESH EYES* REVELATIONS

VISUAL 3

**ACTION**

***DEEP DIVE INTO THE NUMBERS***

**RESULT**

***WE HAVE BEEN AGGRESSIVE IN OUR ASSUMPTIONS FOR MANY, MANY YEARS – AGGRESSIVELY WRONG***

- KRS... "payroll growth, investment returns and inflation assumptions

***blatantly incorrect or wildly overstated***

"Actuarial assumptions

***ridiculously high***

- When you use rea ... een used for the last 10 years -- not **fantasy land numbers** the numbers are gonna go up"

***Exorbitant fund fees***

***fantasyland numbers***

**March 5, 2017**

"... most important, is that the actuarial assumptions are realistic ... the Board's No. 1 responsibility is to set the rates on investment returns, payroll growth and inflation. These three numbers determine the actual liability and required actuarial payments by the legislature"

"One ... oard I did was to undertake an examination of 10-year historical rates. We ... tuarial assumptions used by the previous board were 30% to 60% perce ... rical averages."

***shocked***

* * *

The board is required by law to estimate the numbers, so the actuaries can calculate required payments. ... or

***too afraid of the political consequences to use the accurate numbers for these assumptions***

**June 18, 2018 By John R. Farris**

The new leadership…terminated [ACTUARY] … after discovering that is was using

***helped hide the true pension costs and liabilities from Kentucky taxpayers***

**STATE CONTROLLER**

**"In the past, a lack of realistic and rational actuarial assumptions helped obscure the distressed financial status of the plans and contributed to the long-term unsustainability of the plans...**

***lack of realistic and rational actuarial assumptions helped obscure the distressed financial status of the plans***

**February, 2017**

Nearly all of [The $800 million per year increased tax payer payments] is because the board of trustees believes the state will earn less money on its investments and have fewer employees contributing to the system over the next three decades. **Board chairman ... Farris says the numbers, while more expensive, are more realistic.**

***Our role [is] to calculate these numbers correctly and give them to the legislature. Previous boards didn't do that***

**December 7, 2017**

New Actuaries ... found that the systems have ... unfunded liabilities of $26.75 billion, ... — the result of KRS replacin

***fantasyland numbers***

**"EXORBITANT" HEDGE FUND FEES**

- "Exorbitant Hedge Fund Fees"~Farris, June 25, 2018/Feb 24, 2017

***Exorbitant Hedge Fund fees***

ic pension plans. Corporate plans are too smart to pay these outrageous fees. **The only stupid people are the taxpayers of Kentucky for letting these people get away with this."**

- CEM Benchmarking -- KRS annual investment expenses in 2014 were **100 percent higher** than reported: $126.6 million instead of the $62.4 million.

36. In 2017, this Commonwealth's highest elected officials laid bare the misconduct:

> "The biggest cause of the shortfall was erroneous actuarial assumptions made by past members of the [B]oards..., which led to significant underfunding .... [P]ast assumptions were often ***manipulated*** by the prior pension [B]oards in order to minimize the "cost" of pensions to the state budget. Unreasonably high investment expectations were made and funding was based on ***false*** payroll numbers.
>
> The result was to provide a false sense of security .... ***This was a morally negligent and irresponsible thing to do***."
>
> [The remainder of this page is deliberately left blank.]



**MANIPULATION OF ACTUARIAL ASSUMPTIONS**

Rate of Return: 7.75% - Employee Growth: 4.5% - Inflation 3.25%

*Shocked • Assumptions Ridiculously High • Blatantly Incorrect • Wildly Overstated • Aggressively Wrong • Fantasy Numbers*

VISUAL 4

37.     In December 2017, this action was originally filed alleging KRS Pension and Insurance Funds and Trusts were underfunded, financially impaired and in danger of failure.  They have never recovered.  Today, they remain the worst funded plans in the United States and are "***essentially bankrupt***" — all because of a course of misconduct beginning in or before 2008 that decimated KRS and its pension and insurance funds, almost destroying them until the wrongdoing was finally shut down in 2016.  Unfortunately, the damage continues.

### B.     The Trustees/Officers' and Defendants' Wrongful Course of Conduct

#### 1.     Investment Losses and False Actuarial Assumptions Plunge KRS into a Crisis in 2009–10

38.     Between 2001 and 2009, the funded status of the KRS Funds declined due to large investment losses, which severely damaged KRS's investment portfolio and demonstrated that the 7.75% Assumed Annual Rate of Investment Return ("AARIR")

26

the Trustees had been using for years was unrealistic and would never be achieved. By 2009-10, the Trustees were facing accelerating retirements, requiring KRS to pay out increasing amounts to longer-living retirees while slowing government hiring — meaning fewer new hires, *i.e.*, less new money coming into the Plans. Billions in investment losses and deteriorating demographics had hurt the funds. The T/Os were trapped in a financial/demographic vise.

39.     In the midst of the 2009–10 crisis, the T/Os were also engulfed by the infamous placement agent kickback scandal,[12] which would result in firings and demotions of KRS insiders implicated in these dubious activities. Audits uncovered $13 million in "***suspicious payments***" to "placement agents" who had received kickbacks in return for getting KRS investment monies placed. Exposure of this unsavory practice at public funds erupted into a national scandal. Several pension fund figures and fixers went to jail. In Kentucky, Park Hill Group—controlled by Blackstone and/or some of its executives — received one of the largest "suspicious payments," over $2 million. As a result of this scandal, KRS's CIO and CEO/ED were both fired. Overstreet, longtime Board Chair, was demoted.

40.     This scandal, and related firings, gutted KRS's staff and deprived the Trustees of the kind of staff support needed at this critical time. The sophisticated Hedge Fund Sellers were already stalking the KRS funds because they "knew the Trustees were dealing with internal turmoil and staff turnover [as well as] new,

---

[12] Crit Luallen, *Examination of Certain Policies, Procedures, Controls, and Financial Activities of Kentucky Retirement Systems*, June 28, 2011, *available at* https://kyret.ky.gov/About/Internal-Audit/Documents/2011%20State%20Audit.pdf (last visited Dec. 30, 2020).

27

inexperienced investment staff and would be unusually dependent upon their ...
expertise and sophistication."

41.     Confronting KRS's threatened financial status in the midst of this
"suspicious payments" scandal and personnel pandemonium, the T/Os received a
liquidity study.  That April 2010 "Bombshell" report warned that KRS "***faces an
appreciable risk of running out of assets in the next few years***," and there
was "***no prudent investment strategy that would allow KRS to invest its
way to significantly improved status***."  PCM at 21–25.  It warned that increasing
the risk level of investments to try to invest KRS out of the hole "***substantially
increases the chances of the catastrophic event of depleting all assets in
the near future***."



42.     Notably, in evaluating investments a few years earlier, the KRS Board's
Investment Committee ("I.C.") — then headed by Susan Horne (who left the Board) —
rejected hedge funds as an unsuitable investment for the life savings of the Kentucky

28

workers and taxpayer funds the Trustees were sworn to protect.  The I.C. concluded KRS was "**not interested in hedge funds**" from a "**fiduciary standpoint**" due to "**red flags**" including "**higher risk**."

# KRS REJECTS HEDGE FUNDS IN 2006

**April 24, 2006**

**VISUAL 6**

**KRS INVESTMENT COMMITTEE MEETING**

- *Need to be concerned about the **PERCEPTION** from members, legislators, or other public officials.*
- *Concern from **FIDUCIARY STANDPOINT** - hedge funds **UNCONSTRAINED**.*
- ***FUNDS WILL NOT TELL INVESTORS WHAT THEY DO** [or] **WHAT POSITIONS THEY HOLD**.*
- **SELL ASSETS THEY DO NOT OWN**.
- **HAVE HIGHER RISK AND EXPOSURE.** <span style="color:red">**Present: Overstreet, Henson, Thielen, Aldridge**</span>
- <span style="color:red">*ENOUGH RED FLAGS ABOUT HEDGE FUNDS – NO NEED TO GO ANY FURTHER.*</span>
- <span style="color:red">[KRS] *NOT INTERESTED IN HEDGE FUNDS*</span>

43.    As a direct result of the T/Os' disregard of both the Bombshell report's warnings and the prior decision to avoid hedge funds, the "**catastrophic event of depleting all assets in the near future**" came very close to occurring in due course.

> **2.    The Forecasted Financial Catastrophe Followed the Trustees/Officers' Reckless Purchase of $1.5 Billion in High-Risk Black Box Hedge Funds**

44.    As the T/Os searched for a way out of that financial and actuarial vise, and while in the midst of internal scandal and disorganization, KRS presented a tempting "honeypot" for the high-powered Hedge Fund Sellers. The Hedge Fund Sellers "knew KRS T/Os were dealing with a much more serious situation than was known by the public." They targeted KRS to sell it risky and expensive "Black Boxes." They custom-

designed "Black Box" fund-of-funds vehicles for KRS and named them the "Henry Clay Fund," the "Daniel Boone Fund" and the "Newport Colonels Fund."

45.     Ignoring the Bombshell report's dire warnings, the Trustees turned to these Wall Street financial houses. They sell high-fee, high-risk hedge funds and pocket large annual management fees *regardless of investment performance*. These Hedge Fund Sellers targeted KRS as part of their business plans, which focused on public funds—especially underfunded funds.[13]  They did this due to the combined factors of no government oversight of public funds, the relative lack of sophistication of public fund trustees and officers, and the huge amount of monies available for "investment," *i.e.*, the "honey pot."[14]  A former KRS trustee said: "These funds can't get [high fees] from anywhere besides public pension plans.  Corporate plans are too smart to pay these outrageous fees."

46.     In August 2010, the T/Os and the Hedge Fund Sellers dramatically changed KRS's investment allocations to allow them take on much more risk. The T/Os rejected a "more conservative" portfolio because it would not project out future investment returns at 7.75%, fearing that since KRS "***members do not understand sophisticated market strategies***," "***they won't understand a lower rate of return***" which "***will create anxiety***."  So the T/Os picked a "***more aggressive***"

---

[13] *See* Gary Rivlin, *The Whistle Blower: How a Gang of Hedge Funds Strip-Mined Kentucky's Public Pensions*, THE INTERCEPT, Oct. 21, 2018, *available at* https://theintercept.com/2018/10/21/kentucky-pensions-crisis-hedge-funds/ (last visited Dec. 30, 2020).

[14] *See* Gary Rivlin, *A Giant Pile of Money: How Wall Street Drove Public Pensions into Crisis and Pocketed Billions in Fees*, THE INTERCEPT, Oct. 20, 2018, *available at* https://theintercept.com/2018/10/20/public-pensions-crisis-wall-street-fees/ (last visited Dec. 30, 2020).

strategy "**_with higher projected returns_**" that projected out investment returns over 7.75% — even though they knew that was impossible to achieve — because it would "**_look better_**."

**KRS Investment Allocations Changed to Accept**
**Hedge Fund Sellers' High-Risk/High-Fee Blackbox Hedge Funds**

AUGUST 12, 2010 - I.C. MEETING
AUGUST 19, 2010 - B.T. MEETING                                    VISUAL 7

**INVESTMENT COMMITTEE BOARD OF TRUSTEES MEETINGS – TRUSTEES CHANGE KRS**
**INVESTMENT ALLOCATIONS – GO AGGRESSIVE/ADD RISK**

- Present: Overstreet (B.T. Chair), Lang (I.C. Chair), J. Elliott, Longmeyer, Henson, Aldridge, Peden, Thielen
- Portfolio 1 – "more conservative" but will earn **less** than 7.75%
- INVESTMENT ADVISOR recommends "more conservative" portfolio - Trustees reject.
  - Trustee Lang: "KRS members do not understand sophisticated market strategies" – "Won't understand lower rate of return"
  - Trustee Lang: "Portfolio 1 has lower rate of return" – will create "ANXIETY" among members
- Trustees go aggressive – select Portfolio 2
  - Portfolio 2 – "more aggressive" "more aggressive" "more aggressive" – will **earn over 7.75%**
  - Trustee Overstreet: "go with Portfolio 2 because of the higher projected returns" – WILL LOOK "BETTER"

**NEW ALLOCATION OF KRS TRUST FUNDS**
- Absolute Return – Black Box Fund of Hedge Funds – 100% increase – 0% to 10% – $1.5 billion

**CREATES AN APPARENT ANNUAL RATE OF RETURN OF 7.93%**

47.   The T/Os then sold off much of KRS's solid income-producing investments to fund these highly risky, super-expensive "absolute return" hedge fund purchases. The T/Os sold off 34% of KRS's good stocks, 53% of its fixed-income investments and 100% of its U.S. Treasuries.  This $1.5-billion bet — 10% of KRS's funds — resulted in, by far, the largest single and riskiest investment KRS ever made and it turned out to be a disaster which helped cripple the KRS pension and insurance Plans/Trusts and damaged KRS and injured the named Plaintiffs.  Hundreds of millions of dollars of these Black Box speculations were put into the KRS insurance and trusts funds.

48.   The T/Os "recklessly gambled," and "chose to cover up the true extent of the KRS financial/actuarial shortfalls and take longshot imprudent risks ... to try to

catch up for the Funds' prior losses."  In 2009, the Trustees had been warned that these new exotic "absolute return" products and their sellers required "***thorough***," "***extensive due diligence***."

**THE 2009 WARNING REQUIRING EXTENSIVE THOROUGH DUE DILIGENCE INTO ABSOLUTE RETURN VEHICLES AND SELLERS**

To:     Investment Committee                                    VISUAL 8

From:   KRS Investment Staff        Presented to Feb 3, 2009 I.C. Meeting
                                    Present: Henson, Lang, Overstreet, Thielen, Aldridge
Date:   February 3, 2009

Subject: KRS Absolute Return Strategy Allocation

**Recommendation:** It is the recommendation of the KRS Investment Staff and Consultant that the Investment Committee approve an initial allocation **of up to 5.0% of the Fund's assets to be invested in absolute return strategy fund-of-funds ("FOF").**

**Risks:  … structural risks are the primary concerns faced by absolute return fund–of–funds … Structural risks often entail risks to the organization or the operations of the absolute return strategies …they cannot be eliminated … structural risks can be monitored and controlled by ensuring that extensive due diligence of the manager is conducted. Thorough due diligence may entail the use of private investigator checks on manager …**

49.     In 2010, the T/Os had put over $100 million into the first "absolute return" vehicle Arrowhawk, a startup, which folded quickly under a cloud of controversy.  A second speculative "investment" in Camelot collapsed when the owner was indicted. As these two speculative plunges blew up, a "tip" about payoffs in return for investments led to the 2009-10 special audit that uncovered that millions of the "suspicious" payments were connected to these "investments."

50.     In spite of this "absolute return" test run blowup, the "suspicious payments" scandal and the disruption of the KRS Board and staff, the T/Os and their assistors and co-conspirators acted in direct defiance of the April 2010 report's explicit

warnings.  In August-September 2011, they greatly increased the risk of KRS's investment portfolios by betting $1.5 billion in trust funds (10% of the Funds' assets) on "Black Boxes" — opaque vehicles that had *no prior investment performance*.  The T/Os bet on the most exotic, risky, toxic and expensive type of hedge funds — ***funds that invest in other hedge funds***.  They are called "Black Boxes" because the investor does not know what downstream hedge funds invest the money in, or what the true fees are or how they are computed or shared among the various funds involved.  The investor does not have any way to monitor the investing practices of the downstream funds or accurately value the holdings. "Black Boxes" are secretive because downstream funds claim their methods and strategies and fees are "proprietary" and will not share them. This is why KRS rejected hedge funds earlier and considered them unsuitable investments for trust funds.

51.     The Hedge Fund Sellers have admitted in governmental filings ***that the Black Boxes were the riskiest products they had to sell***.



**TRUE RISKS OF THE BLACK BOX FUNDS OF HEDGE FUNDS
BLACKSTONE/KKR-PRISMA 10-K SEC FILINGS**

Presented to T/O's, J. Elliott (B.T. Chair) T. Elliott (I.C. Chair)
Overstreet, Lang, Longmeyer, Henson, Thielen, Carlson, Aldridge

**THESE HEDGE FUNDS**

• *newly established without any operating history or track records*

• *illiquid* investment vehicles – invest in markets that are **volatile – impossible to liquidate**

• *Use leverage – significant degree of risk – **enhances possibility of significant loss** subject to **unlimited risk of loss*** in short selling, commodities

• *could result in significant losses* – Involve **risk of loss** that **investors** … should be **prepared to bear – high degree** of business and financial risk that can result in **substantial loss**

**AND THESE  *RISKS ARE EXACERBATED FOR OUR FUNDS OF HEDGE FUNDS***

VISUAL 9

52.     The initial $1.5 billion in Black Box sales in 2011 were also polluted by serious conflicts of interest. Defendant William S. Cook (a hedge fund seller for Aegon/Prisma who would later in 2016 become a KRS Trustee as the course of misconduct progressed) was a key actor from the outset. Based in Louisville for Aegon for years, Cook became a partner in Wall Street-based Defendant Prisma (which later combined with KKR), and specialized in selling Black Boxes. Cook led the initial $1.5 billion hedge fund sales effort to KRS in 2010–11.  David Peden was Cook's friend who worked for years with Cook at Aegon and Prisma before going inside KRS in 2009 as a junior fixed-income investment officer.  Nevertheless, Peden was quickly involved in selecting Prisma and handing over $500 million to Cook/Prisma for their "Daniel Boone Fund."  At the time of the 2010–11 Black Box sales to KRS:

- Board Chair and I.C. member, Jennifer Elliott, was a partner at Louisville-based Stites and Harbison, lawyers for Aegon — which owned 68% of Prisma. Cook, who was a partner in Aegon with long-time connections to Elliott and her firm — was in 2010-11 a top executive at Prisma based in Louisville and leading the Black Box sales effort; and

- Peden, a new KRS investment officer whose duties did not involve "alternative investments," but rather stodgy fixed income, was intimately involved in selecting Prisma and KRS's purchase of its risky/exotic "Daniel Boone Fund"; he had worked with Cook at Aegon and Prisma for years and was Cook's friend.

34

53.     These relationships were flagged internally at KRS in September 2011 as "***conflicts of interest***" when the hedge fund purchases took place.  Yet no further investigation took place.  ***The conflict was never cleared***.  It was never discussed by the Board or the I.C. The tainted Black Box hedge fund transactions went forward—a key step in the course of misconduct that would go on for several years, enriching the Hedge Fund Sellers by hundreds of millions of dollars.

### 3.     The Trustees/Officers, Their Advisors/Assistors and the Hedge Fund Sellers Lied to KRS's Members, the Public and the Legislature

54.     The T/Os reported the financial/actuarial status of KRS's funds via Annual Reports.  KY. REV. STAT. 61.645(19)(m). During 2010-15 the T/Os issued false and misleading Annual Reports that were reviewed and approved by the other Defendants. This created a "false sense of security" while covering up the course of misconduct.

## FALSEHOODS IN KRS/ANNUAL 2010-2015 REPORTS
### ABSOLUTE RETURN - IMPROVED RETURNS - REDUCED RISK

2010-2015 T/O's Overstreet, Longmeyer, Henson, T. Elliott, J. Elliott, Lang, Peden, Carlson, Aldridge, Thielen

**TRUSTEES/OFFICERS:**                                                                    VISUAL 10

*Board's strategic decision, new allocation to absolute return, will improve returns while reducing risk.*

Board decided on the most effective asset allocation ... in order to lower risk, control illiquidity and generate returns expected to exceed 7.75% ... lower our risks ... portfolio more diversified than ever.

**RVK:**     *Lower risk – Not illiquid – Will beat 7.75%*

adopted most effective asset allocation strategies to lower risk, control the level of illiquidity in the portfolios, and generate a return expected to exceed the actuarially assumed rate of return of 7.75%

... As of 2010 - 2011 ... the Board has been transitioning   *transitioning ... in a prudent manner*

... We expect the Board's c   *Board's continued high standard of care*   System to meet its long-term goals and objectives.

**CAV MAC:**   *Funding to increase to 100% – Adequate funding of liabilities*

the funding level ... should increase over time until it reaches 100%. ...  adequate provisions are being determined for the funding of the actuarial liabilities ... as required by the Kentucky Revised Statutes.

Based on the ... current funding policies ...  adequate provisions are being determined for the funding of the actuarial liabilities ... as required by the Kentucky Revised Statutes.

55.     Not only did the T/Os fail to disclose the truth, they actively misled KRS members, the public, and taxpayers about what they and their assistors misleadingly described as new "*absolute return*" investments, suggesting they always provided positive returns — which they most certainly did not.  The T/Os falsely assured that they had made decisions "***to diversify this portfolio to improve returns while reducing risks***," "***adopted [the] most effective asset allocation strategies to lower risk***," that the new "absolute return" investments would "***lower*** [***KRS's***] ***risks***," "***reduce volatility***," "***control [the] level of illiquidity***," thus making KRS's "***portfolio*** ... ***more diversified than ever***," and were "***expected to exceed the actuarial/assumed rate of return of 7.75%***."

56.     The Trustees furthered the "***false sense of security***" by extolling their own "***continued high standard of care***," assuring KRS members, Kentucky taxpayers and the Legislature that "***adequate provisions are being determined for the funding of actuarial liabilities***" as required by law and "***the funding level should increase over time until it reaches 100%***."  None of this was true. These false statements were part of the course of misconduct made to cover up the T/Os' actions and false presentation of KRS finances.

[The remainder of this page is deliberately left blank.]

4.    **The $1.5-Billion Black Box Plunge Was a Financial Disaster, Helping Push KRS's Funds/Trusts to the Brink of Insolvency Where They Remain Today**



**HOW DID THE ORIGINAL BLACK BOXES DO?**
***WORSE THAN CASH***







57.    The speculative Black Box plunge was a big loser.  By 2016, despite the "exorbitant fees" paid to the Hedge Fund Sellers, these super expensive Black Boxes earned just 3.73% over their 5-6 year lives — ***less than the 3.75% KRS historically earned on its cash*** in the bank, and ***less than fixed income*** over comparable periods — during a time when the S&P 500 went up over 350%.  Then these funds lost over $100 million in less than 12 months in 2015–16.  Then they lost hundreds of millions more (−2.3%) in 2016-18 — as the S&P soared by another 30%.  These were the exact sort of losses the "hedges," with their supposed "reduced volatility" and "safe diversification," were supposed to protect against.  Along the way they consumed hundreds of millions of dollars in "exorbitant" fees.  The investment opportunities missed because they were displaced by the hedge fund misadventure cost KRS dearly.  All of this exacerbated KRS's underfunding and helped push it to the edge of insolvency.

37

58.     The Hedge Fund Sellers' predation on KRS continued into 2015–16.  The course of misconduct, aiding and abetting, common enterprise and conspiracy that came together in 2010–11, when Defendant William S. Cook (then a senior executive of Prisma) and David Peden (then a member of the KRS investment staff) worked together to help engineer the initial Black Box purchases, including the conflicted $400+ million Prisma Daniel Boone Fund, continued in 2015–16 when KKR Prisma's Cook and Michael Rudzik worked in concert with Peden, by then KRS's Chief Investment Officer (CIO), to **deliver control over KRS's entire $1.6 billion hedge fund portfolio to KKR — a Wall Street behemoth whose numerous interests conflicted with the interests of KRS and its members — and then allow KKR Prisma and its top executives to leverage that position for their own self-interested benefit**, **all to the detriment of KRS**, **its members**, **and the taxpayers**.

59.     Cook and Peden convinced the Trustees to have KRS enter into a "Strategic Partnership" with  KKR/Prisma, through which another KKR/Prisma executive (Defendant Michael Rudzik) and his team were "seconded" to KRS — inserted into KRS while still on KKR's payroll to "help" KRS with its investments. In effect, this KKR/Prisma team took over management and oversight of KRS's entire $1.6 billion hedge fund portfolio, answering only to the conflicted Peden.  And, under the secret (*i.e.*, confidential and non-public) Advisory Services Agreement, KKR/Prisma was purportedly allowed to use its fiduciary position and KRS assets for its own self-dealing profit, in violation of Kentucky law and KRS's Conflict of Interest Policy.

60.     With this KKR/Prisma executive team illegally inside KRS and while other public pension funds were fleeing Black Boxes, KRS put $300 million more into the

KKR/Prisma Black Box (the biggest loser), and allowed the KKR/Prisma team to manage KRS's other hedge fund investments and illegally profit from those activities. This was nothing less than a conflicted, insider-assisted takeover of KRS's absolute return investment portfolio, resulting in at least **$585 million** in self-interested investments benefiting KKR/Prisma.

61.     By gaining the additional $300 million in its own losing Daniel Boone Fund, KKR/Prisma helped itself at the expense of KRS at a time when the hedge fund industry was badly stressed and KKR/Prisma needed more assets under management. Additionally, the transactions also benefitted Cook and Rudzik **personally**, as they stood to receive millions of dollars from contingent KKR performance-based payments because of KKR's prior acquisition of Prisma.  This was self-dealing of the first order in blatant violation of the KRS conflict of interest policies.



### 2016 KKR/PRISMA $300-MILLION SALE
#### VIOLATION OF KRS CONFLICT OF INTEREST RULES

VISUAL 12

**KENTUCKY RETIREMENT SYSTEMS
CONFLICT OF INTEREST AND CONFIDENTIALITY POLICY**

2015-2016 KRS Trustees/Officers: T. Elliott, Lang, Peden, Aldridge, Thielen

Individuals associated with KRS must not engage in activities that have the potential to become a conflict of interest …

**Section 1: Application of Policy**

**(1)** This policy shall apply to all individuals who have a statutory, contractual or working relationship with KRS.

**Section 2: Standards of Conduct Regarding Conflicts of Interest**

1. Individuals have an obligation to **diligently** … avoid … conflicts of interest.
2. Potential conflicts … exist when an individual … **may be directly or indirectly financially impacted** … by a decision made by KRS in which the individual participates….
5. **Individuals should not conduct business or participate in decisions with a company … in which the individual … is employed….**

**INDIVIDUALS *ASSOCIATED WITH* KRS PROHIBITED FROM:**
- using KRS *confidential information* to further his/employer's economic interests
- participating in decisions involving company employing individual
- having direct/indirect interest in gains/profits of any investments by KRS board

62.     All of this was also in violation of the KPL, including the "sole interest" fiduciary standard required by KY. REV. STAT. § 61.650(1)(c).  The investments were not

made "solely" in the interests of the members and the beneficiaries of KRS, as required

by the KPL, but to benefit KKR/Prisma, Reddy, Cook, Rudzik, Kravis and Roberts. The

additional $300 million Daniel Boone investment — just like the original purchase in

2010-11 — *was a disaster*, *losing some 2.3% over the next 2+ years versus a*

*30% gain for the S&P Total Return Index*.   Moreover, because it had handed

control over the entire $1.6 billion hedge fund portfolio over to conflicted hedge fund

sellers, KRS stayed fully invested in hedge funds when other pension funds were rapidly

divesting the asset class, to the detriment of KRS and its members and beneficiaries.

The hedge funds continued to underperform while charging large fees.  The damage to

KRS Funds by Defendants' and the T/Os' misconduct was serious, lasting and continued

well into 2018 and beyond.  The KRS pension and insurance trust Funds have simply

never recovered.

### C.    The 2016–17 Disclosures and Near Collapse of the KRS Plans

63.    The 2013 elimination of the COLA and creation of the new Tier 3 plan

benefit levels did not halt the financial decline of the KRS funds.  By 2016–17, the KRS

Pension Plans were $28+ billion underfunded and facing collapse. The new Chair of the

KRS Board, John Farris, was quoted as saying:

> KRS made serious math errors in recent years, relying on
> overly optimistic assumptions about its investment returns,
> the growth of state and local government payrolls. We have
> been aggressively wrong in our assumptions for many years
> ….
>
> It doesn't make any sense … We wonder why the plans are
> underfunded. It's not all the legislatures fault. It's the board's
> responsibility to give the correct numbers. …
>
> Payroll growth was negative and you assumed 4% growth?
> Were any of you paying attention?

64.    When the KRS year-end 2017 financial results were released:

"The massive dollar amounts came as no surprise and are largely a result of new assumptions ... lowering projections on how much the plans will earn on investments and on how much government payrolls are expected to grow."

John Farris, [The New] Chairman of the Board, said the new assumptions replace optimistic ones used by boards in the past that caused Kentucky Retirement Systems to not ask for sufficient funding which led to the accumulation of billions in unfunded liabilities.

"Now we're giving the right numbers. Lots of complaints about the right numbers. I understand it ... I wish it wasn't that way. I wish they were given the right numbers 10 years ago."

65.     At the time these results were released the State Budget Director stated:

"In the past, a lack of realistic and rational actuarial assumptions helped obscure the distressed financial status of the plans and contributed to the long-term unsustainability of the plans ...."

66.     On February 16, 2017, the *Lexington Herald Leader* reported:

**TROUBLED KENTUCKY PENSION SYSTEM MIGHT
NEED BILLIONS MORE THAN ASSUMED**

Kentucky Retirement Systems ... might be in far worse financial shape than previously thought.

*       *       *

KRS made serious math errors in recent years by relying on overly optimistic assumptions about its investment returns, the growth of state and local government payrolls, and the inflation rates, KRS board chairman John Farris told his fellow trustees ....

For example, KRS assumed that it would earn an average of 6.75 percent to 7.5 percent on money it invested, but it earned an average of 4.75 percent, Farris said. KRS assumed that public payroll would grow by 4 percent a year through pay raises or more government hiring — a larger payroll means larger pension contributions by employees — but public payroll has dropped overall because of repeated budget cuts, he said.

41

> "*It doesn't make any sense*," said Farris …. "*We wonder why the plans are underfunded. It's not all the legislature's fault. It's the board's responsibility to give the correct numbers*."

67.     On May 18, 2017, the *Lexington Herald Leader* reported:

### KENTUCKY'S PUBLIC PENSION DEBT JUST GOT BILLIONS BIGGER

> Kentucky's public pension debt just got a few billion dollars bigger.
>
> Under the new numbers presented to the board, KRS' official unfunded pension liability of $18.1 billion will increase by somewhere between $3.6 billion and $4.5 billion ….
>
> \*     \*     \*
>
> Following Thursday's board vote, the primary state pension fund operated by KRS — known as the Kentucky Employees Retirement System (Non-Hazardous) — has only 13.81 percent of the money it is expected to need in coming years.
>
> \*     \*     \*
>
> "*The most important function of our board is to give correct numbers to the legislature*," Farris said. "*If we don't do that, if we continue to rely on aggressively optimistic assumptions, then we will continue to fall behind*."
>
> \*     \*     \*
>
> KRS had assumed that it would earn from 6.75 percent to 7.5 percent on money it invested; it assumed that public payroll would grow by 4 percent a year; and it assumed an inflation rate of 3.25 percent. All of those numbers look unrealistic.
>
> \*     \*     \*
>
> "*We* (*at KRS*) *have been* "*aggressive*" *in our assumptions for many years — aggressively wrong*," Farris said. "*And we wonder why we're underfunded*."

68.     During 2016–2017, independent eyes got to look at what had gone on

inside KRS for the past several years when the PFM investigation of KRS was

42

commissioned by the Executive Branch.  In 2017, PFM issued the "PFM Report," which was described in media reports as follows:

### KENTUCKY'S PENSIONS ARE WORST-FUNDED IN U.S., STUDY SHOWS

A new study shows that Kentucky has the worst funded pension system in the nation

*… And from another media report*:

The PFM Group today presented an alarming report to the Public Pension Oversight Board detailing the factors that made Kentucky's pension systems the worst funded systems in the United States.  The report revealed that the systems have had a combined $6.9 billion negative cash flow since 2005 as benefits paid to retirees plus program expenses greatly exceeded appropriated funding.  According to the report, if this negative cash flow is not corrected, the ability to make payments to current and future retirees is at risk … "PFM's analysis is the most comprehensive and detailed look at the many factors that contributed to the massive unfunded pension liabilities crippling our state," stated John Chilton, Kentucky's State Budget Director.

69.   The Executive Branch of the Commonwealth has stated:

*The KRS and TRS plans have taken on significantly more investment risk over the last decade in order to chase unrealistically high investment returns*.

When compared to other public plans, the KRS plans have had an allocation to riskier alternative investments that nearly double the peer average.  Unfortunately, significant exposure to market risks still remains."

\*    \*    \*

Billions in pension debt are growing in perpetuity … even if the plans earn their expected investment return ….

70.   On August 24, 2017, the *Lexington Herald Leader* reported:

### FORMER HEAD OF KENTUCKY RETIREMENT SYSTEMS `SHOULD BE IN JAIL,' BEVIN SAYS

Gov. Matt Bevin told a gathering of Kentucky's city and county leaders Thursday that the former executive director

of the financially ailing Kentucky Retirement Systems *deserves to be in jail*.

\* \* \*

"Bill Thielen should be in jail and that's a fact. And I don't know who's here from the media but if this was a private company, if this was a private pension plan he would be."

"It has been negligent, it has been irresponsible and it is shameful".

"What has been done in our pension systems has been criminal," Bevin said ... "if these were private companies they would have been taken over and frozen and disbanded and the payouts of benefits would have been stopped by law."[15]

71.  On November 8, 2018, the *Lexington Herald Leader* reported:

### Kentucky's Main Pension Fund for State Workers Was Already Frail.  It Just Got Weaker

***As bad as Kentucky's pension prospects were***, ***it turns out there was still room for further decline***.

As of June 30, Kentucky state government's primary pension fund had only 12.9 percent of the money it's expected to need to make future payments to tens of thousands of retirees, compared to 13.6 percent a year earlier ....

The pension fund — managed by the KRS board within the Kentucky Employees Retirement System — had about $2 billion in assets and $15.6 billion in liabilities on June 30 ....

72.  The declining finances and funding of the KERS and SPRS Plans were now feeding on themselves.  As their assets dwindled and funding levels fell and benefit costs soared, straining their liquidity, the ability of the funds to invest in rational long-term investments that hold the potential for higher returns — as well funded, liquid pension

---

[15] Even then, there was no indication that Governor Bevin, Trustee Farris or PFM was aware of the secret terms of the ASA and the blatant self-dealing supposedly permitted thereunder.  To date, the extent and monetary value of the self-dealing in which KKR/Prisma engaged through the ASA is unknown, as neither Prisma or KKR has made disclosures of the same.  Nor is it known at this time whether any of the involved persons committed violations of KRS Ch. 521 in connection with the ASA.

plans can do — was lost.  KERS and SPRS now had to hoard dwindling resources — being more conservative and cautious.  Their investment strategy became preservationist.  In November 2015, *www.Kentucky.com* reported:

### Five Problems the Legislature Never Seems to Solve

Kentucky is struggling with the cost of more state government retirees drawing guaranteed lifetime pensions while fewer workers remain on the job contributing to the pension funds, and the funds get smaller investment returns than originally anticipated.

\*\*\*

***The fund could run out of money in 2019*** …. ***[B]y 2018***, ***the fund will pay out nearly half of its assets every year to cover retiree benefits***, ***pension officials warned***.

"***There are months where we have to sell off assets to make payments***," ***said Mike Burnside***, ***KRS executive director***, in a recent interview.  "***The problem is***, ***your best rate of return is in large***, ***long-term investments***.  ***That's obviously hard to get when we need to keep liquefying our assets***."

73.     In May 2017, *Pensions & Investments* reported:

### Kentucky Retirement Systems Lowers Return Assumption to 5.25%

"For far too long (KRS) has been too aggressive with (its) assumptions and has helped contribute to (its) severely underfunded position," Mr. Eager said.

Along with the assumption changes, KRS' investment committee ***is recommending more conservative asset allocations*** ….

74.     At the KRS Board of Trustees meeting in May 2017, the Board received a report that explained why these funds' investment options were so severely limited.

### ILLUSTRATIONS ARE FOR KERS NON-HAZARDOUS PENSION

- June 30, 2016 market value of assets = $1.9 billion

- 2015–16 benefit payments = $0.9 billion

- Assets represent two years' worth of benefit payments

- High liquidity needs

- High funding needs

75.   In February 2018, it was publicly reported:

### Kentucky Retirement System Earmarks $270 Million, Cuts Hedge Fund Managers

Kentucky Retirement Systems, ... allocated up to $270 million total to three alternatives managers, said David Eager, interim executive director.

*** 

***The Kentucky Employees Retirement System non-hazardous pension plan and the State Police Retirement System were the only plans that did not participate in the new investments because they have low funding ratios and cannot afford to lock up capital*** ....

76.   When some of the actuarial and other changes required by the near

financial collapse of the KRS funds, which was caused by the defendants' misconduct,

were later criticized, KRS insisted they were absolutely necessary.  On May 24, 2019, the

*Courier Journal* reported:

### Kentucky Retirement Systems Asked to Reconsider Math that Made Pension Costs Skyrocket

A statewide citizens group is calling on the Kentucky Retirement Systems board to back down from conservative economic assumptions it set two years ago that sent pension costs soaring for state and local governments, as well as for quasi-governmental groups that are seeking relief from the higher costs.

*** 

Kentucky Retirement Systems has responded to the "action alert" sent to KFTC members by posting a link at the top of its website saying the new assumptions are a realistic and

needed reform that provide an honest view of the poor financial condition of the state plans.

"***Economic assumptions used for many years had been too optimistic***," the KRS website notice stated.

The board's 2017 actions "***while fiscally painful, were absolutely critical in order to protect the current and future retirement benefits legally promised to more than 379,000 Kentuckians***."

\*\*\*

But the rate of investment return assumptions for the Kentucky plans are the very lowest of 129 state pension plans.

\*\*\*

Farris said Kentucky's assumption for the main state government plan is lowest because it is also the worst-funded plan in America, reporting $13.7 billion in unfunded liabilities and having just 12.9% of assets on hand to cover known future benefits.

"***It's the most severely underfunded plan in the country***," ***Farris said. Because it is so underfunded, it must invest more conservatively and avoid investments that*** "***lock up your assets for 10 years***."

\*\*\*

"We have a fiduciary responsibility.  We do not take this lightly," Farris said ....

77. The following presentation of the current Actuarial and Investment situation at the KRS Plans is taken from KRS's 2019 Annual Report.

[The remainder of this page is deliberately left blank.]

47

# ACTUARIAL REPORT

*This is an overview of the Pension and Insurance Funds' actuarial status for the fiscal year ended June 30, 2019. For more detailed information, refer to the Actuarial Section of the 2019 CAFR published on the KRS website.*

## 2019 ACTUARIAL VALUATION RESULTS

Each year the funding levels of the KRS Pension and Insurance plans are determined by the annual actuarial valuation based on assumptions set by the KRS Board for the fiscal year ending June 30. The fiscal year 2019 valuation results include new assumptions that were adopted by the Board in April 2019. In summary, total pension unfunded liabilities increased by $2.15 billion which was caused by lower payroll, changes in actuarial assumptions, and investment returns that fell short of the assumed rate of return. Total insurance unfunded liabilities also increased by $0.53 billion due to higher than expected Medicare insurance premiums and actuarial assumption changes. Total KRS unfunded liabilities increased by $2.68 billion. KRS is in year 24 of a 30 year amortization period.

## PENSION PLANS

The actuarial unfunded liability for the Pension plans was $25.75 billion, an increase over fiscal year 2018. The funded ratio for all plans, except KERS Non-Hazardous, decreased since the prior year. These decreases are mainly due to the updated actuarial assumptions adopted by the Board. Additionally, the full actuarially determined contribution rates for both CERS funds were not paid in fiscal year 2019 due to the contribution phase-in provisions from HB 362 passed during the 2018 legislative session, which further decreased the funded ratio for these funds.

## INSURANCE PLANS

The Insurance Plans' unfunded actuarial liability as of June 30, 2019, was $3.18 billion compared to $2.65 billion in the last fiscal year. The decreases for KERS Hazardous and CERS Non-Hazardous funds are mainly due to the updated actuarial assumptions adopted by the Board. The updated actuarial assumptions decreased the funded ratio for the other funds as well; however, other demographic experience offset this decrease so that the funded ratio stayed relatively stable for the KERS Non-Hazardous, CERS Hazardous, and SPRS funds. Total KRS Insurance funded ratio was 63.5%.



| | PENSION - FUNDED RATIOS | | | | 2019 Funding Status ($ in Billions) | INSURANCE - FUNDED RATIOS | | | |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | 2019 UNFUNDED LIABILITY = $28.9 Billion | | | | |
| $7.31 | $2.87 | $14.26 | $0.55 | $0.76 | **2019** | $1.04 | $0.42 | $1.74 | $(0.10) | $0.08 |
| | | | | | 2018 UNFUNDED LIABILITY = $26.3 Billion | | | | |
| $6.24 | $2.47 | $13.66 | $0.51 | $0.72 | **2018** | $0.72 | $0.43 | $1.55 | $(0.12) | $0.07 |

Pension funded ratios: CERS NON-HAZ 49.1%, CERS HAZ 45.3%, KERS NON-HAZ 13.4%, KERS HAZ 54.8%, SPRS 27.0%

Insurance funded ratios: CERS NON-HAZ 70.7%, CERS HAZ 75.8%, KERS NON-HAZ 36.3%, KERS HAZ 123.1%, SPRS 71.3%

16

# INVESTMENTS REPORT

## Fair Values By Plan - Pension as of June 30, 2019 ($ in Millions)

| Assets | CERS Non-Hazardous | | CERS Hazardous | | KERS Non-Hazardous | | KERS Hazardous | | SPRS | | TOTAL KRS | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Fair Value (FV) | % of Total FV | Fair Value (FV) | % of Total FV | Fair Value (FV) | % of Total FV | Fair Value (FV) | % of Total FV | Fair Value (FV) | % of Total FV | Fair Value (FV) | % of Total FV |
| U.S. Equity | $1,359 | 18.90% | $454 | 18.79% | $341 | 15.65% | $128 | 18.72% | $44 | 15.68% | $2,326 | 18.25% |
| Non-U.S. Equity | 1,502 | 20.90% | 502 | 20.80% | 367 | 16.83% | 138 | 20.13% | 48 | 17.32% | 2,557 | 20.06% |
| Core Fixed Income | 1,222 | 17.00% | 402 | 16.65% | 483 | 22.18% | 114 | 16.59% | 66 | 23.56% | 2,287 | 17.94% |
| Specialty Credit | 1,169 | 16.26% | 387 | 16.02% | 300 | 13.77% | 110 | 16.08% | 43 | 15.56% | 2,009 | 15.76% |
| Opportunistic | 67 | 0.94% | 22 | 0.92% | 20 | 0.90% | 6 | 0.89% | 3 | 0.87% | 118 | 0.92% |
| Real Return | 639 | 8.89% | 218 | 9.02% | 168 | 7.71% | 58 | 8.44% | 23 | 8.22% | 1,106 | 8.68% |
| Private Equity | 670 | 9.32% | 229 | 9.49% | 201 | 9.24% | 62 | 9.00% | 19 | 6.86% | 1,181 | 9.27% |
| Real Estate | 271 | 3.76% | 87 | 3.59% | 78 | 3.62% | 25 | 3.74% | 11 | 3.80% | 472 | 3.71% |
| Absolute Return | 125 | 1.73% | 39 | 1.63% | 40 | 1.84% | 11 | 1.52% | 4 | 1.51% | 219 | 1.71% |
| Cash | 165 | 2.30% | 74 | 3.09% | 180 | 8.26% | 33 | 4.89% | 19 | 6.62% | 471 | 3.70% |
| TOTAL PORTFOLIO | $7,189 | | $2,414 | | $2,178 | | $685 | | $280 | | $12,746 | |

## Fair Values By Plan - Insurance as of June 30, 2019 ($ in Millions)

| Assets | CERS Non-Hazardous | | CERS Hazardous | | KERS Non-Hazardous | | KERS Hazardous | | SPRS | | TOTAL KRS | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Fair Value (FV) | % of Total FV | Fair Value (FV) | % of Total FV | Fair Value (FV) | % of Total FV | Fair Value (FV) | % of Total FV | Fair Value (FV) | % of Total FV | Fair Value (FV) | % of Total FV |
| U.S. Equity | $466 | 18.84% | $249 | 18.88% | $185 | 19.93% | $99 | 18.82% | $37 | 18.74% | $1,036 | 19.02% |
| Non-U.S. Equity | 498 | 20.17% | 269 | 20.36% | 199 | 21.57% | 111 | 21.04% | 40 | 19.80% | 1,117 | 20.53% |
| Core Fixed Income | 384 | 15.54% | 206 | 15.59% | 138 | 14.86% | 86 | 16.27% | 30 | 15.41% | 844 | 15.50% |
| Specialty Credit | 366 | 14.79% | 194 | 14.71% | 155 | 16.77% | 84 | 15.94% | 30 | 14.96% | 829 | 15.22% |
| Opportunistic | 27 | 1.10% | 15 | 1.12% | 10 | 1.05% | 6 | 1.15% | 2 | 1.12% | 60 | 1.10% |
| Real Return | 216 | 8.75% | 112 | 8.52% | 76 | 8.19% | 45 | 8.54% | 16 | 7.85% | 465 | 8.55% |
| Private Equity | 284 | 11.46% | 160 | 12.10% | 48 | 5.16% | 52 | 10.02% | 24 | 12.13% | 568 | 10.43% |
| Real Estate | 90 | 3.66% | 50 | 3.75% | 28 | 3.07% | 21 | 3.95% | 8 | 4.00% | 197 | 3.62% |
| Absolute Return | 40 | 1.62% | 22 | 1.70% | 14 | 1.53% | 9 | 1.78% | 4 | 1.77% | 89 | 1.65% |
| Cash | 101 | 4.07% | 43 | 3.27% | 73 | 7.87% | 13 | 2.49% | 8 | 4.22% | 238 | 4.38% |
| TOTAL PORTFOLIO | $2,472 | | $1,320 | | $926 | | $526 | | $199 | | $5,443 | |

15

## IV.    THE NAMED PLAINTIFFS

78.    Tia Taylor became a member of KRS in March 2019 and is a member of the KERS-NH plan, entitled to Tier 3 benefits.  She is in the Tier 3 KRS Hybrid Cash Balance Plan which is not a defined benefit plan.  She has an individual retirement account within the KRS plans. She contributed her own funds to KRS.  Her pension and insurance benefits are not protected by any inviolable statute, and her pension benefit depends upon KRS's stewardship and investment performance, which impact the end value of her individual pension account.  Taylor's "upside sharing" pension benefits have been diminished due to the decreased returns and increased expenses to KRS post January 1, 2014 as a result of the misconduct complained of, and will continue to be diminished going forward.  This has and will cost her thousands of dollars.

79.    Ashley Hall-Nagy became a member of KRS in November 2016 and is a member of the KERS plans, entitled to Tier 3 benefits.  She is in the Tier 3 KRS Hybrid Cash Balance Plan which is not a defined benefit plan.  She has an individual retirement account within the KRS plans.  She contributed her own funds to KRS.  Her pension and insurance benefits are not protected by any inviolable statute and her pension benefit depends upon KRS's stewardship and investment performance, as that impacts the end value of her individual pension account.  Nagy's "upside sharing" pension benefits have been diminished due to the decreased returns and increased expenses to KRS post January 1, 2014 as a result of the misconduct complained of, and will continue to be diminished going forward.  This has and will cost her thousands of dollars.

80.    Bobby Estes became a member of KRS in August 2015 and is a member of the CERS-H plan, entitled to Tier 3 benefits.  He is in the Tier 3 KRS Hybrid Cash Balance Plan which is not a defined benefit plan.  He has an individual retirement

account within the KRS plans.  He contributed his own funds to KRS.  His pension and insurance benefits are not protected by any inviolable statute and his pension benefit depends upon KRS's investment performance, as that impacts the end value of his individual pension account.  Estes's "upside sharing" pension benefits have been diminished due to the decreased returns and increased expenses to KRS post January 1, 2014, as a result of the misconduct complained of, and will continue to be diminished going forward.  This has and will cost him thousands of dollars.

81.    All of the named Plaintiffs are residents and citizens of Kentucky.

## V.    THE KRS PENSION AND INSURANCE PLANS AND THE TIER 1, TIER 2 AND TIER 3 BENEFITS

82.    KRS is a component unit of the Commonwealth of Kentucky, created and organized under Kentucky Law pursuant to the 1956 Pension Law to contain Trust Funds held for several pension and health insurance plans for Kentucky workers:

> **KERS (Kentucky Employee Retirement System**): this system consists of two plans — **Non-hazardous and Hazardous**. Each plan is a cost-sharing multiple-employer benefit pension plan that covers all regular full-time members employed in positions of any state department, board, or agency directed by Executive Order to participate in KRS.

> **CERS (County Employee Retirement System)**: This consists of two plans — **Non-hazardous and Hazardous.** Each plan is cost sharing multiple-employer benefit pension plan that covers all regular full-time members employed in non-hazardous positions of each participating county, city and school board, and any additional eligible local agencies electing to participate in CERS.

> **SRS (State Police Retirement System**:  This system is a single-employer pension plan that covers all full-time state troopers employed in positions by the Kentucky State Police.

83.    KRS provides three Tiers of Pensions and Insurance Plans for each of the funds it administers.  The General Assembly passed House Bill 1 during the 2008 special

51

legislative session.  House Bill 1 established different criteria for retirement eligibility, the final compensation calculation, and benefit factors for these members, *i.e.*, Tier 1 members.  Tier 2 members have a participation date of September 1, 2008 through December 31, 2013.  During the 2013 legislative session, Senate Bill 2 was enacted, creating Tier 3 benefits for members with a participation date on or after January 1, 2014.  ***The only benefits promised by KRS to its member plan beneficiaries that are protected by so-called*** "***inviolable contracts***" ***are the core*** "***monthly pension benefit***" ***of members entitled to Tier 1 and Tier 2 benefits.  All others benefits of all plan participants are specifically***, ***explicitly denied any such protection by statute and are subject to diminishment or elimination by KRS and/or the Legislature as they see fit***.

84.     According to KRS's publications — from which the following graphics are taken — this is how KRS's pension and insurance plans/trusts work. Below is a comparison of the Tier 1, Tier 2 and Tier 3 plans as described by KRS:

[The remainder of this page is deliberately left blank.]

# What is the Tier 1 Plan?

The Tier 1 plan is one of three tiers within our defined benefit pension plan. This benefit tier is for members who began participation prior to September 1, 2008. Tier 1 is a defined benefit plan because it uses a specific formula to determine benefits and the assets of the plan remain in a single investment pool.

### Who is eligible?

All regular full-time employees who began participation with KRS prior to September 1, 2008 contribute to the Tier 1 plan. Your participation date is when you began paying contributions and earning service credit with KRS. This date may be different from the date you were hired.

Your participation in the plan is mandatory unless you are a non-participating employee. Employment classifications that are non-participating include part-time, seasonal, temporary, probationary (CERS only), interim, emergency, and independent contractors.

### How does it work?

Benefits are funded through three sources:

1. Employee contributions deducted from a member's creditable compensation.
2. Employer contributions paid by each participating agency.
3. Return on investments.

When a member is eligible to retire, the benefit is calculated based on a formula:

| Final Compensation | | Benefit Factor | | Years of Service |
|:---:|:---:|:---:|:---:|:---:|
| $ | x | % | x | 📅 |

# My Retirement Account

### How much do I contribute?

Members of the Tier 1 plan contribute a set percentage of their salary each month to their own account as required by Kentucky law:



5% of creditable compensation — Non-Hazardous Members

8% of creditable compensation — Hazardous Members

### How much does my employer contribute?

The employer contribution rate is set annually by the KRS Board of Trustees based on an actuarial valuation. The employer contributes a set percentage of the member's salary. KERS and SPRS rates are subject to approval by the General Assembly through the adoption of the biennial Executive Branch Budget.

### How are the contributions invested?

The KRS Board of Trustees and its investment professionals are responsible for investment decisions.

# Good to Know

### Are my benefits protected?

The laws governing each retirement system establish an inviolable contract with the Commonwealth, which means that most retirement benefits provided by law at the time the member begins participation cannot be changed.

In 2003, the law changed generally, removing retiree health insurance benefits from the inviolable contract for members who began participating July 1, 2003 and after. This means that the General Assembly could change retiree health insurance benefits for members participating on or after July 1, 2003 if fiscal circumstances call for it.

## What is the Tier 2 Plan?

The Tier 2 plan is one of three tiers within our defined benefit pension plan. This benefit tier is for members who began participation on or after September 1, 2008 through December 31, 2013. Tier 2 is a defined benefit plan because it uses a specific formula to determine benefits and the assets of the plan remain in a single investment pool.

### Who is eligible?

All regular full-time employees with a participation date on or after September 1, 2008 through December 31, 2013 contribute to the Tier 2 plan. Your participation date is when you began paying contributions and earning service credit with a state-administered retirement plan. This date may be different from the date you were hired.

### How does it work?

Benefits are funded through three sources:

1. Employee contributions deducted from a member's creditable compensation.
2. Employer contributions paid by each participating agency.
3. Return on investments.

 Kentucky law defines creditable compensation. For more info, refer to our Summary Plan Description at https://kyret.ky.gov.

When a member is eligible to retire, the benefit is calculated based on a formula:

| Final Compensation | | Benefit Factor | | Years of Service |
|:---:|:---:|:---:|:---:|:---:|
|  | X |  | X |  |

## My Retirement Account

### How much do I contribute?

Members of the Tier 2 plan contribute a set percentage of their salary each month to their own account as required by Kentucky law. Tier 2 members also contribute an additional 1% to the health insurance fund. This 1% is not credited to the individual account and is not refundable.



### How are the contributions invested?

The KRS Board of Trustees and its investment professionals are responsible for investment decisions. The Board has established clearly defined investment policies, objectives and strategies for both the pension and insurance portfolios. The Board's investment policies and detailed monthly investment performance reports are published on our website at https://kyret.ky.gov.

## Good to Know

### Are my benefits protected?

The laws governing each retirement system establish an inviolable contract with the Commonwealth, which means that most retirement benefits provided by law at the time the member begins participation cannot be changed.

Health insurance benefits are not covered under the inviolable contract for Tier 2 members. This means that the General Assembly could change Tier 2 retiree health insurance benefits.



## Hybrid Cash Balance Plan Guide

*for members who began participating January 1, 2014 and after*

### Tier 3

KRS currently administers three different pension benefit tiers within our defined benefit plans. The Hybrid Cash Balance plan was established as part of Senate Bill 2, which was enacted by the Kentucky General Assembly during its 2013 Regular Session. We refer to this as Tier 3 Benefits.

# What is the Hybrid Cash Balance Plan?

The Hybrid Cash Balance Plan is for members who began participation on or after January 1, 2014. A Cash Balance Plan is known as a hybrid plan because it has characteristics of both a defined benefit plan and a defined contribution plan. A Cash Balance Plan resembles a defined contribution plan because it determines the value of benefits for each participant based on individual accounts. However, the assets of the plan remain in a single investment pool like a traditional defined benefit plan. A Cash Balance Plan resembles a defined benefit plan since it uses a specific formula to determine benefits.

**Who is eligible?**
All regular full-time employees who began participation with KRS on or after January 1, 2014 contribute to the Cash Balance Plan. Your participation in the plan is mandatory unless you are a non-participating employee. Employment classifications that are non-participating include part-time, seasonal, temporary, probationary (CERS only), interim, emergency, and independent contractors.

**How does it work?**
Members and employers contribute a specified amount into the member's account. The account earns a guaranteed amount of interest at the end of each fiscal year. If the member has participated in the plan during the fiscal year, there may be an additional interest credit added to the member's account depending on KRS' investment returns. All interest is paid on the preceding year's balance so there is no interest paid in the member's first year.

When a member is eligible to retire, the benefit is calculated based on the member's accumulated account balance.

## BASE INTEREST

Your account earns a base of 4% interest annually on both the member contributions and the Employer Pay Credit balance. Interest is credited to your account each June 30, based on your account balance from the preceding June 30. New members do not see interest credited in their first year since there is no prior year balance.

Over time, the value of your account can increase a great deal. Visit myretirement.ky.gov for more information. For more information about how to register for your online account, see page 18.

### What is Creditable Compensation?

Creditable compensation is used to calculate retirement benefits and includes all salary, wages, tips, and fees as a result of services performed for the employer, including time when you are on paid leave. It does not include payments for compensatory time paid to you.

## UPSIDE SHARING 

Upside Sharing Interest is the additional interest credit that may be applied to a Tier 3 account.

Upside Sharing Interest is not guaranteed. The following conditions must be met before Upside Sharing Interest is credited to a member's account:

» The system's geometric average net investment return for the last five years must exceed 4%.

» The member must have been active and contributing in the fiscal year.

If a system's geometric average net investment return for the previous five years exceeds 4%, then the member's account will be credited with 75% of the amount of the return over 4%. The credit will be applied to the account balance as of June 30 of the previous year.

The following example illustrates how Upside Sharing Interest works. Remember, Upside Sharing Interest is an additional interest credit. Member accounts automatically earn 4% interest annually. In this example, the additional 2.63% Upside Sharing Interest credit means the total interest paid would be 6.63%.

The geometric average net investment return is calculated on an individual system basis (i.e. KERS, CERS and SPRS). It is possible that the Upside Sharing Interest percentage will differ from system to system. It is also possible that one system may get an Upside Sharing percentage, and another system would not.

| | | |
|---|---|---|
| Geometric average net return | 7.5% | |
| Base interest | - 4% | |
| | 3.5% | |
| | X 75% | |
| | 2.63% | Upside Sharing Interest Credit |
| | + 4% | Base Interest |
| Total Interest Paid | 6.63% | |

## UPSIDE SHARING EXAMPLES

The examples below illustrate the range of return a Tier 3 member may expect to see in their accumulated account balance and final monthly benefit. Over the course of a career, members are likely to have a mixed return. These examples are intended only to demonstrate the possible range.



| Service at Retirement | BASE INTEREST 4% *without Upside Sharing Interest* This demonstrates an account where no Upside Sharing Interest was applied, this is the minimum. | | VS | BASE INTEREST 4% *+ 2.63% Upside Sharing Interest* This demonstrates the account balance growth possible with a continuously healthy market return. | |
|---|---|---|---|---|---|
| | Accumulated Account Balance | Monthly Life Annuity Amount | | Accumulated Account Balance | Monthly Life Annuity Amount |
| **NONHAZARDOUS:** *This example is a nonhazardous member retiring at **age 65**. You can see how the monthly benefit increases when the member works longer.* | | | | | |
| 20 yrs | $93,800.95 | $610.04 | | $123,696.19 | $804.46 |
| 25 years | $131,184.61 | $853.16 | | $188,827.41 | $1228.04 |
| 30 years | $176,667.55 | $1148.96 | | $278,211.51 | $1809.35 |
| **HAZARDOUS:** *This example is a hazardous member who began participation at **age 25.** You can see how the monthly benefit increases when the member works longer.* | | | | | |
| 20 yrs | $161,546.08 | $818.97 | | $213,502.50 | $1,082.36 |
| 25 years | $225,929.05 | $1,204.90 | | $325,202.77 | $1,734.33 |
| 30 years | $304,260.79 | $1,727.11 | | $479,142.05 | $2719.81 |

## GOOD TO KNOW

**Are my benefits protected?**
Accrued benefits are protected but the General Assembly could change future benefits if required by fiscal circumstances.

57

## KRS Benefit Tier Comparison

| | | Tier 1 — Participation before 9/1/2008 — Defined Benefit | Tier 2 — 9/1/2008 through 12/31/2013 — Defined Benefit | Tier 3 — Participation on or after 1/1/2014 — Cash Balance Plan |
|---|---|---|---|---|
| **Employee Contribution** | Non-Haz | 5% total member contribution | 6% total member contribution: 5% to defined benefit pension 1% Health Insurance Contribution (HIC) | 6% total member contribution: 5% to defined benefit pension 1% Health Insurance Contribution (HIC) |
| | Haz | 8% total member contribution | 9% total member contribution: 8% to defined benefit pension 1% Health Insurance Contribution (HIC) | 9% total member contribution: 8% to defined benefit pension 1% Health Insurance Contribution (HIC) |
| **Retirement Formula** | Haz/Non-Haz | Final Compensation x Benefit Factor x Years of service** **Early Retirement Factors are applicable if requirements for an Unreduced Benefit are not met. | Final Compensation x Benefit Factor x Years of service** **Early Retirement Factors are applicable if requirements for an Unreduced Benefit are not met. | Accumulated Account Balance / Actuarial Factor Accumulated Account Balance= Employee Contributions + Employer Pay Credits + Base Interest + Upside Sharing (if applicable) |

| | | Tier 1 — Participation before 9/1/2008 — Defined Benefit | Tier 2 — 9/1/2008 through 12/31/2013 — Defined Benefit | Tier 3 — Participation on or after 1/1/2014 — Cash Balance Plan |
|---|---|---|---|---|
| **Cost of Living Adjustment (COLA)** | Haz/Non-Haz | No COLA unless authorized by the Legislature with specific criteria. This impacts all retirees regardless of Tier. | No COLA unless authorized by the Legislature with specific criteria. This impacts all retirees regardless of Tier. | No COLA unless authorized by the Legislature with specific criteria. This impacts all retirees regardless of Tier. |

| | | | | |
|---|---|---|---|---|
| **Inviolable Contract** | Haz/Non-Haz | "Inviolable Contract" language covers all benefits except COLA and retiree health benefits after 7/2003 | "Inviolable Contract" language covers all benefits except COLA and retiree health benefits after 7/2003 | Accrued benefits would remain protected but the Legislature could change prospective benefits if fiscal circumstances call for it. |

Revised: 2/2019

85.     Not all of the benefits promised and provided by the KRS Plans are protected by a guarantee of the Commonwealth — so-called "inviolable contracts." Even though the KRS plans are funded in part from the members' personal "contributions" (mandatory deductions from their paychecks), the "inviolable contract" protection exists for just a few of the benefits, *i.e.*, the monthly pension benefits of Tier 1 and Tier 2 members. ***None of the other benefits provided by the Plans/Funds are so protected***, ***including all Tier 3 benefits.***

[The remainder of this page is deliberately left blank.]



# Kentucky Retirement Systems
## Inviolable Contract Overview

**NOT COVERED BY INVIOLABLE CONTRACT:**

- Pension benefits on or after January 1, 2014
- Health benefits on or after July 1, 2003
- Cost of Living Adjustments (COLAs)
- Employer contribution rates

**Inviolable Contract Exception: Cost of Living Adjustments**
KRS 61.691(2)(f)  Increase of Benefits

The benefits of this subsection as provided on July 1, 2009, and thereafter shall not be considered as benefits protected by the inviolable contract provisions of KRS 16.652, 61.692, and 78.852. The General Assembly reserves the right to suspend or reduce the benefits conferred in this subsection if, in its judgment, the welfare of the Commonwealth so demands.

**Inviolable Contract Exception: Health Insurance Benefits**
KRS 61.702(8)(e)

The benefits of this subsection provided to a member whose participation begins on or after July 1, 2003, shall not be considered as benefits protected by the inviolable contract provisions of KRS 61.692, 16.652, and 78.852. The General Assembly reserves the right to suspend or reduce the benefits conferred in this subsection if in its judgment the welfare of the Commonwealth so demands. (Made applicable to SPRS by virtue of KRS 16.645(22) and to CERS by virtue of KRS 78.545(35).)

**Inviolable Contract Exception: Pension Benefits on 1/1/2014**
KRS 61.692 (2)(a) (KERS)

For members who begin participating in the Kentucky Employees Retirement System on or after January 1, 2014, the General Assembly reserves the right to amend, suspend, or reduce the benefits and rights provided under KRS 61.510 to 61.705 if, in its judgment, the welfare of the Commonwealth so demands, except that the amount of benefits the member has accrued at the time of amendment, suspension, or reduction shall not be affected.

86.     According to KRS this is the current composition of the KRS pension and insurance plans membership and the average pensions being received:

# SYSTEMS AND BENEFIT TIERS

## BENEFIT TIERS

Each plan provides pension and insurance benefits based on the member's participation date.

 Participation Date Prior to 9/1/2008

 Participation Date 9/1/2008 – 12/31/2013

 Participation Date of 1/1/14 and after



### COUNTY EMPLOYEES RETIREMENT SYSTEM

CERS participating agencies include local governments (county and city), school boards, and eligible local agencies. The Non-Hazardous and Hazardous plans combined cover 248,969 members.

**CERS Non-Hazardous**

|        | Active | Inactive | Retired | Total   |
|--------|--------|----------|---------|---------|
| Tier 1 | 34,428 | 51,356   | 58,497  | 144,281 |
| Tier 2 | 15,352 | 17,123   | 435     | 32,910  |
| Tier 3 | 34,852 | 16,821   | 1       | 51,674  |
| Total  | 84,632 | 85,300   | 58,933  | 228,865 |

**CERS Hazardous**

|        | Active | Inactive | Retired | Total  |
|--------|--------|----------|---------|--------|
| Tier 1 | 4,441  | 1,471    | 7,985   | 13,897 |
| Tier 2 | 1,967  | 548      | 12      | 2,527  |
| Tier 3 | 2,994  | 683      | 3       | 3,680  |
| Total  | 9,402  | 2,702    | 8,000   | 20,104 |



### KENTUCKY EMPLOYEES RETIREMENT SYSTEM

KERS participating agencies include state departments, boards, and employers directed by Executive Order of the Governor to participate in KERS, which covers 135,046 members.

**KERS Non-Hazardous**

|        | Active | Inactive | Retired | Total   |
|--------|--------|----------|---------|---------|
| Tier 1 | 17,086 | 32,034   | 42,736  | 91,856  |
| Tier 2 | 6,207  | 8,527    | 137     | 14,871  |
| Tier 3 | 10,139 | 6,160    | 1       | 16,300  |
| Total  | 33,432 | 46,721   | 42,874  | 123,027 |

**KERS Hazardous**

|        | Active | Inactive | Retired | Total  |
|--------|--------|----------|---------|--------|
| Tier 1 | 1,264  | 1,833    | 3,121   | 6,218  |
| Tier 2 | 752    | 1,267    | 25      | 2,044  |
| Tier 3 | 1,763  | 1,994    | 0       | 3,757  |
| Total  | 3,779  | 5,094    | 3,146   | 12,019 |



### STATE POLICE RETIREMENT SYSTEM

SPRS covers all full-time Kentucky State Police troopers.

**SPRS**

|        | Active | Inactive | Retired | Total |
|--------|--------|----------|---------|-------|
| Tier 1 | 460    | 173      | 1,483   | 2,116 |
| Tier 2 | 197    | 64       | 1       | 262   |
| Tier 3 | 242    | 76       | 0       | 318   |
| Total  | 899    | 313      | 1,484   | 2,696 |

### KRS TOTALS

The KRS totals below reflect all systems combined.

**KRS TOTALS - ALL SYSTEMS**

|        | Active  | Inactive | Retired | Total   |
|--------|---------|----------|---------|---------|
| Tier 1 | 57,679  | 86,867   | 113,822 | 258,368 |
| Tier 2 | 24,475  | 27,529   | 610     | 52,614  |
| Tier 3 | 49,990  | 25,734   | 5       | 75,729  |
| Total  | 132,144 | 140,130  | 114,437 | 386,711 |

## Average Monthly Benefit by Length of Service in KERS As of June 30, 2019 (in Whole $)

| | KERS Non-Hazardous | | KERS Hazardous | |
|---|---|---|---|---|
| Service Credit Range | Number of Accounts | Average Monthly Benefit | Number of Accounts | Average Monthly Benefit |
| Under 5 years | 6,211 | $173.91 | 841 | $202.44 |
| 5 or more but less than 10 | 6,084 | 433.48 | 853 | 574.94 |
| 10 or more but less than 15 | 5,594 | 719.91 | 782 | 1,030.75 |
| 15 or more but less than 20 | 4,779 | 1,060.91 | 698 | 1,539.20 |
| 20 or more but less than 25 | 5,102 | 1,407.91 | 1,117 | 2,025.22 |
| 25 or more but less than 30 | 12,854 | 2,296.57 | 207 | 2,859.94 |
| 30 or more but less than 35 | 6,712 | 3,241.38 | 59 | 3,688.32 |
| 35 or more | 2,550 | 4,565.84 | 6 | 4,230.57 |
| **Total** | **49,886** | **$1,662.13** | **4,563** | **$1,235.65** |

## Average Monthly Benefit by Length of Service in CERS As of June 30, 2019 (in Whole $)

| | CERS Non-Hazardous | | CERS Hazardous | |
|---|---|---|---|---|
| Service Credit Range | Number of Accounts | Average Monthly Benefit | Number of Accounts | Average Monthly Benefit |
| Under 5 years | 9,221 | $163.47 | 1,156 | $392.85 |
| 5 or more but less than 10 | 11,313 | 339.67 | 1,117 | 701.83 |
| 10 or more but less than 15 | 11,327 | 541.91 | 1,029 | 1,253.77 |
| 15 or more but less than 20 | 9,392 | 806.55 | 1,021 | 1,796.36 |
| 20 or more but less than 25 | 10,776 | 1,008.31 | 3,844 | 2,554.80 |
| 25 or more but less than 30 | 12,344 | 1,917.41 | 1,458 | 3,550.65 |
| 30 or more but less than 35 | 2,981 | 2,692.07 | 420 | 4,277.51 |
| 35 or more | 792 | 3,730.67 | 88 | 5,290.93 |
| **Total** | **68,146** | **$947.63** | **10,133** | **$2,133.82** |

## Average Monthly Benefit by Length of Service in SPRS As of June 30, 2019 (in Whole $)

| Service Credit Range | Number of Accounts | Average Monthly Benefit |
|---|---|---|
| Under 5 years | 137 | $547.95 |
| 5 or more but less than 10 | 57 | 937.32 |
| 10 or more but less than 15 | 63 | 1,410.22 |
| 15 or more but less than 20 | 114 | 2,081.51 |
| 20 or more but less than 25 | 506 | 2,691.85 |
| 25 or more but less than 30 | 491 | 3,670.44 |
| 30 or more but less than 35 | 238 | 4,753.84 |
| 35 or more | 60 | 6,167.45 |
| **Total** | **1,666** | **$3,073.44** |

65

## VI.  ALL OF THE NAMED TIER 3 PLAINTIFFS WHO ARE IN KRS PENSION AND INSURANCE TRUSTS/PLANS HAVE STANDING TO SUE

### A.  KRS Members' Personal Contributions to Help Fund the KRS Pension and Health Trusts Have Been Lost

87.   Each of the named Plaintiffs has suffered harm — injury in fact — traceable to, indeed ***caused by***, the T/Os' and Defendants' alleged misconduct, which injury in fact is redressable in this lawsuit via the relief sought for KRS and as prayed for herein.  The alleged misconduct damaged KRS and impaired the financial condition of the KRS pension and insurance plans/trusts, greatly increasing the likelihood that those pension and insurance plans will fail, resulting in the loss of all benefits and causing the amount of the Upside Sharing Interest credited to the accounts of Tier 3 members to be materially diminished.  It is virtually certain KRS will have to curtail or delay unprotected benefits in the future — benefits that are not protected by any inviolable contract statutory provision, *i.e.*, all Tier 3 benefits — pension and health.  Because of the interconnected structure of the KRS pension and insurance funds and trusts, the inevitable failure of the KERS and SPRS funds will cause the failure or substantial impairment of the other pension funds and trusts, and will result in serious adverse restructuring, benefit cuts or deferments — harm to all the Plans/Trusts.

88.   Each of the Named Plaintiffs (and all members of KRS Plans) are or were required to contribute varying percentages (5–9%) of their own money in the form of payroll deductions to help fund the respective pension ***and insurance plans*** in which they are participants.  These personal contributions are involuntary extractions because participation in the plans is mandatory for all covered state employees.

89.     For each of the individual Named Plaintiffs, these mandatory personal contributions have amounted to thousands of dollars.  In the aggregate for all KRS members/beneficiaries these individual contributions here amounted to several billion dollars.

90.     These KRS members' personal contributions are comingled with employer payments to the KRS funds and are invested with them according to KRS's investment strategy and decisions made by the Trustees, the advisors and investment/product vendors they work with.  Over the years, the KRS plan **members' *personal funds contributions have been ill-invested*, *diminished*, *lost and/or*** wasted including in unsuitable, reckless investments such as Black Box Hedge Funds and the excessive fees those Black Boxes carry.  For example, in fiscal 2014, 2015, 2016 and 2018, the KERS-NH plan was cash flow negative — deductions (primarily benefit payments to retirees and administrative expenses) were greater than the sum of all incomes (including member and employer contributions, general funding and investment income).  Thus, current employees who are contributing to the KERS-NH plan were paying for current retirees, and none of the current employees' contributions was put away for their own retirement.  But the monies contributed by ***all KRS members including the Tier 3 Plaintiffs and plan members*** belonged to Plaintiffs and other KRS members.  It was entrusted by them to the KRS Trustees and their advisors/assistors' fellow actors who mis-invested, lost or wasted those funds, causing injury-in-fact to the named Plaintiffs and other KRS plan members as laid out below.

**B.    The Insurance Benefits Provided as Part of KRS's Pension Plans Are Not Covered by Inviolable Contract Statutory Provisions**

91.    The insurance benefits — health and life insurance — of all 5 of the KRS

Plans covering all 390,000 members ***are not covered by the Kentucky inviolable***

***contract protections***.  KY. REV. STAT. §§ 61.692 (KERS), 78.853 (CERS); 16.652

(SPRS).  These health/life insurance benefits are subject to change, even elimination, by

the legislature if they determine circumstances require it.  These benefits can be

changed in the future depending on the economic condition, *i.e.*, financial performance

of the funds or any other reason.

92.    The statute creating the insurance benefits explicitly excluded inviolable

contract protection:

> Section 61.702 Group hospital and medical insurance and
> managed care plan coverage — Employee and employer
> contributions — Minimum service requirements
>
> *            *            *
>
> (8)(e) The benefits of this subsection provided to a member
> whose participation begins on or after July 1, 2003, ***shall***
> ***not be considered as benefits protected by the***
> ***inviolable contract provisions of KRS 61.692***, ***16.652***
> ***and 78.852*** ….

*See*, *e.g.*, KY. REV. STAT. § 61.560(1).  This amounts to thousands, even hundreds of

thousands, of dollars over a worker's career.

93.    The insurance trusts for the pension plans have suffered substantial

investment losses due to the defendants' alleged misconduct, including investments of

hundreds of millions in insurance trust fund monies in the reckless, risky, bad "Black

Box" hedge funds.  Hundreds of millions of dollars of Black Box and other hedge funds

were sold to, and placed in, each of the KRS insurance funds/trusts, damaging them by

yielding bad returns and charging excessive fees.  Today the five insurance trusts are

$3.18 billion underfunded.  The KERS-NH and SPRS insurance funds are impaired and are in clear and present danger.  For example, Tier 3 members have been required for many years to make additional mandatory "1% Health Insurance Contributions" in addition to their mandatory employee pension contributions.  However, these "health insurance contributions" have for a number of years been put into the pension trusts, not the insurance trusts, thus further weakening the insurance trusts.  In most, if not all, years covered by this Complaint, the monies raised via the "1% Health Insurance Contributions" have in fact been used to pay current pension benefits to KRS retirees and/or KRS administrative expenses.  Despite the fact that these contributions have been put into the pension plans, they are not credited to the members' individual accounts.  Moreover, these *de facto* pension contributions are not protected by the "Inviolable Contract" statutes.  ***All told, the loss or impairment of these benefits is not a theoretical threat — it is an actual imminent threat***.

### C.  KRS Pension Tier 3 Plan Members Are Not in a Defined Benefit Plan, None of Their Benefits Is Protected by Inviolable Contract Statutes and Their Current Benefits Have Been Diminished

93.  Kentucky Revised Statutes Section 61.692 states:

(2) (a) For members who begin participating in the Kentucky Employees Retirement System ***on or after January 1, 2014, the General Assembly reserves the right to amend, suspend, or reduce the benefits and rights provided under KRS 61.510 to 61.705 if, in its judgment, the welfare of the Commonwealth so demands, except that the amount of benefits the member has accrued at the time of amendment, suspension, or reduction shall not be affected***.

94.     The Tier 3 members are not in a defined benefit plan with a fixed and guaranteed future pension benefit like Tier 1 and Tier 2 members.  The Tier 3 Plan is a Hybrid Cash Balance Plan where the member's actual pension benefit depends on the *value* of the member's *individual account* when he/she retires.  Tier 3 members have *individual retirement accounts within KRS Funds and their retirement benefit is based on the value of their individual account* at the time they retire, the value of which depends on the investment performance of KRS over the years the Tier 3 member works for the Commonwealth.  The individual accounts, however, exist as accounting entries; the actual assets are part of the comingled whole of the KRS plans.  Thus, if a plan (such as the KERS-NH pension plan) were to be depleted, the assets backing the Tier 3 individual accounts would be gone.

95.     The investment funds of all Plan Members are comingled by each Fund, and investment decisions are made by the KRS Trustees, the same as other Plans.  But each Tier 3 member has his or her own individual pension account.  In return for paying a higher percentage of their pay into KRS and taking a lower assured benefit, via the 2013 legislation, Tier 3 Members were given a chance to obtain an "upside sharing," *i.e.*, they get 75% of any KRS investment returns over 4% per year, an amount calculated and credited to the Tier 3 members' individual accounts *each year*.  Because they are in a Hybrid Cash Balance Plan, the Tier 3 retiree's pension benefit is ultimately based on the value of his/her individual account at retirement, which is in turn affected by the stewardship and KRS retirement investment returns over the years the worker is employed.

96.     While the amount of the upside sharing returns to Tier 3 members have been modestly positive since 2014, Tier 3 benefit recipients have nevertheless been

injured in fact by the defendants' alleged misconduct.  The alleged wrongdoing *i.e.* the course of conduct was still raging on inside KRS well into 2016, and the adverse economic impact of that misconduct, the bad hedge fund investments, and their excessive fees ***continued well into 2018–20***.  For instance, in fiscal 2016 the BAAM, PAAMCO and PRISMA hedge funds lost, respectively, 1.19%, 7.64% and 8.01%.  Last year (2019) — the KERS hedge funds lost 0.54%.  On top of the losses were excessive fees.

97.     The poor hedge fund returns, resulting from the wrongful conduct complained of and caused in part by the excessive and wasteful Black Box fees, were a drag on KRS returns for each 5-year period ended from 6/30/2015 through 6/30/2019, and thus diminished the amount of "upside sharing interest" the Tier 3 beneficiaries received.  Moreover, the investment constraints under which the KERS-NH and SPRS pension funds labored, caused by the wrongful conduct complained of, further diminished the upside sharing interest for the Tier 3 participants in those plans.  Were it not for the defendants' misconduct and waste of plan assets, which have been ongoing well through 2018–20, the investment returns of KRS would have been higher, and the upside sharing of these Tier 3 beneficiaries would have been higher and their ultimate pension benefit greater.  ***This injury-in-fact has already occurred***.  The *minimum* "drag" for each of the five-year periods mentioned is:

| fye 6/30/15 | fye 6/30/16 | fye 6/30/17 | fye 6/30/18 | fye 6/30/19 |
|---|---|---|---|---|
| 3.56% | 3.89% | 3.54% | 2.97% | 1.05% |

71

## VII.   THE DEFENDANTS AND OTHER IMPORTANT ACTORS

### A.   Nominal Defendant KRS

98.    Nominal Defendant KRS is a component unit of the Commonwealth of

Kentucky created and organized under Kentucky Law pursuant to the 1956 Pension Law

to contain Trust Funds held for several pension and health insurance plans (defined

herein previously as the "Pension Plans" or the "Plans") for Kentucky workers:

> **KERS (Kentucky Employee Retirement System**): this
> system consists of two plans — **Non-hazardous and
> Hazardous**. Each plan is a cost-sharing multiple-employer
> benefit pension plan that covers all regular full-time
> members employed in positions of any state department,
> board, or agency directed by Executive Order to participate
> in KRS.

> **CERS (County Employee Retirement System)**: This
> consists of two plans — **Non-hazardous and Hazardous.**
> Each plan is cost sharing multiple-employer benefit pensions
> plan that covers all regular full-time members employed in
> non-hazardous positions of each participating county, city
> and school board, and any additional eligible local agencies
> electing to participate in CERS.

> **SRS (State Police Retirement System)**:  This system is
> a single-employer pension plan that covers all full-time state
> troopers employed in positions by the Kentucky State Police.

99.    While KRS is designated a "defendant," that designation is a technical

formality, *i.e.*, it is a "nominal defendant."[16]  In reality, KRS is the plaintiff in this action,

---

[16] To the extent this action, for whatever reason, need be construed as a
derivative action on behalf of the KRS Trust Funds or KRS Plans, as opposed to KRS
itself, Plaintiffs ask it to be so construed.  The recovery from this action will not be
individual recoveries, but rather will be for the benefit of the Trust Funds of KRS, and
should, as Plaintiffs request, be under the supervision of this Court or a special fiduciary
appointed by this Court, who can assure that all monies are applied properly and in
accordance with the law.

which is on behalf of, not against, KRS and in order to obtain relief for it, not from it or

from any other unit or part of the government of the Commonwealth of Kentucky.

100. The "Joint Notice" filed by KRS and the Plaintiffs in this action on April 19,

2018 is incorporated by reference.  In part it states:

> KRS: 1) will not pursue the claims asserted by Named
> Plaintiffs; 2) would not have been in a position to pursue
> those claims had they been brought to KRS prior to the filing
> of the Complaint or the Amended Complaint; and 3) believes
> that it is in the best interests of KRS for Named Plaintiffs to
> continue their pursuit of these claims on a derivative basis
> on KRS's behalf.

> Based on the investigation by the independent special
> litigation committee ... the derivative claims made by Named
> Plaintiffs appear to have merit and should proceed ....  The
> amount in controversy in the Amended Complaint is
> substantial and, if recovered, could have a significant impact
> on the financial well-being of KRS and its member
> employees and retirees.  The nature of the claims, however,
> is not typical of litigation a corporate board or state agency
> could easily authorize at this stage or pursue.  Litigation of
> the nature and scope brought by Named Plaintiffs and their
> counsel is likely to be very expensive and time consuming.
> Despite the enhancements to, and added expertise of, the
> current Board of Trustees, it would be extremely onerous for
> KRS to maintain their claims by itself.  KRS believes that
> there would be significant risk to KRS should it undertake to
> pursue these, or similar, claims on its own, especially in the
> form of costs of litigation and devotion of limited KRS time
> and resources without the certainty of recovery.  The billions
> of dollars are sought on behalf of KRS and its member
> retirees and state employees, justify pursuit by Named
> Plaintiffs of their claims.  This is especially true when viewed
> in light of the fact that Named Plaintiffs have capable and
> experienced counsel who have themselves undertaken much
> of the time, risks, and costs associated with such litigation.

101. This is a derivative action on behalf of, and for the benefit of, KRS and its

Funds and Plans, brought by members of KRS Pension Plans for breach of trusteeship,

fiduciary, and statutory duties including aiding, abetting, and participating in concerted,

*i.e.*, a common course of conduct or a civil conspiracy.  The action is brought to redress injuries suffered and to be suffered by KRS and the Commonwealth as a result of the breaches of duties and misconduct by Defendants.

102.    KRS is named as a nominal defendant solely in a derivative capacity.  This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have. Plaintiffs are members of the KRS Plans, and were at the time of one or more of the breaches of duties complained of.  Plaintiffs will adequately and fairly represent the interest of KRS, its Funds and its members in enforcing and prosecuting their rights. Prosecution of this action, by private counsel independent of the current Board, is in the best interests of KRS and its members, beneficiaries and the Commonwealth of Kentucky.

103.    As detailed throughout this Complaint, as the members of KRS and as beneficiaries of the KRS pension and insurance Trust/Funds, Named Plaintiffs have standing to assert claims on behalf of KRS and/or its Funds, to affect a recovery that will accrue to the Funds, because trustees have improperly neglected, or are unable (without the resources) to bring an action, or actions, against the Defendants.  This remedy is available to Plaintiffs in their status as trust beneficiaries regardless of whether a demand on the trustees, or any other person, would have been futile.

104.    KRS and its Funds cannot help or protect themselves by bringing this litigation.  When this action was filed the legal status of the KRS Board — and its power to act — is itself in doubt, the subject of ongoing lawsuits and disputes between the Attorney General, certain KRS Trustees and the Governor, challenging the legality of the composition of the current Board of Directors of KRS.

105.    Plaintiffs have not made a demand on the current KRS Trustees to bring suit asserting the claims set forth herein because pre-suit demand on them is not required under KRS § 61.645(15) and trust law, since they have neglected to bring these facially meritorious claims.  However, if demand were required as in a "corporate law" derivative suit, it is excused, as it would be a futile act.

106.    David Harris, Neil Ramsey, Matt Lattis and John Farris were members of the Board of Directors of KRS (when this action was commenced) and whose appointment by the Governor created litigation that caused the legal status of the KRS Board to be put into dispute and doubt.  Susan Smith, Mary Helen Peter, Randy Stevens, Joseph Hardesty and David Rich were also members of the Board when this action was commenced.  While these individuals are not named as defendants at this time, they were each disqualified from acting objectively and independently and in good faith with respect to this action.  These individuals have (a) allowed Cook to sit on the Board and its Investment Committee even though he has a large economic interest in KKR/Prisma, was with Prisma when it designed and sold the Daniel Boone Fund to KRS; (b) allowed KRS to have a KKR/Prisma Executive inside KRS while being paid by KKR/Prisma; and (c) agreed to have KRS put $300 million more into the losing Prisma Daniel Boone Fund, while selling off its other hedge funds while hedge funds generally and KKR/Prisma specifically were suffering fund outflows, acting in a way that benefited KKR/Prisma and Cook's economic interests and not solely in the interests of KRS's Funds and their beneficiaries

107.    The legal status and power of the current KRS Board to act was in dispute when this action was originally filed.  There was an ongoing legal dispute in this Court placing the legal authority of the current Board of Directors to act for KRS in doubt.  The

Governor, by a June 2017 Executive Order, disbanded the 13 person KRS Board of Trustees and replaced it with a 17-person Board of Directors which included those 13 people and four new Board Members David Harris, Neil Ramsey, William S. Cook and Mark Lattis, who were also appointed to the Investment Committee. The Attorney General filed suit to block the Executive Order in July. There is also the litigation over the removal of the prior Chair of the KRS Board and the appointment of his successor. As of the date of original filing, these litigations are ongoing. Thus, the then current board of directors cannot undertake litigation like this with its own legal status in controversy/doubt and thus neither the current board nor any state officer bring a direct action on their/KRS's behalf under these circumstances.

108. Given that the KRS Board cannot bring the claims, the only way these facially meritorious and potentially valuable claims can be vigorously prosecuted and Defendants held accountable for their misconduct, is by this derivative action (i) prosecuted by experienced, competent, private lawyers on a contingent basis with litigation expenses advanced to assure a vigorous, independent, uncompromised prosecution of these claims; (ii) under this court's ongoing supervision where the resolution of this case is under the control of the court; and (iii) where any recovery by settlement or otherwise can be placed under the control of a "special fiduciary" appointed by the court to make sure any net recovery is used — as the Kentucky Pension Law commands — "solely in the interests of the members and beneficiaries" and for the "exclusive purpose of providing benefits to members and beneficiaries" so that any recovery on the taxpayer claims for the Commonwealth is used exclusively to reduce KRS funding deficit and thus benefit taxpayers.

109.     As detailed herein, all of the KRS trustees in office when this action was filed suffered from disabling conflicts of interest and divided loyalties which preclude them from exercising independent good faith judgment required to commence, oversee, and pursue this type of expensive and contentious litigation.  A majority of the Board of Trustees participated in, approved of, and/or permitted some or all of the wrongs alleged herein, concealed or disguised those wrongs, or recklessly and/or negligently disregarded them.

110.     They would and will not sue the Investment, Actuarial or Fiduciary Advisors because to do so necessarily would expose their own mistakes and misconduct and show that they are culpable co-actors and schemers, who were pursuing a common course of wrongful conduct with them.  Also, in a direct action by KRS, contractual defenses would or will be available to the defendants that are not available when the claims are pursued derivatively.  To think that under these circumstances Trustees would undertake to sue themselves and the third parties with whom they have worked in concert to deceive is unrealistic in the extreme.

111.     A legal claim for damages to a pension fund is an asset of the fund and properly protected and developed can be a very large asset.  Like any other significant asset of a pension fund the trustees have a fiduciary **duty to protect that asset and to maximize** its value.  Other public pension funds have recouped billions of dollars through lawsuits against persons and firms which damaged those funds in violation of law — including Wall Street financial houses.  Most notable are the suits arising out of the Enron, WorldCom and AOL Time Warner financial collapses by which public pension funds recovered billions of dollars through lawsuits prosecuted by counsel retained by the named Plaintiffs here.  Many public pension funds have recovered

77

millions more via suits against vendors of investment products and service providers whose negligence or other misconduct damaged them.  Yet, trustees here have never retained special outside counsel with expertise in such matters to evaluate the legal basis to pursue such claims and then if valid to pursue them.  However, they did recognize the merit of the claims asserted here, as did the Commonwealth's Attorney General in moving to intervene in this action based largely on the prior FAC and endorsed the prosecution of this case by the named Plaintiffs.

**B.   Individual Defendants Cook and Rudzik**

112.    For over seventeen years, Defendant William S. Cook — a longtime Louisville financial operator — was an executive with Aegon USA, a Louisville Kentucky-based company owned by Aegon International, where he specialized in selling hedge funds.  In 2004, Cook and fellow Aegon executive, Defendant Michael Rudzik, along with three former Goldman Sachs partners including Defendant Girish Reddy, helped form Prisma Capital Partners, L.P. ("Prisma") in New York City with Aegon as its biggest investor and biggest client.  Throughout the relevant period Cook and Rudzik on behalf of the firms they represented, co-owned, were partners in, or executives of, were assigned the role of gaining access to and capturing KRS's pension funds' huge pool of assets — the "honey pot" — and getting KRS as a customer for their investment products.  Cook was a managing director — top executive — of Prisma, had a large equity interest in Prisma, and was a member of the Prisma Investment Committee, which included the other four top officers of Prisma.  Prisma was acquired by KKR in 2012.  Cook, Rudzik and Reddy were among the small group of those who sold their Prisma equity to KKR in a multi-hundred million-dollar "earn out" transaction."  Cook became a managing director of KKR, and participated in the multi-million-dollar long-

term "earn out" payments, with large contingent payments in 2014–17 based on Prisma's continued growth in assets under management and profits.  Cook retired from KKR in March 2015, but retained his interests both in KKR and in the contingent multi-million-dollar performance payment due in 2017.

113.    Defendant Cook was at Prisma when it marketed and sold the $400+ million "Daniel Boone Fund" to KRS in 2010–11 and was a major participant in and driver of that transaction using his contacts — inside KRS and elsewhere — to help arrange the transaction in violation of KRS's own, as well as generally applicable conflict of interest policies and standards.  His friend and protégé, and former Aegon and Prisma employee, David Peden, was on the KRS investment staff and personally inserted himself into the sales process even though his job in Fixed Income had little if anything to do with Alternative Investments in general, or hedge funds in particular. Prisma was a very small hedge fund seller and likely would not have qualified to sell the initial $400+ million Black Box to KRS — especially in view of the fact that the total Management Fees to be paid to Prisma and its sub-managers were the highest of the three selected — without undue and improper influences behind the scenes.  Cook used his influence improperly and behind the scenes to further KKR's and Prisma's interests over those of KRS, including helping to arrange the $585 million in self-dealing Daniel Boone and other conflicted, KKR Prisma-recommended hedge fund transactions. Defendant William S. Cook was appointed to the KRS Board of Trustees on June 17, 2016, and remained on the Board until his term expired in the summer of 2019.  Cook is not sued for any conduct or action he took as a Trustee of KRS.  Cook resides in the Louisville area and is a citizen of Kentucky.

114. Defendant Michael Rudzik was at Aegon and Prisma with Cook and Peden, subsequently was a managing director/partner at KKR Prisma, and continues as a managing director of PAAMCO Prisma (the company formed upon the combination of Prisma and PAAMCO). Cook, Peden, Reddy, and others arranged for Rudzik to go inside KRS to promote and protect the interests of KKR and Prisma, while he remained on the KKR Prisma payroll. By undertaking this role — which Peden described as "effectively ... [an] extension of KRS staff" – Rudzik individually took on a fiduciary role. Rudzik's conduct violated KRS's conflict of interest policy and Kentucky law. He attended both the May 3, 2016 Investment Committee Meeting where the $300 million self-dealing Daniel Boone Fund conflicted upsizing transaction was approved, as well as other KRS Board, Investment Committee and staff meetings where the additional $285 million in KKR/Prisma-recommended investments were made. Rudzik, Reddy and Cook all had performance-based payouts from KKR based on the sale of Prisma to KKR that could potentially pay them millions of dollars in 2017. The gross amount of the contingent payment — owed to 15 people including Cook, Rudzik and Reddy — was estimated by KKR at nearly $50 million as reflected in December 15, 2015 SEC reports. Rudzik resides in the Lexington area and is a citizen of Kentucky.

## C. The KRS Trustees and Officers Who Were Important Actors

115. David Peden was an investment officer at KRS from early-2009 through January 2017, when he was dismissed. Peden went to work under Cook and Rudzik at Aegon while still a young man, fresh out of college. He then worked at Prisma with Cook and Rudzik for several years and was involved in the sales of the Black Boxes to KRS in 2011, as well as the $300 million self-dealing Daniel Boone transaction in 2016 and the $285 million in related conflicted KKR/Prisma hedge fund investments, and

helped to engineer all these transactions behind the scenes and in violation of KRS's

own, as well as generally applicable conflict of interest standards, and the Kentucky

Pension Law.  Peden was fired in January 2017.

116.   In 2016, Reuters reported KRS had put $300 million more into

KKR/Prisma's Daniel Boone Fund, making it by far the largest single investment of KRS

— almost $800 million — 5% of its assets:

> When Kentucky's public pension put U.S. buyout firm KKR
> & Co., L.P. in charge of its hedge fund investments ... its
> board expected the deal to save money and boost its return.
>
> *   *   *
>
> For the Wall Street firm, the deal paid off. KKR Prisma,
> increased by nearly half the amount of money it managed on
> Kentucky's behalf and its fee income rose by at least a
> quarter, according to KKR Prisma documents seen by
> Reuters ... Kentucky, so far, has come up short.
>
> *   *   *
>
> What [made] KKR Prisma ... the top manager of about $1.65
> billion in Kentucky's hedge fund investments, was an offer to
> let an executive work for two weeks per month out of
> Kentucky's Frankfort office overseeing the portfolio.
>
> *   *   *
>
> It was "like having a free staff member," David Peden, who
> was the pension fund's chief investment officer at the time ...
> He said KKR approached him after it learned he could not
> find a qualified candidate to run hedge fund investments ...
>
> *   *   *
>
> Peden who worked at Prisma a decade ago and before it was
> taken over said the relationship ... "made it ... unnecessary to
> do a competitive process" ... Girish Reddy, co-founder of
> KKR Prisma, described the deal as a strategic partnership ...

117.   Peden has admitted that KRS has had consistent difficulty in hiring

experienced and qualified staff and that because KRS was "***not fully staffed***" he

allowed ***Prisma employees*** to act as KRS staff, *i.e.*, "***essentially we use them as***

*an extension of our staff*," while they were still paid by Prisma in what a KKR Prisma employee described as a "partnership."  He thus permitted executives of KKR Prisma (Rudzik and others) with adverse legal interests to KRS and against whom KRS had valid and valuable legal claims to have access to its internal operations, data, information, strategies and discussions while causing KRS to agree to put $300 million more into KKR/Prisma's Daniel Boone Fund *and $285 million in KKR/Prisma-recommended hedge funds*.

118.     In 2016, while the current trustees were selling off $800 million in high-fee, poorly performing hedge funds, with Cook as the Chair of the Investment Committee, his former employee Peden as the CIO and a KKR/Prisma executive working at their side inside KRS, Trustees put $300 million more of KRS trust funds in the KKR/Prisma Black Box *i.e.*, the Daniel Boone Fund, on which the KRS Funds had recently suffered big losses. In fact, this Black Box was the worst performing of the Black Boxes. This "investment" was not done "solely" in the interest of the members and the beneficiaries but to help KKR/Prisma and its senior executives. During 2016, Hedge Fund sellers like KKR/Prisma suffered over $100 Billion in outflows/ redemptions because of bad returns and expensive fees.  The hedge fund industry was described as "an industry in crisis" at the time Cook, Peden and the trustees made this $300 million addition to the Daniel Boone Fund.  One 2016 headline makes the point: "*Hedge Funds Suffer Worst Outflows Since Financial Crisis Era*," BLOOMBERG, Apr. 20, 2016.  The image below shows some the redemptions sweeping the hedge fund industry in 2016:



119.    The so-called "partnership" with a KKR/Prisma executive inside KRS acting as a "manager" of and gatekeeper for KRS assets while still being paid by KKR/Prisma, while advising KRS what to do with its Black Box fund of hedge fund vehicles, and then directing hundreds of millions of KRS dollars to KKR/Prisma while KKR/Prisma's hedge business was facing redemptions and increasing outflows and loss of customers, violated the Kentucky Pension Law's conflict of interest prohibitions. Further, the ASA violated Kentucky law in several respects, including by purporting to allow KKR/Prisma, a fiduciary, to profit from self-dealing with KRS assets.  Named Plaintiffs are not presently aware whether Peden or others involved in the proposal, negotiation and/or operation of the "partnership" and/or the ASA violated other Kentucky laws, such as Chapter 521 of the Kentucky Revised Statutes, but it may be

reasonably inferred from the nature — and secrecy — of the ASA that improper pecuniary benefits may have been part of the package.

120.    Randy Overstreet, a retired highway patrolman, was a Trustee of KRS from 1995 through 2015.  He served as Chair from 1997 until 2011 when he was removed as Chair following the huge 2008–09 losses and the discovery of $12–15 million in "suspicious" placement agent "fee" payments.  Overstreet was again appointed Chair in 2013.  Overstreet was permitted to stay on the Investment Committee even when demoted as Chair, serving on that committee from 2010 through 2011, and again 2013 through 2014.

121.    Timothy Longmeyer was Trustee of KRS from April 1, 2010 through 2015 and on the Investment Committee from 2010 through 2013, including when KRS was sold the Black Boxes by the Hedge Fund Sellers. He recently pleaded guilty to taking a bribe in connection with the award of a consulting contractor for a government entity and has been sentenced to 70 months in jail.

122.    Bobby D. Henson was a Trustee of KRS from approximately 1998 through 2014, including when KRS was sold the Black Boxes by the Hedge Fund Sellers.

123.    Thomas Elliott has been a Trustee of KRS from at least April 2011 through the present. T. Elliott was the Chair of KRS from May 2012 to April 2013 and on the Investment Committee from his appointment through 2017, including when the Black Boxes were sold to KRS by the Hedge Fund Sellers.

124.    Jennifer Elliott was a member of the Board of Trustees of KRS from 2009 through October 2012. She was Board Chair after Overstreet was demoted until 2012. J. Elliott was Chair of the Board and also on the Investment Committee when the Black Boxes were sold to KRS by the Hedge Fund Sellers. J. Elliott was a partner at Stites

Harbison, PLLC ("Stites"), a law firm which represented Aegon, and used her influence and that of Stites to help Prisma (and thus its client, Aegon) as part of the conspiracy complained of in the original sale of the Daniel Boone Black Box to KRS in 2011.  Aegon owned the majority equity interest in Prisma, and at least 50% of its voting power.  In 2011, when KRS made its first $400 million+ investment in Prisma's Daniel Boone Fund, Prisma was attempting to "dress up" to sell itself to KKR (a sale which was already being negotiated).  The purchase and sales transaction were consummated a few months later, with Aegon cashing out with a $100 million gain on its $2 million investment in Prisma.

125.    According to an August 2, 2011 KRS internal memo regarding the proposed sale of Prisma's Daniel Boone Black Box to KRS:

> Prior to joining Prisma, Cook was the head of the capital market strategies group at Aegon ... focusing on alternative investments [hedge funds].  Also at AEGON USA, Cook was the head of the derivatives group ....
>
> *        *        *
>
> Conflicts of Interest — There are three known relationships between KRS Trustees/employees and Prisma Capital Partners; 1) KRS Board of Trustees Chair Jennifer Elliott's employer, Stites & Harbison, PLLC (but not Ms. Elliott), has provided legal work for Prisma co-owner Aegon Group; ... and 3) KRS Fixed Income Director David Peden was previously employed by both Aegon Group and Prisma Capital Partners.

126.    This admitted conflict was buried in staff paperwork.  It was not discussed or cleared at the Investment Committee or Board meetings when, at the urging of Peden (former Aegon/Prisma employee and protégé of Cook), KRS handed over $400+ million in KRS trust funds to a super-high-fee, high-risk black box hedge fund sold by Prisma/Cook.

127.   Vince Lang was a Trustee of KRS from April 2005 through 2013, and again from 2014 to the present.  Lang was Chair of the Investment Committee from at least February 2010 through April 2011, and on the Investment Committee from 2010 through 2013 including when the Black Boxes were sold to KRS by the Hedge Fund Sellers.

128.   T. J. Carlson was an Officer of KRS from February 2011 through November 2013, during which time he served as the Chief Investment Officer.  Carlson was CIO of KRS when the Hedge Fund Sellers sold the Black Boxes to KRS.  Carlson moved to Texas in 2013.

129.   Brent Aldridge was an Officer of KRS from August 1991 through August 2016.  Aldridge was in charge of Alternative Investments at KRS.  When Mr. Tosh was fired as CIO, Aldridge was asked to serve as interim CIO during 2009–2010.  Aldridge returned to head Alternative Investments even though he had no significant experience or expertise in fund of hedge fund vehicles.  He was in that position when the Black Boxes were sold to KRS by the Hedge Fund Sellers.

130.   William A. Thielen was an Officer of KRS from at least July 2006 through September 1, 2016.  Thielen became interim Executive Director ("ED") of KRS in April 2011 after the previous Executive Director (Mr. Burnside) was fired in connection with the "fee" payments scandal, and he served as ED from 2012 through 2016.  Thielen had no expertise in investments.  When the Black Boxes were sold to KRS by the Hedge Fund Sellers, Thielen was serving as the interim Executive Director.  Thielen signed the original ASA for KRS.

131.   David Eager joined the KRS Board in May 2016.  He joined the Investment Committee on May 3, 2016, was sworn in, and in his very first acts moved for the

approval of not only the $300+ million upsizing of the Daniel Boone Fund, but additional new hedge fund investments recommended by and benefitting KKR Prisma and its insiders as a result of the self-dealing provisions of the ASA.  He again moved for the approval of these conflicted investments at the May 29, 2016 full Board of Trustees Meeting — his first Board meeting as a Trustee.  When he did so, he knew or recklessly disregarded that these transactions were conflicted, favored the interests of KKR Prisma over the interests of KRS, were not done solely in the interests of KRS and its members, and violated KRS's Conflict of Interest Policy and Kentucky law.  His participation and approval were part of — and an indispensable part of the success of — the scheme and conspiracy complained of.  Eager left the Board on August 2016 to become Interim Executive Director of KRS.  In that role as the top and responsible officer of KRS, Eager did nothing to expose or put a stop to the self-dealing that had been secretly and unlawfully "approved" by the ASA.  Even after the filing of the Joint notice by KRS and the Plaintiffs stating KRS's support of this litigation, Eager has twice publicly criticized the case, indicating it made it more difficult to get qualified trustees and hindered KRS's access to sellers of investment products, and has attempted to prevent the filing of these very amendments.  Despite his conflicts of interest, KRS's current Board of Trustees has continued to allow Eager to serve as KRS's CEO and actively participate in matters relating to this litigation and he has attempted to blunt, deflect and dilute the prosecution of this case. Eager has recently admitted that KRS is in a "death spiral" and cannot ever invest its way out of the financial/actuarial mess it is in.  Yet he continues to assist the defendants — especially KKR/Prisma — by interfering with the proper and vigorous prosecution of this case by Plaintiffs.  Eager, as a Trustee and member of the Investment Committee starting in May 2016 — and later as Acting Executive Director —

failed to ensure that the conflicts of interest involving KKR Prisma, Cook, Rudzik, and Peden were vetted, disclosed, and/or dealt with by the Investment Committee or the Board.  He permitted the unlawful ASA to govern the so-called Strategic Partnership without exposing its contents or subjecting it to scrutiny or a vote by the Investment Committee or the Board.  He failed to act in good faith and in an informed manner in connection with the Strategic Partnership or the ASA.  His acts and/or omissions as described were intentional or reckless.

132.    Mary Helen Peter joined the KRS Board in 2013.  She voted to approve the conflicted transactions in 2015–16, discussed above.  She knew or recklessly disregarded that these transactions were conflicted and that they favored the interests of KKR Prisma over the interests of KRS, were not done solely in the interests of KRS and its members, and violated KRS's rules and Kentucky law.

133.    J.T. Fulkerson joined the KRS Board in 2013.  He voted to approve the conflicted transactions in 2015-16, discussed above.  He knew or recklessly disregarded that these transactions were conflicted and that they favored the interests of KKR Prisma over the interests of KRS, were not done solely in the interests of KRS and its members, and violated KRS's rules and Kentucky law.

134.    William Summers joined the KRS Board in 2014.  He voted to approve the conflicted transactions in 2015–16, discussed above.  He knew or recklessly disregarded that these transactions were conflicted and that they favored the interests of KKR Prisma over the interests of KRS, were not done solely in the interests of KRS and its members, and violated KRS's rules and Kentucky law.

135.    Daniel Bauer joined the KRS Board in 2012 and served as Vice-Chair of the Board and Chair of the Investment Committee from 2012–16.  He voted to approve the

conflicted transactions in 2015–16, detailed herein. He knew of KKR Prisma's unlawful conflicted role inside KRS and of Cook's conflicts of interest. He knew or recklessly disregarded that these transactions were conflicted and that they favored the interests of KKR Prisma over the interests of KRS, were not done solely in the interests of KRS and its members, and violated KRS's rules and Kentucky law.

136.    Bauer, as a Trustee and as chair of the Investment Committee, failed to ensure that the conflicts of interest involving KKR Prisma, Cook, Rudzik, and Peden were vetted, disclosed, and/or dealt with by his committee. He voted in favor of the initial "Strategic Partnership" proposal at the May 5, 2015 Investment Committee meeting without requiring disclosure of the conflicts of interest described above and without establishing any rules or protocol to protect KRS and its members from these conflicts. Bauer either recklessly failed to inform himself about the contents of the ASA, or knew about the ASA and failed to take appropriate action to prevent self-dealing by KKR Prisma or its managing directors who stood to profit from the Strategic Partnership. He permitted the unlawful ASA to govern the so-called Strategic Partnership without exposing its contents or subjecting it to scrutiny or a vote by his committee or the Board. Bauer remained as chair of the Investment Committee through its February 2016 meeting. He attended each Investment Committee meeting during that time, and voted in favor of, among other things, the extension of the Strategic Partnership in February 2016, as a result of which KRS and KKR Prisma entered into an amended ASA with the same self-dealing features as the original. He failed to act in good faith and in an informed manner in connection with the Strategic Partnership or the ASA. His acts and/or omissions as described were intentional or reckless.

### D.   Hedge Fund Seller Defendants

#### 1.   KKR, Kravis, Roberts, Prisma and Reddy

137.   Defendant KKR & Co., Inc. (formerly known as KKR & Co., L.P.) ("KKR") is a large Wall Street financial enterprise which sells "investment" products and provides investment counseling, advice and management services.[17]  KKR makes billions of dollars a year in profits selling extremely complex high-risk investment products charging exceptionally high fees.  It is paid a percentage no matter how the investment performs.  According to KKR, "our hedge fund business is comprised of customized hedge fund portfolios, hedge fund-of-fund solutions ... managed by KKR PRISMA."  At year-end 2015, KKR was worth almost $50 billion with yearly net income of $5 billion.

138.   Defendants Does 1–20 are entities through which KKR and its controlling persons and responsible corporate entities Kravis and Roberts operate their global KKR enterprise.  Kravis, Roberts and KKR have created their complex operation structure to make it difficult for persons with legitimate legal grievances to sue them or collect upon the KKR companies or Kravis's and Roberts' personal assets.  This corporate structure was devised by KKR for the personal benefit and protection of Kravis and Roberts and to ensure KKR global enterprise to operate in an ultra-aggressive fashion to maximize its profits. These entities have participated in the violations alleged herein and have performed acts and made statements in furtherance thereof.  The true names and capacities, of Defendants Does 1 through 20, inclusive, are unknown to Plaintiffs at this time.  Plaintiffs therefore sue Defendants Does 1 through 20 by such fictitious names.

---

[17] Effective on July 1, 2018, KKR converted its entity structure from a public limited partnership to a public corporation.

Plaintiffs further allege that each of the Doe Defendants is responsible for the acts and occurrences alleged herein.  Plaintiffs will amend this Complaint to (i) show their true names and capacities when such information is ascertained; and (ii) allege the manner in which each Doe Defendant is responsible for the damages sustained by KRS and its members.

139.    In 2012, KKR acquired Prisma (combined company referred to as KKR/Prisma). In 2017, KKR/Prisma combined with Pacific Alternative Asset Management Co. ("PAAMCO") to create a new firm PAAMCO/PRISMA HOLDINGS. The new firm continues the KKR/Prisma hedge fund business. The reason for this acquisition and combination was the severe consolidation and shrinkage of the hedge fund industry, customer anger, redemptions and the increasingly bad reputation of fund of hedge fund vehicles. This led to ongoing large redemptions of assets under management and slowing sales of new funds because of the poor returns and high expenses of their products. KKR bears ultimate legal responsibility for the liabilities of Prisma and PAAMCO.

140.    KKR/Prisma holds itself out as having great sophistication, experience and expertise in financial matters, stating: (i) "Our business offers a broad range of investment management services to our fund investors"; (ii) "We are a leading global investment firm that manages investments ... including ... hedge funds. We aim to generate attractive investment returns by following a patient and disciplined investment approach"; (iii) "Our investment professionals screen the [potential investment] opportunity and [then] ... proceed with further diligence ....  This review considers many factors including ... expected returns ... historical and projected financial data ... the quality and track record of the issuer's management team ... specific investment

committees monitor all due diligence practices"; and (iv) "We monitor our portfolios of investments using as applicable, daily, quarterly and annual analyses."

141.    Defendant Henry R. Kravis co-founded KKR in 1976 and is Co-Chairman and Co-Chief Executive Officer and its Managing Partner.  According to KKR's Annual Report, Kravis is "actively involved in managing the firm and … has more than four decades of experience financing, analyzing and investing in public and private companies ….  As Co-Chief Executive Officer, Mr. Kravis has an intimate knowledge of KKR's business."

142.    Defendant George R. Roberts co-founded KKR in 1976 and is Co-Chairman and Co-Chief Officer and its Managing Partner. According to KKR's Annual Report, Roberts is "actively involved in managing the firm … has more than four decades of experience, financing, analyzing, and investing in public and private companies ….  As our Co-Chief Executive Officer, Mr. Roberts has an intimate knowledge of KKR's business."

143.    Because of Kravis's and Roberts' status as co-founders, Board Co-Chairs and Co-CEOs of KKR, as well as serving Co-Chairs of its Management Committee, Kravis and Roberts were both in a position to control and did control the day-to-day operations of KKR during the relevant time periods.  Through a complex web of private partnerships Kravis and Roberts personally controlled "the management of [KKR's] business and affairs … rather than through a board of directors … and [were] authorized to appoint other officers" at all relevant times prior to 7/1/2018.  After the conversion to the corporate entity, Kravis and Roberts effectively control 100% of the voting stock of KKR.  Kravis and Roberts could elect all of the Directors of KKR, appoint all officers and control all aspects of KKR's corporate structure and operation, and they did so. Kravis

92

and Roberts were the responsible corporate officers for the selection, oversight, supervision and training of the top officers and personnel of KKR who were involved in the day-to-day dealings with KRS during the relevant time period.  They use their control of KKR to require it rent corporate jets they own, which provides them millions of dollars each year and special tax breaks.  KKR is in truth and fact the personally controlled alter ego instrumentally of Kravis and Roberts.

144.    For jurisdictional purposes the corporate jurisdictional contacts of KKR with Kentucky are attributable to both Kravis and Roberts personally as they are the "jurisdictional alter egos" of KKR and it is proper to do so to prevent fraud, avoidance of law or legal obligation, and frustration of justice and to protect Kentucky and its citizens.

145.    Kravis and Roberts are two of the most financially sophisticated and wealthiest people on Wall Street. In addition to the vast wealth they have accumulated, they were each paid about $113 million per year for running KKR in 2017. KKR states in governmental filings that:

> "We depend on the efforts, skills, reputations and business contacts of ... our founders Henry Kravis and George Roberts ... the information and deal flow they and others generate during the normal course of their activities ....  Accordingly, our success depends on the continued service of these individuals."

146.    Defendant Girish Reddy co-founded Prisma in 2004 with Cook and some Goldman Sachs bankers who agreed "it was time for a fund of funds that could tap into pension funds [because] they knew they wanted hedge fund exposure."  Prisma was formed to specialize in selling custom-designed Black Box hedge funds to public pension funds. Before founding Prisma in 2004, Reddy was a partner in the Wall Street firm

Goldman Sachs. He made millions of dollars a year – for a number of years – running Prisma before he retired in 2018. He was actively involved in creating the Daniel Boone Fund and selling it to KRS for its Funds. Cook worked closely with Reddy at Prisma. Peden worked with them at Prisma.

147.    KKR entered the hedge fund business in 2008–2009, but during 2010–2011, two KKR hedge fund operations suffered large losses, a serious setback for KKR at the time it was attempting to expand its business to target underfunded public pension funds as customers for high-fee hedge fund products. After those losses, KKR intensified its efforts to get into the fund of hedge fund business because of its very high profit potential, *i.e.,* the opportunity to sell these Black Box vehicles to troubled public pension funds.  Beginning in early 2010, Kravis and Roberts began to try to acquire Prisma, which was already successfully targeting pension funds with its custom-designed fund of hedge fund products and producing very rapid growth in assets under management, and consequent profits.  Securing the $400+ million Daniel Boone Fund sale to KRS was a major step in "dressing up" Prisma for sale to KKR — thus further enriching Cook and Reddy by boosting not only Prisma's assets under management and its profits, but also Cook's stature and position in the KKR/Prisma negotiation.

148.    Because of the importance of the acquisition of Prisma to KKR, the effort was personally overseen by Roberts and Kravis.  "One of the things that was extremely important was whether the team at Prisma would fit into our culture," Kravis says.  "We spent a lot of time discussing this ....  We got to know Girish and his team by spending time with them [and spoke] to our management committee at length about this."  The acquisition was completed in 2012.  After the acquisition, KKR/Prisma intensified its targeting of public pension plans.

149.     KKR/Prisma's business plan, created, approved, and implemented under Kravis and Roberts, targeted public pension plans and specifically targeted Kentucky where they knew there were two large, underfunded public pension plans — KRS and the KTRS.  In this fashion, they achieved economies of scale.

150.     Prisma had targeted troubled, underfunded public pension funds as customers for the exotic investment vehicles it sold.  Prisma realized that KRS trustees and officers were dealing with a much more serious financial and actuarial situation than was publicly appreciated.  Prisma custom-designed a "Black Box" fund of hedge funds vehicle.  It indicated to Trustees and Officers that this Black Box would produce the kind of high investment returns, with downside protection and safe diversification, that Trustees and Officers were seeking to cover up their own malfeasance, and would make up for past losses, while providing safe diversification.  Prisma nicknamed this fund the "Daniel Boone Fund," because it targeted and was designed for the workers of Kentucky who were members and beneficiaries of KRS.

151.     During their efforts to acquire Prisma and their intimate involvement in its business as the Co-CEO's of KKR/Prisma thereafter, Roberts and Kravis acquired knowledge about Prisma, the strategy by which Reddy and Prisma were producing rapid and profitable growth by targeting troubled pension funds, including the very large $400-to-$500 million Daniel Boone Fund that Prisma had recently sold to KRS.  After the acquisition by KKR of Prisma, KKR/Prisma knew that this custom-designed Daniel Boone Fund was an extraordinarily risky fund of hedge funds vehicle, and that it was illiquid, opaque, and unsuitable for continued holding by a pension fund in the particular situation of KRS, which was badly underfunded and facing accelerating retirements, increasing liquidity needs and fewer and fewer new members.

95

152.   By 2015–16 many institutional investors in funds of hedge funds had grown angry over excessive and hidden fees, poor investment returns and/or large losses.  As lock up periods expired and the toxic reputation of these exotic, opaque, secretive, high-fee/high-risk vehicles spread, the fund of hedge funds industry contracted.  Assets under management, the industry's life blood, declined, and the business of the industry underwent a severe contraction.

153.   As the Daniel Boone Fund began to lose millions in 2015–16, KKR/Prisma, Roberts, Kravis, Reddy and Cook helped to arrange for a KKR/Prisma Executive to work inside KRS, ***while still being paid by KKR/Prisma***.  Reddy and KKR/Prisma referred to this arrangement as a "Strategic Partnership."  Subsequently, while Cook and Peden and the KKR/Prisma executive were working inside KRS, KKR/Prisma sold $300 million more in Black Box vehicles to KRS despite that KRS was then selling off over $800 million in other hedge funds because of poor performance, losses, and excessive fees and the KKR/Prisma Black Box was the worst performing of the three.  This very large sale to KRS was a significant benefit to KKR/Prisma, which was then suffering outflows due to customer dissatisfaction over poor results and excessive fees.

154.   KKR/Prisma needed new hedge fund business in 2015–2016 as the growth of its business began to slow and its profits suffered.  PAAMCO (whose fund of hedge fund business was even more dependent on public pension plans), was also facing the adverse impact of the dramatically shrinking fund of hedge funds market.  So, in 2016 PAAMCO and KKR/Prisma began to discuss a strategic transaction, which would be negotiated and approved by Kravis, Roberts, Reddy and Buchan, and by which they would combine the two fund of hedge fund businesses in hopes of surviving the declining market.

96

155.    The new KKR/Prisma and PAAMCO partnership was announced in

February 2017 as one of the largest hedge fund sellers in the world:

> KKR/Prisma and PAAMCO will combine to form a new firm, PAAMCO Prisma Holdings, which will have over $30 billion in assets.
>
> The combined business will be majority employee-owned with employees of PAAMCO and KKR Prisma owning 60.1% of the combined business and KKR retaining a 39.9% ownership stake as a long-term strategic partner.
>
> The combined business will be jointly run by Jane Buchan, co-Founder and CEO of PAAMCO, and Girish Reddy, co-Founder of KKR Prisma and Head of KKR Hedge Funds.
>
> The transaction will ... create one of the largest firms in the liquid alternatives industry ....

156.    When Reddy was asked why KKR/Prisma and PAAMCO were merging

their businesses, he said they were moving beyond "funds of funds":

> "As the industry consolidates clients are looking for broader solutions than currently exist — they are looking beyond fund of funds, such as how we can combine products and bring the fees down ....  That's where we see the puck going and we would like to be there and do it from a positive strength."

In other words, we are leaving the burnt-out embers of the fund of hedge fund industry where we sold toxic waste by the billions to public pension funds (profiting by the hundreds of millions of dollars), and moving on to greener pastures.  Unfortunately, KRS and Kentucky taxpayers must now deal with the ashes left behind. Reddy says the new KKR/Prisma/PAAMCO sales pitch is "***We will combine the alpha engines of each firm and redistribute it***."  Whatever that means, it does not communicate a primary focus on prudent fiduciary investing.

157.    Under the language of the Kentucky Pension Law, and also (i) because

their roles gave them constant access to non-public information of KRS and its Pension

Funds; (ii) because they held themselves out to be very sophisticated, highly qualified experts with extensive experience and expertise in their respective fields; (iii) because they knew the KRS trustees were dealing with internal turmoil and staff turnover and new, inexperienced investment staff and investment advisors and would be unusually dependent upon their professed, superior experience, expertise, and sophistication in their respective areas of expertise; and (iv) because in the case of the Hedge Fund Sellers they had discretion to select the downstream Black Box funds and were also acting investment advisors and/or investment managers for KRS, the Hedge Fund Sellers and the Investment, Actuarial and Fiduciary Advisors were all fiduciaries to KRS, its Plans and its members and beneficiaries.  The Hedge Fund Sellers became fiduciaries no later than Fall 2010/Spring 2011.  It was a breach of fiduciary duty for the out of state Hedge Fund Seller to favor themselves and to disadvantage KRS to alter, dilute or eliminate in any way KRS's rights to seek legal redress in Kentucky state court, or through open proceedings, or to in any way eliminate or diminish its right to a jury trial.  It was also a breach of fiduciary duty when the Hedge Fund Sellers attempted, notwithstanding their positions as fiduciaries, to shift to KRS (and away from themselves) responsibility for making "suitability" determinations.[18] This included inserting highly one-sided unfair and disadvantageous contractual provisions in the Black Box hedge fund purchase

---

[18] The Hedge Fund Sellers, in an attempt to avoid ever being successfully sued by their clients/customers to whom they owe fiduciary duties, insert in each Subscription Agreement a provision disclaiming their own suitability responsibilities and purporting to shift such responsibilities to the clients/customers.  These provisions are, in this case, ineffective because, *inter alia*, the Hedge Fund Sellers were already fiduciaries before presenting the Subscription Agreements to KRS.  They are also ineffective because the Hedge Fund Sellers made every investment decision for the LLP entities; KRS had little or no knowledge of the underlying investments and changes thereto, and certainly not enough information to adequately assess the risks and rewards, even if KRS had been sufficiently sophisticated to do so, which it was not.

documents that disadvantaged KRS and its Plans and Trusts — provisions — a breach of fiduciary duty for the Trustees to agree and for the Defendant hedge fund sellers to foist on them.

158.    In acting and failing to act as alleged herein, these Defendants breached their own duties to KRS and knowingly aided and abetted the breach of duties by the Trustees and Officers, while participating by committing overt acts, in an ongoing scheme, civil conspiracy, common course of conduct and joint enterprise acting in concert with Trustees and/or each other to commit unlawful acts, including the violation of the mandatory duties imposed on each of them and Trustees by Kentucky law.

### 2.    Blackstone, Schwarzman and Hill

159.    Defendant Blackstone Group, Inc. (formerly known as Blackstone Group L.P.) ("Blackstone") is a large Wall Street financial enterprise that provides asset management and advisory services and sells hedge fund products targeting pension funds as potential customers. Blackstone has yearly revenues of about $5 billion. It has over $2 billion in annual net income. It is an extraordinarily profitable business and receives large fees on its hedge fund vehicles regardless of investment performance.

160.    Defendant Blackstone Alternative Asset Management, L.P. ("BAAM") is a subsidiary and operating unit of Blackstone ("Blackstone" and "BAAM" are collectively referred to as "Blackstone"), and is the world's largest "allocator" to hedge funds, and is a leading manager of institutional funds of hedge funds. It stated that its "Hedge Fund Solutions" investment philosophy "is to protect and grow investors' assets through both commingled and custom-designed investment strategies designed to deliver compelling

risk-adjusted returns and mitigate risk.  Diversification, risk management, due diligence and a focus on downside protection are key tenets of our approach."

161.    Blackstone claims to be a sophisticated and experienced expert in financial matters. It has said that before deciding to invest in a new hedge fund or with a new hedge fund manager, it "conducts extensive due diligence" including a "review of the fund's manager's performance ... [and] risk management ....  Once initial due diligence procedures are completed and the investment and other professionals are satisfied ... the team will present the potential investment to the relevant Hedge Fund Solutions Investment Committee ... [of] senior managing directors ... and other senior investment personnel....  Existing hedge fund investments are reviewed and monitored on a regular and continuous basis ... Blackstone Vice Chairman and BAAM CEO, J. Tomilson Hill, ... and other senior members of our Hedge Fund Solutions team meet bi-weekly with Mr. Schwarzman ... to review the group's business and affairs."

162.    Defendant Stephen A. Schwarzman is the Chairman and Chief Executive Officer of Blackstone and leads the firm's Management Committee. Schwarzman founded Blackstone and has been involved in all phases of the firm's development since its founding. Schwarzman rose to prominence at Lehman Brothers, where he was a top executive — a Managing Director.  Lehman later collapsed amidst widespread financial fraud and misconduct at the firm.  According to Blackstone, it "depends on the efforts, skills, reputations and business contacts of Schwarzman, and other key senior managing directors, the information and deal flow they generate during the normal course of their activities ...."

163.    Because of Schwarzman's status as a Founder, Board Chair and CEO of Blackstone, as well as serving as Chair of its Management Committee, Schwarzman was

in a position to control and did control the day-to-day operations of Blackstone during the relevant time periods.  Through a complex web of private partnerships and trusts, Schwarzman can elect all of Blackstone's Board of Directors and control all aspects of Blackstone's corporate structure and operation and has done so – control so absolute that he has "no duty or obligation (fiduciary or otherwise) to give any consideration to any interest of [Blackstone's unit holders] and will not be subject to any different standards imposed by … law, rule, or regulation or in equity."  Schwarzman was the responsible corporate officer for the selection, oversight, supervision and training of the top officers and personnel of Blackstone other than himself who were involved in the day-to-day dealings with KRS during the relevant time period.  Schwarzman uses his control of Blackstone to require it to rent corporate jets he owns and pay him millions of dollars each year providing him tax benefits.  Blackstone is in truth and fact the personally controlled instrumentally and *alter ego* of Schwarzman.

164.    For jurisdictional purposes the corporate jurisdictional contacts of Blackstone with Kentucky are attributable to Schwarzman personally as he is the "jurisdictional alter ego" of Blackstone and it is proper to do so to prevent fraud, avoidance of law or legal obligation, and frustration of justice and to protect Kentucky and its citizens.

165.    Defendant J. Tomilson Hill is President and Chief Executive Officer of the Hedge Fund Solutions group, Vice Chairman of Blackstone and Chief Executive Officer of BAAM.  Hill is responsible for overseeing the day-to-day activities of the group, including investment management, client relationships, product development, marketing operations and administration.  Before joining Blackstone, Hill served as Co-

Chief Executive Officer of Lehman Brothers, which later collapsed amidst widespread financial fraud and misconduct.

166.    The Blackstone business plan, created, approved, and implemented under the personal supervision of Schwarzman and Hill, and targeted troubled public plans and specifically targeted Kentucky where they knew there were two large, underfunded public pension plans — KRS and KTRS. This was done to achieve economies of scale, and because the funds shared common actuarial and fiduciary advisors known to the Hedge Fund Sellers as part of a business plan to purposely avail themselves of the privilege of doing business — and making money for themselves — in Kentucky.

167.    Blackstone targeted KRS as a troubled public pension fund making it a potential customer for the exotic investment vehicles it created and sold. It spotted KRS's underfunded Funds and, because of its sophistication, Blackstone realized the Trustees and Officers were dealing with a much more serious internal financial and demographic situation than was publicly known.  Blackstone custom-designed "Black Box" fund of fund vehicles and indicated to Trustees and Officers that it would produce the kind of high investment returns, with downside protection and safe diversification, that Trustees and Officers were seeking to make up for past losses and cover up their malfeasance.  Blackstone nicknamed this vehicle the "Henry Clay Fund."

168.    Blackstone, Schwarzman and Hill knew that this custom-designed Henry Clay Fund was an extraordinarily risky fund of hedge funds vehicle, and that it was illiquid, opaque, and unsuitable for a pension fund like KRS. KRS was badly underfunded and facing accelerating numbers of member retirements, resulting in increasing liquidity needs and fewer new members.

169.    The Henry Clay Fund provided exceptionally large fees for Blackstone. The amount of the fees could not be calculated and were not disclosed to KRS, many hidden in an impenetrable spider web of fees, spun together by Blackstone for its benefit.

170.    Hedge Fund Sellers themselves and the "absolute return assets" or "absolute return strategies," *i.e.,* fund of hedge funds they sold KRS were discussed in KRS's Annual Reports, each of the Hedge Fund Sellers reviewed and was aware of the contents of the KRS Annual Reports.  They knew that the information therein regarding the KRS "Absolute Return" assets/strategies, *i.e.,* the Black Boxes, was incomplete, inaccurate, false, and misleading.  Hedge Fund Sellers also knew if the true nature and risks of these high-risk/high-fee vehicles were disclosed in the KRS Annual Reports, an uproar would have resulted and the unsuitable "investments" could have been terminated, costing the Hedge Fund Sellers millions and millions of dollars a year in fees.  Hedge Fund Sellers let the deception continue because it served their selfish economic purposes.

171.    In acting and failing to act as alleged herein, these Defendants knowingly aided and abetted the breach of duties by Trustees, while participating by committing overt acts, in an ongoing scheme, civil conspiracy, common course of conduct and joint enterprise acting in concert with Trustees and/or each other to commit unlawful acts, including the violation of the mandatory duties imposed on each of them and Trustees by Kentucky law.

### 3.    PAAMCO and Buchan

172.    Pacific Alternative Asset Management Company, LLC ("PAAMCO") is located in Irvine, California and operates world-wide.  PAAMCO sells investment products including hedge funds and funds of hedge funds and describes itself as:

> "... a leading institutional investment firm dedicated to offering alternative investment solutions to the world's preeminent investors.  Since its founding in 2000, PAAMCO has focused on investing on behalf of its clients while striving to raise the standard for industry-wide best practices.  With a global footprint that extends across North America, South America, Europe and Asia, PAAMCO's clients include large public and private pension funds, sovereign wealth funds, foundations, endowments, insurance companies and financial institutions.  The firm is known for its complete Alpha approach to hedge fund investing which focuses on ... controlling costs and protecting client assets."

In 2017, PAAMCO was acquired by KKR/Prisma as detailed above.

173.    During 2009–11 PAAMCO was one of the largest, fastest growing and most profitable hedge fund sellers in the United States with several billion dollars of assets under management.  PAAMCO claimed special expertise in designing and managing hedge funds, especially funds of hedge funds designed for public pension plans. PAAMCO's business plan, created, approved, and implemented under the personal supervision of Buchan, targeted troubled public pension plans and specifically targeted Kentucky where there were two large, underfunded public pension plans — KRS and KTRS.

174.    Defendant Jane Buchan was a co-founder and CEO of PAAMCO. Materials approved by Buchan and PAAMCO describe her as the Chief Executive Officer of PAAMCO, and "[a]s CEO, Jane is responsible for overall business strategy and firm direction."  Buchan was the dominant Executive and personality at PAAMCO, a closely held private company, and was hands-on involved in all aspects of its funds of hedge fund business which specifically targeted public pension plans.  She personally oversaw and directed the sale of the PAAMCO Black Box fund of hedge funds to KRS.

175.     Because of Buchan's status as a co-founder, Board member, and CEO of PAAMCO, as well as serving Chair of its Management Committee, Buchan was in a position to control and did control the day-to-day operations of PAAMCO during the relevant time periods.  Buchan could, with a few co-founders, elect all of the Directors of PAAMCO, appoint all officers and control all aspects of PAAMCO's corporate structure and operation, and she did so.  Buchan was the responsible corporate officer for the selection, oversight, supervision and training of the top officers and personnel of PAAMCO other than herself who were involved in the day-to-day dealings with KRS during the relevant time period.

176.     For jurisdictional purposes the corporate jurisdictional contacts of PAAMCO with Kentucky are attributable to Buchan personally since during relevant times she has controlled and dominated PAAMCO and is the "jurisdictional alter ego" of PAAMCO. It is proper to do so to prevent fraud, avoidance of law or legal obligation, and frustration of justice and to protect Kentucky and its citizens.

177.     PAAMCO targeted KRS as a troubled public pension fund as a potential customer for the exotic investment vehicles it created and sold, knowing the trustees and officers were dealing with a much more serious financial and actuarial situation than was publicly known. PAAMCO custom-designed a "Black Box" fund of hedge funds vehicle and indicated to Trustees and Officers that it would produce the kind of high investment returns, with downside protection and safe diversification, that Trustees and Officers were seeking to make up for past losses and cover up their malfeasance. PAAMCO nicknamed this vehicle the "Newport Colonels Fund."

178.     PAAMCO and Buchan knew that this custom-designed Colonels Fund was an extraordinarily risky fund of hedge funds vehicle, and that it was illiquid, opaque,

and unsuitable for a pension fund like KRS. KRS was badly underfunded and facing accelerating numbers of member retirements, resulting in increasing liquidity needs and fewer and fewer new members.

179.    For years, PAAMCO and Buchan have held themselves out to be paragons of virtue in the hedge fund industry, a leading example of adherence to the highest possible standards of honesty, transparency and ethical behavior in its business practices.  In a glowing profile of Buchan in 2014 in the Orange County Register, that Buchan reviewed and approved, it was reported:

> Buchan, CEO and co-founder of Pacific Alternative Asset Management Co. (PAAMCO), is one of the most powerful women in global finance, a luminary in the complex, opaque hedge fund universe.

> With satellite offices in Singapore and London, Buchan's fund-of-funds is a manager and adviser for some of the world's biggest pension plans, endowments and sovereign wealth funds, helping them to invest some $15.7 billion into hedge funds.

> WORKING FOR RETIREES
> ...
> From the outset, PAAMCO focused on institutions. Unlike many funds-of-funds, Buchan said, "we don't do high-net worth individuals. There's nothing wrong with making rich people richer, but that is not the ethos of this company."

> Plus, there's the intellectual challenge: a single wealthy investor might have as much as a billion or so dollars to invest in hedge funds. Pension plans juggle many billions.

> "We build big portfolios for very sophisticated clients," Buchan said. "We like working with very large pools of capital and very compelling problems."

> While a few institutions set aside "affirmative investment" money targeting, in part, female or minority managers, Buchan said PAAMCO has never sought business through diversity mandates.

> "This firm has succeeded by going toe to toe with the top firms," she said. "I compete against both men and women. I'm not interested in being the tallest dwarf. I don't care to get extra points for being green, purple, short, thin or fat."

180.    According to Buchan, she is asked to speak all over the world because "[w]e are known throughout the world for promoting fiduciary standards in hedge fund investing."  Buchan and PAAMCO helped found, and Buchan is a director of, the International Hedge Fund Standards Board,[19] the standard-setting organization for the hedge fund industry, which claims to promote "transparency, integrity and good governance" in the way the hedge fund industry operates.

181.    PAAMCO was founded in 2000 by Buchan and a few others with secret financial support from ultra-wealthy hedge fund mogul S. Donald Sussman of Greenwich, Connecticut.  Sussman had a background Buchan wanted to conceal from potential investors, customers and regulators, as he had been convicted of dishonest behavior in connection with the investment of fiduciary monies.  Buchan and Sussman created fake documents to disguise Sussman's large ownership stake in PAAMCO as a loan, because Buchan and the other founders believed they could hide Mr. Sussman's background from investors and regulators.  "A Hedge Fund Controlled by Women, So It Claimed," published by *The New York Times* on October 18, 2010, reported that the "loan" terms were extraordinary.  The real deal was a $2 million investment by Sussman for 40% ownership of PAAMCO, with Buchan and the parties putting up only $40,000 total under the fake documents.  Sussman was paid the greater of either 10% annual

---

[19] In light of recent events disgracing the fund of hedge fund industry Buchan's Board is now called "Standards Board for Alternative Investments."

interest or 40% of the profit of PAAMCO.   From 2003 to 2007, Sussman secretly collected his share of the profits, $55 million.  As PAAMCO continued to make these huge profits, Buchan decided to evade and dishonor the secret commitment to Sussman. As a result, Sussman sued Buchan and her co-founders of PAAMCO for fraud and breaches of fiduciary duty, exposed their dishonesty and won the case on summary judgment.  Buchan and her PAAMCO co-founders did not appeal.  To further conceal Sussman's ownership of PAAMCO, Sussman and Defendant Buchan used offshore shell companies called Paloma Partners/Franklin Realty Co. to hold his PAAMCO interest.

182.    In sworn testimony, one PAAMCO co-founder admitted there were "two important factors" why Sussman's ownership and control of PAAMCO was hidden: "The first was the potential impact of disclosing Mr. Sussman's involvement" in a governmental filing and "the second was our potential to have status as a majority female-owned entity," which could lead to "engagement as an investor and manager to an extent that otherwise wouldn't be the case."

183.    Buchan not only concealed Sussman's ownership of PAAMCO to deceive customers and regulators but also to falsely present the picture of a female-controlled enterprise, which gave PAAMCO an edge in competing for public pension fund business. Buchan used PAAMCO's purported "female majority owned" to improperly gain a competitive advantage, and to attract pension funds.

184.    The Judge in Sussman's case noted that the disguised ownership arrangements with Sussman "may have been designed to mislead a number of observers, from the tax authorities to the SEC to entities wishing to invest in women-owned businesses."  As a result of these findings of fiduciary dishonesty by the PAAMCO founders, public pension funds withdrew millions of dollars of their trust fund assets

from the PAAMCO managed or created hedge funds. These events occurred shortly before PAAMCO sold the Colonels Fund to KRS.

### 4.   The Peculiar Partnership Structures of KKR and Blackstone

185.   Due to carefully crafted and unusual corporate structures, while KKR and Blackstone appear to be companies with publicly traded units and unit holders, they are in fact the personal instrumentalities of Kravis, Roberts and Schwarzman, controlled vehicles used by them to conduct their businesses such that they have a complete unity of interest and purpose with them and are as a result the "jurisdictional alter egos" of those entities.  This was true both before and after KKR and Blackstone converted from limited partnership form to corporate form.

186.   KKR and Blackstone were originally privately-owned partnerships. As private partnerships owned by the Defendants Kravis and Roberts, and Schwarzman, respectively, KKR and Blackstone were spectacularly successful making Kravis, Roberts and Schwarzman among the richest, most powerful and most prominent people in the world. They achieved this in large part by selling billions of dollars of "alternative investments" — much of it to public pension funds — and by acting as investment advisors and managers for those funds as well.

187.   Kravis, Roberts and Schwarzman wanted to enjoy the financial benefits of taking their private partnerships public, thereby achieving an immediate, large increase in their liquid wealth and gaining access to billions of dollars of other people's money in fresh capital, and a liquid trading market in the Blackstone and KKR units on which they could capitalize and other personal tax-planning and estate-planning benefits. But they did not want to be accountable to shareholders, owe duties to anyone else, or to

give up any of their existing iron-clad personal control of every aspect of their businesses.

188.    In 2008, Schwarzman took Blackstone Group L.P. "public" and in 2010 Kravis and Roberts followed with KKR & Co. L.P.  In his offering, Schwarzman pocketed over $60 million by selling his units.  But through similar sets of complex agreements, Kravis and Roberts in KKR, and Schwarzman in Blackstone, retained 100% legal, managerial and operational control of KKR and Blackstone respectively so they could continue using those entities as their personal instrumentalities going forward.

189.    KKR and Blackstone are not traditional public companies with shareholders who have true ownership rights and to whom the controlling owners owe fiduciary duties.  Fiduciary duties dilute the personal control and unrestricted use of their companies that these Defendants wanted for their own personal ends.  Kravis, Roberts and Schwarzman wanted the benefits of being "public" but did not want to lose any of the 100% control they had of their private partnerships.  So they structured the "public vehicles" over which they wanted absolute control, as limited partnerships without shareholders — substituting instead "unit holders."  They also specified the elimination of the normal corporate governance standards and normal fiduciary duties owed by officers and controlling persons to shareholders of companies whose stock is listed on a national exchange.  And through a series of partnership and of other agreements, they retained exclusively for themselves the absolute legal, managerial and operational control of KKR and Blackstone, down to the smallest operational and financial decisions, regardless of the percentage of the outstanding units of KKR and/or Blackstone they actually own or control.

190. As "public" companies, KKR and Blackstone are required to make filings with the SEC.  These filings must be truthful. According to SEC filings, Schwarzman "is the Chairman and Chief Executive Officer of Blackstone and the Chairman of the board of directors of our general partner....  Blackstone Group Management L.L.C. is wholly owned by our senior managing directors and controlled by our founder, Mr. Schwarzman."

> Our general partner Blackstone Group Management L.L.C., Schwarzman manages all of our operations and activities. Our general partner is authorized in general to perform all acts that it determines to be necessary or appropriate to carry out our purpose and to conduct our business.  Our partnership agreement provides that our general partner in managing our operations and activities is entitled to consider only such interests and factors as it desires, including its own interests, and will have no duty or obligation (fiduciary or otherwise) to give any consideration to any interest of or factors affecting us or any limited partners, and will not be subject to any different standards imposed by the partnership agreement, the Delaware Limited Partnership Act or under any other law, rule or regulation or in equity.
>
> The limited liability company agreement of Blackstone Group Management L.L.C. establishes a board of directors that is responsible for the oversight of our business and operations.  Our general partner's board of directors is elected in accordance with its limited liability company agreement, where our senior managing directors have agreed that our founder, Mr. Schwarzman will have the power to appoint and remove the directors of our general partner.

191. Schwarzman is Blackstone's general partner and it "manages all of our operations and activities," "as it desires" in "its own interests" and is not subject to "any law rule, regulation or equity."  Now that's 100% control.

192. The KKR structure is almost a duplicate of that of Blackstone – just with Kravis and Roberts on top.  Kravis and Roberts are Co-Chairman and Co-Chief Executive Officers of KKR and they are the only two members of its Executive

Committee.  The managing general partner of KKR is KKR Management LLC, which is

owned and controlled by Kravis and Roberts.

> ... [O]ur limited partnership agreement provides for the management of our business and affairs by a general partner rather than a board of directors. Our Managing Partner [Kravis/Roberts] serves as our sole general partner.  Our Managing Partner has a board of directors that is co-chaired by our founders Henry Kravis and George Roberts who also serve as our Co-Chief Executive Officers and are authorized to appoint our other officers.

193.    A KKR Financial Holdings legal filing signed and/or approved by Kravis

and Roberts states:

> KKR's founders are able to determine the outcome of any matter that may be submitted for a vote of KKR's limited partners.
>
> ***
>
> KKR's partnership agreements contains provisions that reduce or eliminate duties (including fiduciary duties) of KKR's managing partner and limit remedies available to holders of KKR common units for actions that might otherwise constitute a breach of duty.
>
> ***
>
> KKR's partnership agreement contains provisions that require holders of KKR common units to waive or consent to conduct by KKR's managing partner and its affiliates that might otherwise raise issues about compliance with fiduciary duties or applicable law.  For example, KKR's partnership agreement provides that ..., it may act without any fiduciary obligations to holders of KKR common units, whatsoever. When KKR's managing partner, in its capacity as KKR's general partner, ... is permitted to or required to make a decision in its "sole discretion" or "discretion" or that it deems "necessary or appropriate" or "necessary or advisable," then KKR's managing partner ... will be entitled to consider only such interests and factors as it desires, including its own interests, and will have no duty or obligation (fiduciary or otherwise) to give any consideration to any interest of or factors affecting KKR or any holder of KKR common units and will not be subject to any different standards imposed by KKR's partnership agreement, the

Delaware Revised Uniform Limited Partnership Act, which is referred to in this proxy statement/prospectus as the Delaware Limited Partnership Act, or under any other law, rule or regulation or in equity.

194.   That KKR legal filing continued:

**Risks Related to KKR's Organizational Structure**

- *KKR's managing partner and its affiliates have limited fiduciary duties to KKR and the holders of KKR Group Partnership units, which may permit them to favor their own interests to KKR's detriment and that of the holders of KKR Group Partnership units.*

- *"KKR's managing partner, which is its general partner, will manage the business and affairs of KKR's business, and will be governed by a board of directors that is co-chaired by KKR's founders, who also serve as KKR's Co-Chief Executive Officers. Conflicts of interest may arise. As a result of these conflicts, KKR's managing partner may favor its own interests ....  These conflicts include, among others, the following:*

  - *KKR's managing partner indirectly through its holding of controlling entities determines the amount and timing of the KKR Group Partnership's investments and dispositions, indebtedness, issuances of additional partner interests, tax liabilities and amounts of reserves;*

  - *KKR's managing partner is allowed to take into account the interests of parties other than KKR in resolving conflicts of interest, which has the effect of limiting its duties, including fiduciary duties to KKR;*

  - *KKR's managing partner..., has limited its and their liability and reduced or eliminated tis and their duties, including fiduciary duties, under KKR's partnership agreement to the fullest extent permitted by law, while also restricting the remedies available to holders of KKR common units for actions, that without these limitations, might constitute breaches of duty, including fiduciary duties;*

  - *KKR's managing partner determines which costs incurred by it and its affiliates are reimbursable by KKR;*

- *KKR's managing partner controls the enforcement of obligations owed to the KKR Group Partnerships by KKR and its affiliates*; and

- *KKR's managing partner ... decides whether to retain separate counsel, accountants or others to perform services for KKR.*

Now that is 100% control as well.

195.    The control by these three individuals of the "public" vehicles through which they operate is absolute.  The fact that these Limited Partnerships are made to look like "public" companies cannot conceal that they are actually the personal and business and wealth-creation vehicles of Kravis, Roberts and Schwarzman personally and that the control, legal, operational and managerial power of Kravis, Roberts, and Schwarzman is such that these entities are in effect their personal instrumentalities, of which they are controlling, responsible corporate officers, and their *de facto* "alter egos" as well.

196.    In addition to the control agreements cited above, Kravis, Roberts and Schwarzman each in fact constantly and actually exercise their control of their instrumentalities.  According to Blackstone, Schwarzman "has been involved in all phases of the firm's development since its founding in 1985" and it "depends on the efforts, skills, reputations and business contacts of Schwarzman, and other key senior managing directors, the information and deal flow they generate during the normal course of their activities ...."  As to the part of Blackstone's business that is at the center of this case, *i.e.*, hedge funds:

> Before deciding to invest in our new hedge fund or with a new hedge fund manager, our Hedge Fund Solutions team, conducts extensive due diligence ....  Once initial due diligence procedures are completed and the investment and other professionals are satisfied with the results of the

review, the team will present the potential investment to the relevant Hedge Fund Solutions investment committee.

· The investment committee is comprised of Tomlinson Hill, C.E.O. of the Hedge Fund Solutions group and Vice Chairman of Blackstone, and other senior members of our Hedge Fund Solutions team meet regularly with Mr. Schwarzman to review the group's business and affairs.

197.    As to Kravis and Roberts as Co-Chairmen and Co-Chief Executive Officers of KKR, they are "actively involved in managing the firm and [have] an intimate knowledge of KKR's business."

"We depend on the efforts, skills, reputations and business contacts of … our founders Henry Kravis and George Roberts …. the information and deal flow they and others generate during the normal course of their activities….  According, our success depends on the continued service of these individuals."

## E.    Investment, Actuarial and Fiduciary Advisors

### 1.    Investment Advisors RVK, Voytko and Gratsinger

198.    Defendant R.V. Kuhns & Associates, Inc., a/k/a/ RVK, Inc. ("RVK") became KRS's investment advisor following the termination of the previous advisor as a result of KRS's $4.4 billion in investment losses in 2008–09.  RVK holds itself out as having great experience and expertise in investments.  It describes itself as: "One of the largest fully independent … consulting firms in the US, [which] provides world-class investment advice to institutional investors, including defined benefit and defined contribution pension plans ….  RVK also states it provides 'unbiased general investing consulting services … a team of dedicated consultants with significant experience in the financial field, including investment advising, investment management and actuarial advisory services.'"

199.    Defendant Jim Voytko was the President and Principal of RVK until 2012. Voytko and his successor, Defendant Rebecca A. Gratsinger, were each personally involved in the KRS account and each signed one or more of the false and misleading letters and reports contained in KRS Annual Reports detailed herein. KRS was an important source of fees for RVK and an account that was crucial to Voytko and Gratsinger's personal success, compensation and position in the firm. RVK, Voytko, and Gratsinger very much wanted to keep KRS as a client. RVK's business model depended on representing a large number of public pension funds, charging each, including KRS, over $500,000 each year. The pension funds were, in effect, an "annuity client." RVK's business model depended on keeping clients. These Defendants chose to go along, participate and approve, and then pocket their large fees each year.

200.    Gratsinger became the CEO of RVK in 2012, and she took over the KRS account.

201.    RVK, Voytko and Gratsinger were intimately involved in the affairs of KRS and its Funds.  They had unlimited access to all KRS internal data and investments detail, and were aware of KRS's true financial and actuarial condition. RVK prepared the analysis ("the RVK Report") in 2010 which revealed the closing vise that KRS faced between the demographics of its members and beneficiaries and its actuarial situation. RVK advised the Trustees and Officers to quickly put $1.2/1.5 billion in the Black Boxes, even though they were unsuitable investments for KRS.  They have also repeatedly made false statements regarding KRS's investing principles, practices, procedures, skills and results in KRS Annual Reports, falsely reassuring members and taxpayers as to the state of the Trustees' stewardship.

202.   RVK, Voytko, and Gratsinger reviewed and were aware of the contents of the KRS Annual Reports and knew that the information therein was incomplete, false, and misleading, and that they had a duty to correct these statements.  They also knew if the true nature of these high-risk, high-fee vehicles or the over-stated AARIR assumptions and estimates were disclosed in the KRS Annual Reports, an uproar would have resulted, an independent investigation could have ensued and RVK could have been terminated, costing them an important client and threatening their high volume public pension fund client driven business model.  RVK, Voytko and Gratsinger let the deception continue because it served their selfish economic purposes to do so.

203.   In acting and failing to act as alleged herein, these Defendants breached their own duties to KRS, and knowingly aided and abetted the breach of duties by the Trustees, while participating by committing overt acts, in an ongoing scheme, civil conspiracy, common course of conduct and joint enterprise acting in concert with the Trustees and/or each other to commit unlawful acts, including the violation of the mandatory duties imposed on each of them and Trustees by Kentucky law.

### 2.   Actuarial Advisors Cavanaugh Macdonald, Cavanaugh, Green and Bennett

204.   Defendant Cavanaugh Macdonald Consulting, LLC ("Cavanaugh Macdonald"), a Georgia limited liability company, represented that it had superior skill, experience and expertise in public pension fund actuarial matters and had the capability to independently and accurately determine the assumptions and estimates necessary to properly oversee and operate a public pension fund.

> "We are innovative and independent, seasoned ....  That's the Cavanaugh Macdonald promise: providing you the advice to help your benefit plans thrive.  We are leaders in the public sector consulting community, providing thoughtful and

> innovative solutions that enable public sector benefit plans
> to thrive.  We provide impartial advice and maintain our
> independence from political and other outside influences,
> and these strengths ... and make us the leading public sector
> actuarial consultants in the country."

205.   Cavanaugh Macdonald provided expert actuarial services to KRS for many years.  It supplied a certification each year for KRS's actuarial estimates and assumptions as contained in the KRS Annual Reports.  This included KRS's AARIR and the underlying actuarial assumptions and estimates that went into calculating the actuarial liabilities owed by KRS.

206.   Defendants Thomas J. Cavanaugh (CEO), Todd B. Green and Alisa Bennett were executives and principals at Cavanaugh Macdonald and were in charge of the KRS account.  They signed one or more of the false Cavanaugh Macdonald certifications, opinions and reports that were contained in KRS Annual Reports.

207.   KRS was an important client and source of fees for Cavanaugh Macdonald. Cavanaugh Macdonald's business model depended on representing many public pension funds, charging each, including KRS, over $500,000 each year.  These funds were essentially "annuity clients."  It was important in this business model not to lose clients, particularly by matters within its own control.  Cavanaugh Macdonald wanted to keep KRS as a client, and was willing to overlook uncomfortable and inconvenient realities to do so.

208.   The KRS account was of considerable personal and financial importance to Cavanaugh, Green and Bennett and their status, compensation and position in the firm depended upon it.

209.   Cavanaugh Macdonald each reviewed and were aware of the contents of the KRS Annual Reports and knew that the information therein was incomplete, false

and misleading. They also knew if the true nature and risks of the false actuarial assumptions and estimates were disclosed in the KRS Annual Reports, KRS's publicly reported funding deficit would have skyrocketed, an uproar would follow, investigations could have ensued, and they could have been terminated.  Cavanaugh Macdonald would lose an important client and their high-volume public pension fund client-driven business model would be threatened.   Allowing the deception to continue served the economic interest of Cavanaugh Macdonald who chose inaction to benefit their own economic self-interest.

210.    In acting and failing to act as alleged herein, these Defendants knowingly aided and abetted the breach of duties by the Trustees, while participating by committing overt acts, in an ongoing scheme, civil conspiracy, common course of conduct and joint enterprise acting in concert with the Trustees and/or each other to commit unlawful acts, including the violation of the mandatory duties imposed on each of them and Trustees by Kentucky law.

### 3.    Fiduciary Advisor Ice Miller

211.    Defendant Ice Miller, LLP ("Ice Miller"), is a limited liability partnership law firm that has served as Fiduciary Advisor to KRS for many years. Ice Miller has had unrestricted access to KRS records and data and constant participation in and intimate knowledge of KRS's true finances, demographics and actuarial situation.

212.    Ice Miller states that it has extensive expertise and experience in fiduciary matters for pension plan trustees including advising on the purchase of fiduciary insurance, conflicts of interest and investments in fund of hedge fund investments:

> We represent ... public retirement systems ... [as] a talent
> mosaic with the ability to bring the exact legal skills needed
> for specific projects; [its] Alternative Investments Group

> offers a broad range of legal advice and services ... in connection with [public funds'] alternative investment programs; [and] ... since the late 1980s, we have advised these clients in the collective investment of billions of dollars .... Our attorneys have significant experience evaluating, structuring and negotiating alternative investments across the full range of strategies .... Our attorneys are experienced with alternative investments of all sizes ... to the largest multi-billion-dollar fund of funds. We also regularly advise our institutional investor clients regarding the protection of their alternative investments.

213.    KRS was an important client and source of fees for Ice Miller. Ice Miller's business model depended on representing many public pension funds, charging each, including KRS, over $500,000 each year. These funds were essentially "annuity clients." It was important in this business model not to lose clients, particularly by matters within its own control. Ice Miller wanted to keep KRS as a client, and was willing to overlook uncomfortable and inconvenient realities to do so.

214.    KRS trustees were authorized by the Kentucky Pension Law to use KRS Funds to purchase fiduciary insurance in order to protect KRS and its Funds from fiduciary defalcations by KRS's trustees or officers. KRS is one of the largest economic entities in the Commonwealth. It holds and invests billions of dollars while overseeing the benefits for hundreds of thousands of workers. These pension plans are funded and backstopped by the Commonwealth of Kentucky. These groups were necessarily exposed to hundreds of millions of dollars in damages, harm or loss if the KRS Trustees or Officers failed to comply with their legal duties.

215.    Given KRS's deteriorating financial and actuarial condition, its internal dysfunction and mismanagement, and the staff turnover, these risks of loss were magnified. Even though the Trustees could have purchased adequate fiduciary insurance with KRS funds, Ice Miller failed as fiduciary advisor to KRS by not advising,

encouraging, and directing the Trustees and Officers to purchase coverage in excess of $300 million, which was clearly needed, instead of the $5 million in fiduciary insurance coverage that KRS had.  Ice Miller had a duty to take proper steps to protect KRS's legal rights by assuring that KRS had rights to pursue litigation in a Kentucky court, with open proceedings, and a jury trial to protect its rights, especially in large financial investment transactions involving sophisticated parties from out-of-state venues that would be inconvenient and more expensive if KRS were required to litigate there.  Ice Miller also had a duty to advise KRS in connection with the "Strategic Partnership" with KKR/Prisma and the ASA entered into in connection therewith.

216.    Ice Miller has also breached its duties by failing to adequately implement, update and oversee the training and education program for trustees and officers as mandated by Kentucky Pension Law.  Trustees who were sold the Black Boxes were inadequately trained in fund of hedge fund vehicles and in how to properly and legally deal with the financial/actuarial vise they were in during 2010–11.  Ice Miller has continued to violate its duties to KRS by permitting Cook to serve on the Investment Committee (and at one time to be the Investment Committee Chair) and as a trustee during the time KRS invested hundreds of millions of dollars in Prisma to help KKR/Prisma while a Prisma executive, still paid by Prisma, worked inside KRS, with access to confidential information and the ability to wield influence.

217.    Ice Miller reviewed and was aware of the contents of the KRS Annual Reports and knew that the information therein was false and misleading.  It knew that, if the true nature of these high-risk, high-fee Black Box vehicles were known and the false and unrealistic actuarial assumptions and estimates were disclosed in the KRS Annual Reports, KRS's publicly reported funding deficits would have skyrocketed, an

uproar would follow, and an independent investigation could have occurred. Ice Miller could have been terminated and could have lost an important client, thereby threatening its high-volume public pension fund client-driven business model. Ice Miller chose inaction to benefit its own economic self-interest.

218.   In acting and failing to act as alleged herein, this Defendant breached its own duties to KRS, and knowingly aided and abetted the breach of duties by the Trustees, while participating by committing overt acts, in an ongoing scheme, civil conspiracy, common course of conduct and joint enterprise acting in concert with the Trustees and/or each other to commit unlawful acts, including the violation of the mandatory duties imposed on each of them and Trustees by Kentucky law.

219.   In acting and failing to act as alleged herein, this Defendant knowingly aided and abetted the breach of duties by the Trustees, while participating by committing overt acts, in an ongoing scheme, civil conspiracy, common course of conduct and joint enterprise acting in concert with the Trustees and/or each other to commit unlawful acts, including the violation of the mandatory duties imposed on each of them and Trustees by Kentucky law.

## VIII.   DUTIES OF THE T/OS AND DEFENDANTS TO KRS AND ITS FUNDS IN OVERSEEING, OPERATING AND DEALING WITH KRS

### A.   Kentucky Pension, Trust and Other Laws

220.   Each Defendant had a duty to comply with Kentucky law, including the Kentucky Pension Law, Kentucky Trust Law, as well as the common law duties to act with loyalty and due care and in good faith with respect to KRS, and to not aid, abet or assist or conspire or collude with any KRS Trustee or officer to facilitate or advance the breach of duties such persons owed in respect to KRS or its pension and insurance funds

and trusts. "A person injured by the violation of any statute may recover from the offender such damages as he sustained by reason of the violation," KY. REV. STAT. § 446.070.  KRS is entitled to avail itself of the rights under KY. REV. STAT. § 446.070.

221.   In order to protect KRS, its Funds and their members and beneficiaries, the Kentucky Legislature imposed stringent statutory duties on persons who became involved with KRS and its Plans.  Each Trustee of KERS was required to swear to the following oath:

> Each member of the board of trustees shall, within ten (10) days after his appointment or election, take an oath that will support the Constitution of the United States and the Constitution of Kentucky, that he will diligently and honestly administer the affairs of the board, and that he will not knowingly violate or willingly permit to be violated any provisions of the law applicable to the retirement system.

222.   The duties owed by each of the Defendants was owed to KRS, its Funds, members and beneficiaries.

223.   The Kentucky Pension Law establishes "a retirement system" with three pension "systems."  The statute creating the Kentucky Employees Retirement System ("KERS"), the oldest of the three systems, provides as follows:

> **61.515   Retirement systems established — Fund created**:
>
> There is hereby created and established:
>
> (1) A retirement system for employees to be known as the "Kentucky Employees Retirement System . . . which . . . shall have the powers and privileges of a corporation; and
>
> (2) A fund, called the "Kentucky Employees Retirement Fund" which shall consist of all the assets of the system [and] all assets received in the fund shall be deemed trust funds to be held and applied solely as provided in [KY. REV. STAT. §§] 61.510 to 61.705.

There are separate, quite similar, statutes creating the "County Employees Retirement System" ("CERS"), KY. REV. STAT. § 78.790, and "State Police Retirement System" ("SPRS"), KY. REV. STAT. § 16.642, and their respective funds. All three systems contain pension and insurance plans/trusts that are governed by the same Board, and managed by staff retained by that Board operating under uniform policies as a united overall economic entity under KERS.

**61.645    Board of Trustees – Powers – Members – Other Duties – Annual financial report – Trustees education program – Information made available to public**

(1) The County Employees Retirements System, Kentucky Employees Retirement System and State Police Retirement System *shall be administered by the board of Trustees of the Kentucky Retirement Systems* ....

\* \* \*

(2)  The board is hereby granted the powers and privileges of a corporation, including but not limited to the following powers:

  (a) To sue and be sued in its corporate name**:**
  (f) To purchase fiduciary liability insurance**;**
\* \* \*
(15)(a)A trustee shall discharge his duties as a trustee ...

    1.  In good faith:

    2.  On an informed basis; and

    3.  In a manner he honestly believes to be in the best interest of the Kentucky Retirement Systems

(b)      A trustee discharges his duties on an informed basis if, when he makes an inquiry into the business and affairs of the Kentucky Retirement Systems or into a particular action to be taken or decision to be made, he exercises the care an ordinary prudent person in a like position would exercise under similar circumstances.

(c)      In discharging his duties, a trustee may rely on information, opinions, reports or statements, including financial statements and other financial data, if prepared or presented by:

1. One (1) or more officers or employees of the Kentucky Retirement System whom the trustee honestly believes to be reliable and competent in the matters presented.

2. Legal counsel, public accountants, actuaries, or other persons as to matters the trustee honestly believes are within the person's professional or expert competence; or

3. A committee of the board of trustees of which he is not a member if the trustee honestly believes the committee merits confidence.

(d) A trustee shall not be considered as acting in good faith if he has knowledge concerning the matter in question that makes reliance otherwise permitted by paragraph (c) of this subsection unwarranted.

(e) Any action taken as a trustee, or any failure to take any action as a trustee, shall not be the basis for monetary damages or injunctive relief unless:

1. The trustee has breached or failed to perform the duties of the trustee's office in compliance with this section; and
2. In the case of an action for monetary damages, the breach of failure to perform constitutes willful misconduct or wanton or reckless disregard for human rights, safety, or property.
f) A person bringing an action for monetary damages under this section shall have the burden of proving by clear and convincing evidence the provisions of paragraph (e)1 and 2, of this subsection, and the burden of proving that the breach of failure to perform was the legal cause of damages suffered by the Kentucky Retirement System.

\* \* \*

(18) The board shall establish a formal trustee education program for all trustees on the board. The program shall include but not be limited to the following:

(a) A required orientation program for all new trustees elected or appointed to the board[, which] shall include training on:

\* \* \*

2 Investment concepts, policies, and current composition and administration of retirement systems investments;

3 Laws, . . . pertaining to the retirement systems and to fiduciaries;

4. Actuarial and financial concepts pertaining to the retirement systems.

\* \* \*

(b) Annual required training for board members on the . . . financing, and investing of the retirement systems...

\* \* \*

(19) In order to improve public transparency regarding the administration of the systems, the board of trustees shall . . . make available...

\* \* \*

(b) The Comprehensive Annual Financial Report ...

\* \* \*

(m)  Information regarding the systems' financial and actuarial condition that is easily understood by the members, retired members, and the public.

224.    The KRS Board is the trustee and guardian of the funds and assets of the overall retirement system.

### 61.650 Board trustee of funds – Investment Committee – Standards of conduct

\* \* \*

(1)(c)        A trustee, officer, employee, or other fiduciary shall discharge duties with respect to ***the retirement system***:

1. Solely in the interest of the members and beneficiaries;

2. For the exclusive purpose of providing benefits to members and beneficiaries and paying reasonable expenses of administering the system;

3. With the care, skill, and caution under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with those matters would use in the conduct of an activity of like character and purpose;

\* \* \*

(d) In addition to the standards of conduct prescribed [above], all individuals associated with the investment and management of retirement system assets, whether contracted investment advisors, board members or staff employees, shall adhere to the Code of Ethics and Standards of Professional Conduct, the asset Manager Code of Professional Conduct if the individual is managing retirement system assets, and the Code of Conduct for Members of a Pension Scheme Governing Body if the individual is a board member...

\* \* \*

### 61.655        Board of trustees — Conflict of interest

No trustee or employee of the Kentucky Retirement Systems Board shall:

(1) Have any interest, direct or indirect, in the gains or profits of any investment or transaction made by the board . . .

*   *   *

(5) Use his or her official position with the retirement system to obtain a financial gain or benefit or advantage for himself or herself or a family member;

(6) Use confidential information acquired during his or her tenure with the retirement system to further his or her own economic interests or that of another person; or

(7) Hold outside employment with or accept compensation from any person or business with which he or she has involvement as part of his or her official position with the retirement system....

### 61.701 Kentucky Retirement Systems Insurance Trust Fund — Purpose — Administration — Participation, regulation, and termination.

(1) (a) There is hereby created and established a trust fund to be known as "Kentucky Retirement Systems insurance trust fund."  All assets received in the trust fund shall be deemed trust funds to be held and applied solely as provided in this section.  Assets of the trust fund shall not be used for any other purpose ...

*   *   *

(2) Trust fund assets are dedicated for use for health benefits as provided in KRS 61.702, and as permitted under 26 U.S.C. secs. 105 and 106, to retired recipients and employees of employers participating in the Kentucky Employees Retirement System, County Employees Retirement System, and State Police Retirement System, and to certain of their dependents or beneficiaries, including but not limited to qualified beneficiaries ....

(3) The trust fund shall be administered by the board of trustees of the Kentucky Retirement Systems and the board shall serve as trustees of the fund. The board shall manage the assets of the fund in the same manner in which it administers the retirement funds ....

**61.702 Group hospital and medical insurance and managed care plan coverage**

e) The benefits of this subsection provided to a member whose participation begins on or after July 1, 2003, shall not be considered as benefits protected by the inviolable contract provisions of KRS 61.692, 16.652 and 78.852.  The General Assembly reserves the right to suspend or reduce the benefits conferred in this subsection if in its judgment the welfare of the Commonwealth so demands.

**61.692 Benefits not to be reduced or impaired for members who began participating before January 1, 2014 — Exceptions — Amendment of benefits and rights.**

(1) For members who begin participating in the Kentucky Employees Retirement System prior to January 1, 2014, it is hereby declared that in consideration of the contributions by the members and in further consideration of benefits received by the state from the member's employment, KRS 61.510 to 61.705 shall constitute an inviolable contract of the Commonwealth, and the benefits provided therein shall not be subject to reduction or impairment by alteration, amendment, or repeal ....

\*    \*    \*

... (a) For members who begin participating in the Kentucky Employees Retirement System *on or after January 1*, *2014*, *the General Assembly reserves the right to amend, suspend, or reduce the benefits and rights provided under KRS 61.510 to 61.705 if, in its judgment, the welfare of the Commonwealth so demands*, *except that the amount of benefits the member has accrued at the time of amendment*, *suspension*, *or reduction shall not be affected*.

(b) For purposes of this subsection, the amount of benefits the member has accrued at the time of amendment, suspension, or reduction shall be limited to the accumulated account balance the member has accrued at the time of amendment, suspension, or reduction.

225.   According to Ky. Rev. Stat. § 61.691, which provided COLA benefits:

Effective July 1, 1996 and on July 1 of each year thereafter ... a recipient of a retirement allowance under KRS 16.510 to 16.652 and 61.515 to 61.705 and 78.520 to 78.852 shall have

has retirement allowance increased by the percentage increase in the annual average of the consumer price index for all urban consumers for the most recent calendar year as published by the federal Bureau of Labor Statistics, not to exceed five percent (5%). ***The benefits of this subsection as provided on August 1, 1996 and thereafter shall not be considered as benefits protected by the inviolable contract provisions of KRS 61.692, 16.652, and 78.852. The General Assembly reserves the right to suspend or reduce the benefits conferred in this subsection if in their judgment the welfare of the Commonwealth so demands***.

### B.   Trustees' Operation and Oversight of the KRS Pension Funds

226.   Operating and overseeing a pension fund is similar to managing other trusts that hold and invest the money of others. The trustee is obligated to protect and invest that money and must be able to pay out those funds to beneficiaries, on demand or according to some contractual obligation down the road. Pension fund trustees must be well informed regarding, and understand in detail, the true financial condition of the trust, the economic circumstances in which they operate, the changing composition of the beneficiary pool, retiree rates, new hire member rates, salary levels and inflation, longevity of plan beneficiaries, and most importantly how much the trustees can realistically expect to earn on the fund assets they oversee and invest. All of this is needed to meet their duties as prudent fiduciaries including having the required funds available to payout when needed, in the short and longer terms. In other words, they must carefully and realistically match the trust fund's assets and liabilities.

227.   Because a public pension plan like KRS involves large numbers of plan members and beneficiaries (over 390,000) entitled to benefits totaling billions of dollars, with large amounts of assets ($15 billion) to be invested over very long periods of time, the "law of large numbers" applies. Even a very small change in any of the key

estimates/assumptions — how many members will retire and how long will they live, how many new employees will enter the plan, how much will they be paid, what will their raises look like, what will be their plan contributions, what will the inflation rate be and how much will the plan earn on its investments — can have a very large dollar impact when spread over the plans and over time.

228.   Of all actuarial assumptions, the annual investment return assumption (AARIR) has the greatest impact on the projected long-term financial health of a pension plan.  This is because over time, the majority of revenues of a public pension fund come from investment earnings. Even a small change in a plan's investment return assumption — as little as ¼ of 1% — can result in a very large impact, often hundreds of millions of dollars, on a plan's publicly reported funding level.  As one commentator has said:

> Of all actuarial assumptions, a public pension plan's investment return assumption has the greatest effect on the projected long-term cost of the plan.  This is because over time, a majority of revenues of a typical public pension fund come from investment earnings.  Even a small change in a plan's investment return assumption can impose a disproportionate impact on the plan's funding level and cost.

229.   Because these actuarial estimates/assumptions are essential to accurately determine all the important metrics on which the pension plan depends, these estimates must be realistic and constantly revised as circumstances evolve.  Using knowledge of these factors, the competent, trained and prudent trustee must make discerning judgments as to each of the pertinent variables, in good faith, on an informed basis, and after making inquiries and undertaking skeptical evaluations.  Only then can the fund, its governmental sponsor and its beneficiaries know how much money the plan will owe and how funded or underfunded it actually is and how much money the government

must put into the fund each year (the annual required contribution) to keep the fund at a healthy funding level. In addition, trustees must accurately and realistically estimate the AARIR a fund will achieve. The amounts the sponsoring political entities are supposed to contribute to the pension funds to keep the pension safe, stable, and adequately funded depends directly on the accuracy of this assumption.

230.   The Trustees and Officers consistently used, or allowed the use of, outdated, misleading or false estimates and assumptions of the actuarial value of the Trust Funds' actuarial assets and liabilities. For instance, KRS used an assumed 4.5% yearly governmental payroll growth for future years when new government hiring rates were then near zero and even declining, and interest rates were too. Most glaring was the use of 7.75% of AARIR in all years from 2006 through 2015 when the cumulative moving average annual rate of return of the KRS Funds never even came close to that figure *in any one year*. That is not a mistake or a bad estimate. It is deliberate, willful manipulation to conceal the true financial and actuarial condition and underfunded status of the KRS Plans.

231.   Trustees also breached their duties by failing to adequately investigate and evaluate on an ongoing basis the proper levels of fiduciary liability insurance that should be purchased to protect KRS and the Commonwealth for damages that they could suffer if the trustees or officers violated their fiduciary trustee duties. The KRS Board only has $5 million in coverage of fiduciary liability insurance coverage, a completely inadequate amount to protect KRS and its funds and Kentucky taxpayers. Given the size of the KRS Trust funds, the ongoing underfunding funding levels and the strict legal duties of trustees and officers, the fiduciary insurance levels should have been at least $300 million.

232.    Under the Kentucky Pension Law, the Trustees were required to undergo initial and ongoing training on "actuarial and financial concepts pertaining to the retirement system" and the "financing and investing of retirement systems."  The Trustees and Ice Miller never adequately implemented the mandated education program; they did not in good faith pursue the training, continuing education program or test over time the Trustees' competence in these very complex and ever-evolving financial matters and products or their progress in learning about or understanding them.

233.    This program was especially important in 2009–10 given the staff turmoil that plagued KRS and deprived Trustees of experienced staff support.  As a result, the Board did not have adequate training, continuing education or expertise to deal with the difficult and complex task presented by the financial and actuarial situation with which they were faced, and they recklessly allowed themselves to be taken advantage of by sophisticated Hedge Fund Sellers, thereby abdicating their mandatory duties.

234.    The Code of Conduct for Members of a "Pension Scheme Governing Body," which is incorporated into the Kentucky Pension Law and sets forth in great detail the conduct required of fiduciary trustees, provides:

### Preamble

The conduct of those who govern **pension schemes** significantly impacts the lives of millions of people around the world who are dependent on pensions for their retirement income. Consequently, it is critical that **pension plans**, also known as systems, schemes, or funds, are overseen by a strong, well-functioning **governing body** in accordance with fundamental ethical principles of honesty, integrity, independence, fairness, openness, and competence.

\*   \*   \*

This *Code of Conduct for Members of Pension Scheme Governing Body (*the Code) represents best practice for members of the pension governing body when complying with their duties to the pension scheme. Whether public or private, each pension scheme board that adopts the code will demonstrate its commitment to servicing the best interest of **participants** and **beneficiaries**.

The code provides guidance to those individuals overseeing the management of the scheme regarding their individual duties and responsibilities.

**Act with skill, competence and diligence**.

Skill and diligence require trustees to be knowledgeable about the matters and duties with which they have been entrusted. Ignorance of a situation or an improper course of action on matters for which the trustee is responsible or should at least be aware is a violation of this code. Improper or ill-advised decisions can be costly to the pension scheme and detrimental to the scheme's participants and beneficiaries. Prior to taking action on behalf of the scheme, effective trustees and/or their designees analyze the potential investment opportunities and act only after undertaking due diligence to ensure they have sufficient knowledge about specific investments or strategies.

Effective trustees will have knowledge and understanding of

- Trust and pension laws.

- Pension scheme funding and liabilities.

- The policies of the scheme.

- The strategies in which the scheme is investing.

- Investment research and will consider the assumptions used — such as risks, inflation, and rates of return – as well as the thoroughness of the analysis performed, the timeliness and completeness of the information, and the objectivity and independence of the source.

- The basic structure and function of the selected investments and securities in which the scheme invests.

- How investments and securities are traded, their liquidity, and any other risks ....

Certain types of investments, such as hedge funds, private equity, or more sophisticated derivative instruments, necessitate more thorough investigation and understanding than do fundamental investments, such as straightforward and transparent equity, fixed-income, or mutual fund products. Trustees may seek appropriate expert or professional guidance if they believe themselves lacking the expertise necessary to make an informed decision.

*   *   *

**Take actions that are consistent with the established mission of the scheme and the policies that support that mission**.

Effective trustees develop and implement comprehensive written investment policies that set forth the mission, beliefs, and strategic investment plans that guide the investment decisions of the scheme (the "policies").

- Draft written policies that include a discussion of risk tolerances, return, objectives, liquidity requirements, liabilities, tax considerations, and any legal, regulatory, or other unique circumstances.

- Review and approve the scheme's investment policies as necessary, but at least annually, to ensure that the policies remain current.

- Only take investment actions that are consistent with the stated objectives and constraints of these established scheme policies.

- Establish policy frameworks within which to allocate risk for both asset mix policy risk and active risk as well as frameworks within which to monitor performance of the asset mix policies and the risk of the overall pension fund.

**Review on a regular basis the efficiency and effectiveness of the scheme's success in meeting its goals**, including assessing the performance and actions of scheme service providers, such as investment managers, consultants, and actuaries.

Effective trustees have knowledge and understanding to critically review and verify the performance of the scheme's investment managers.

- Ensure that the investment entity managing scheme assets employs qualified staff and sufficient human and technological resources to thoroughly investigate, analyze, implement, and monitor investment decisions and actions.

- Ensure that investment managers and consultants retained by the scheme adopt and comply with adequate compliance and professional standards.

- Ensure that the pension scheme has in place proper monitoring and control procedures for investment managers.

- Review investment manager performance assessments relative to the scheme's investment policy statement on a regular basis, generally quarterly but at least annually.

**Communicate with participants**, **beneficiaries**, **and supervisory authorities in a timely**, **accurate**, **and transparent manner**.

Full and fair disclosure of relevant information is a fundamental ethical principle of capital markets and the investment services industry. Developing and maintaining clear, timely, and thorough communication practices is critical to providing high-quality financial services to scheme participants and beneficiaries.

Trustees have a responsibility to

- Ensure that the information they provide to scheme participants and beneficiaries is accurate, pertinent, and complete.
- Not misrepresent any aspect of their services or activities in any communications, including oral representations, electronic communications, or written materials (whether publicly disseminated or not).

* * *

Among other disclosures, trustees have a duty to present performance information that is a ***fair representation*** of the scheme's investment record and that includes all relevant factors. Trustees have a responsibility to comply with the scheme's disclosure policies by submitting any requested information in a timely manner. To be effective, disclosures

> of information must be made in plain language and in a
> manner designed to effectively communicate the
> information. (emphasis added).

235.    The Trustees and Officers willfully or recklessly violated their duties to

KRS and its Funds, and did not act in good faith or in what they honestly believed was in

the best interests of KRS, and its Funds when they failed to: (i) adequately safeguard the

trust funds under their control; (ii) procure adequate fiduciary insurance: (iii) invest the

trust assets prudently, (iv) avoid excessive and/or unreasonable fees and expenses; (v)

use realistic estimates and assumptions regarding the actuarial condition and future

investment returns of the funds; (vi) adequately match the assets and liability of the

funds; (vii) protect and assure KRS's full legal rights, including the right to sue in

Kentucky state court, in open proceedings, with a jury trial, if KRS's legal rights were

violated by others — especially by sophisticated out-of-state sellers of investment

products who might try to limit or eliminate KRS's legal remedies or (viii) make

truthful, complete, accurate disclosure of, or a fair presentation of, the true financial and

actuarial condition the KRS Funds and Plans as is detailed in this Complaint.

### C.    Hedge Fund Sellers' Duties to KRS

236.    The Kentucky Pension Law requires that all individuals associated with the

investments and management of KRS assets, including investment advisors and

mangers like the Hedge Fund Sellers and RVK, adhere to the Chartered Financial

Analyst Institute ("CFA") Code of Ethics, Standards of Professional Conduct, and the

Asset Manager Code of Professional Conduct, which codes express in detail the conduct

required of fiduciary advisors and managers. Hedge Fund Sellers and RVK did not do

so.

237.    The CFA describes itself as follows:

> The CFA Institute Code of Ethics and Standards of Professional Conduct are fundamental to the values of CFA Institute and essential to achieving its mission to lead the investment professional globally by promoting the highest standards of ethics, education, and professional excellence for the ultimate benefit of society.  High ethical standards are critical to maintaining the public's trust in financial markets and in the investment profession.  Since their creation in 1960s, the Code and Standards have ... served as a model for measuring the ethics of Investment professionals ... regardless ... or local laws and regulation.

238.  The CFA "Code of Ethics" provides persons subject to its code must:

1.  Act with integrity, competence, diligence, respect and in an ethical manner with ... clients ....

2.  Place ... the interests of clients above their own personal interests.

3.  Use reasonable care and exercise independent professional judgment when conducting investment analysis, making investment recommendations, taking investment actions ....

239.  In addition, CFA prescribes "Standards of Professional Conduct" for persons subject to the Code:

**A. Knowledge of the Law** ... must understand and comply with all applicable laws, rules, and regulations (including the CFA Institute Code of Ethics and Standards of Professional Conduct). In the event of conflict, [they] must comply with the more strict law, rule or regulation.

**B. Independence and Objectivity** ... must use reasonable care and judgment to achieve and maintain independence and objectivity in their professional activities.

**C. Misrepresentation** ... must not knowingly make any misrepresentations relating to investment analysis recommendations, actions or other professional activities.

**D. Misconduct** ... must not engage in any professional conduct involving dishonesty, fraud or deceit or commit any act that reflects adversely on their professional regulation, integrity or competence.

240.  In addition, the CFA Code of Ethics sets forth "Duties to Clients," providing that persons subject to the code:

**A.  Loyalty, Prudence, and Care** ... have a duty to loyalty to the clients and must act with reasonable care and exercise prudent judgment [and] must act for the benefit of their clients and place their clients' interests before ... their own interests.

**B. Fair Dealing** ... must deal fairly and objectively with all clients when providing investment analysis and making investment recommendations, taking investment action or engaging in other professional activities.

241.    The CFA Code of Ethics also commands that persons subject to the code must:

  a.    Make a reasonable inquiry into a client's or prospective client's investment experience, risk and return objectives recommendation or taking investment action and must reassess and update this information regularly.

  b.    Determine that an investment is suitable to the client's objectives, mandates, and constraints before making an investment recommendation or taking investment action.

  c.    Judge the suitability of investments in the context of the client's total portfolio.

242.    The Code of Ethics also requires that persons subject to it must:

  1.    Exercise diligence, independence and thoroughness in analyzing investments, making investment recommendations, and taking investment actions.

  2.    Have a reasonable and adequate basis, supported by appropriate research and investigation, for any investment analysis, recommendation, or action.

243.    The CFA Institute Asset Manager Code outlines the ethical and professional responsibilities of firms that manage assets on behalf of clients:

**1.  GENERAL PRINCIPLES OF CONDUCT**
Managers have the following responsibilities to their clients. Mangers must:
  1.  Act in a professional and ethical manner at all times.
  2.  Act for the benefit of clients.
  3.  Act with independence and objectivity.

4. Act with skill, competence, and diligence.

\* \* \*

## 2. ASSET MANAGER CODE
### A. LOYALTY TO CLIENTS

1. Place client interests before their own.

\* \* \*

### B. INVESTMENT PROCESS AND ACTIONS

Managers must:

1. Use reasonable care and prudent judgment when managing client assets.

\* \* \*

3. Deal fairly and objectively with all clients when providing investment information making investment recommend-actions or taking investment action.

4. Have a reasonable and adequate basis for investment decisions.

\* \* \*

6. When managing separate accounts and before providing investment advice or taking investment action on behalf of the client.

   a. Evaluate and understand the client's investment objectives tolerance for risk, time horizon, liquidity needs, financial constraints, any unique circumstances consideration legal or regulatory constraints, etc.) and any other relevant information that would affect investment policy.

   b. Determine that an investment is suitable to a client's financial situation.

244. In addition to not complying with the duties and standards of conduct set forth in the CFA Codes above, each of the Hedge Fund Sellers was in a conflict of interest when acting as fiduciaries, investment advisors or managers in advising the KRS Trustees on hedge fund investments and acting to manage KRS's investments, while at the same time selling KRS, or continuing the placement of, their own custom-designed high-fee, Black Box fund of hedge funds products.  The Hedge Fund Sellers, as sophisticated financial professionals recommending investment strategies to KRS while selling their own products, were required to adhere to the highest standards.  They had

complete discretion to pick the sub-funds in each Black Box, and were the only entity able to exercise any management over them.  In addition, the KRS Funds were going to be "locked up" under the Hedge Fund Sellers' control for years.  Hedge Fund Sellers had a duty to only recommend those specific investments or overall investment strategies that were **suitable** for KRS given its **particular circumstances**, having an "adequate and reasonable basis" for any recommendation made, including an obligation to investigate and obtain adequate information about the Funds' financial and actuarial condition and the investment recommended.  And because of their superior knowledge and expertise and their knowledge of the dependence of the understaffed KRS on them and because they had discretion to select the downstream Black Box Funds, and because monies placed in the Black Boxes could not be withdrawn at will — they owed fiduciary duties as well.  They violated all these duties as detailed in this Complaint.

245.   As fiduciaries, the Hedge Fund Sellers were obligated to put the interests of KRS above their own — and in no way to take or gain advantage over KRS. To the extent the Hedge Fund Sellers tried to impose any restrictions on or diminution of KRS's legal rights and its ability to pursue its legal rights in Kentucky's courts, in open proceedings and with a jury trial, it is a breach of that duty.

### D.   Duties of Investment, Actuarial and Fiduciary Advisors

246.   The Investment Advisors, Actuarial Advisors and Fiduciary Advisors each owed KRS and its Funds and Plans fiduciary duties as well as duties of due care and diligence, and the duty to assure that KRS trustees and officers comply with the Kentucky Pension Law and the other statutes enacted to protect KRS, its members and beneficiaries.  The Actuarial Advisor, RVK, was also subject to the CFA Code of Ethics, Standards of Professional Conduct, and the CFA Asset Manager Code of Professional

Conduct and thus owed the same duties as the Hedge Fund Sellers as alleged above, and also failed to comply with those duties, as detailed in this Complaint.  In light of Ice Miller's professed expertise, its duties included overseeing and monitoring the compliance with fiduciary standards by the trustees and officers, and by all professionals rendering expert advice and/or services to KRS, and by the sellers of significant investment products to KRS and the Funds.

IX. **DEFENDANTS' AND THE KRS TRUSTEES/OFFICERS' SCHEME, CONSPIRACY AND CONCERTED COMMON COURSE OF CONDUCT THAT DAMAGED KRS AND ITS FUNDS AND GREATLY INCREASED THE RISK OF FAILURE OF ITS FUNDS/TRUSTS**

A. **The Black Box Fund of Hedge Funds Debacle, the Hidden/Excessive Fees and the True Risks and Nature of the Black Boxes**

1. **The 2000s Bring Huge Losses, Horrible Investment Performance and Funding Deficits**

247.    In 2000–01, KRS lost $2.2 billion in investments (over 20% of the KRS Funds' assets).  In 2008–09, KRS lost over $4.4 billion (over 30% of the KRS Funds' assets).  After these losses, the trustees received studies which revealed that the financial condition and liquidity of the Funds were seriously threatened and far worse than was publicly known.  The trustees had been utilizing outmoded, unrealistic and even false actuarial estimates and assumptions about the Pension Plans' key demographics, *i.e.,* retiree rates, longevity, new hires, wage increases, and inflation.  For example, the Trustees used an assumed 4.5% yearly governmental payroll growth when new hiring rates were near zero or negative and interest rates were too.  Most importantly, KRS's assumed annual rate of investment return ("AARIR") of 7.75% was not realistic.[20]

---

[20] Over the relevant time period KERS used AARIRs of 8.25% (6/30/01–6/30/06), 7.75% (6/30/06–6/30/15) and 7.50% after 6/30/15; amid recent disclosures

Nevertheless, Trustees and other Defendants continued to use assumptions that were proven to be dead wrong by the actual figures established since 2000.  From 2000 through to date, the Funds' cumulative moving average annual rate of return has never even come close to that "assumption."  That is not a mistake or a bad estimate.  It is deliberate concealment.

248.   Between 2000 and 2016, the KRS Plans achieved the following ***actual*** annual rates of return on investments[21] (negative returns are shown in red):

| YEAR | Excluding Interest/Dividends | Including Interest/Dividends |
|---|---|---|
| 2000 | +1.82% | +4.91% |
| 2001 | -3.58% | -0.36% |
| 2002 | -5.12% | -1.74% |
| 2003 | -3.60% | -0.35% |
| 2004 | -0.73% | +2.38% |
| 2005 | + 0.41% | + 3.45% |
| 2006 | + 1.32% | + 4.32% |
| 2007 | + 2.63% | + 5.61% |
| 2008 | + 1.45% | +4.44% |
| 2009 | -1.04% | + 1.91% |
| 2010 | + 0.21% | +3.08% |
| 2011 | + 1.52% | + 4.32% |
| 2012 | + 1.19% | + 3.94% |
| 2013 | +1.68% | + 4.40% |
| 2014 | + 2.36% | + 5.06% |
| 2015 | + 2.21% | +4.85% |
| 2016 | + 1.98% | +4.53% |

249.   By 2009, the KRS Plans had achieved an average annual rate of investment return of negative -1.04% (excluding dividends/interest) and only positive

---

the AARIR has been cut even further to 5.75%.  For simplicity, and because 7.75% was used throughout the bulk of the relevant time periods, we use 7.75% throughout, unless the difference matters.

[21] The data in this chart, and in charts and throughout this Complaint, is the cumulative moving average of the actual returns from the year 2000 forward to each respective year end, unless the context clearly states to the contrary.

+1.91% (including dividends and interest) since 2000 — a ten-year period.  KRS's

AARIR never recovered from the $6.6 billion in investment losses between 2000–

2009.[22]  The use of a 7.75% AARIR going forward was in disregard of the KRS Funds'

own actual investment record and willfully reckless.  The actual KRS's investment

record and performance demonstrated to all Defendants that the 7.75% AARIR used by

the KRS Trustees, and upon which so much else depended, had been unrealistic and

unachievable and would be going forward on an ongoing basis.  The graphs below show

how unrealistic it was to continue use of the AARIR of 7.75%:

[The remainder of this page is deliberately left blank.]



---

[22] If an investment is worth $50 and falls to $25, your loss is 50% or $25.  Just to get back to even, your remaining $50 of investment money must go up 100%. Then to make up the AARIR for both years, you need the equivalent of two 7.75% returns on top of that. Losses of the magnitude suffered by the KRS Funds could not be made up with another AARIR of 7.75%.



### 2. The 2009–10 Financial/Actuarial Vice and KRS's Board and Staff Personnel Crisis

250.    While the trustees were attempting to deal with the largest investment losses KRS had ever suffered ($6.6 billion in just a few years), they were also facing (i) a significant increase in retirees, requiring the Plans to start paying out increasing amounts of benefits to retirees, who were living ever longer lives; and (ii) slowing growth in government hiring, *i.e.*, fewer new members (and fewer wage increases) to provide needed fresh money to the Plans.

251.    In 2009–10, KRS was also suffering from serious Board turmoil and staff turnover. A special audit had uncovered $12–15 million in "suspicious payments" (now statutorily illegal payments) to mysterious placement agents, much of it in connection with KRS's first ever "investment" of over $100 million in two exotic hedge fund-like vehicles sold to KRS by financial firms in 2010 (in which KRS suffered large losses).  The

KRS Chief Investment Officer ("CIO") and Executive Director ("ED") were both fired. The Board Chair, a retired highway patrolman, was removed, but permitted to remain on KRS's Investment Committee.  This left the Trustees to face the financial/actuarial crisis with an interim ED who had no investment experience or expertise, plus a new Board Chair, new CIO, a new Director of Alternative Investments, and a compromised Investment Committee.  None of these individuals had experience or expertise in "absolute return" funds of hedge funds, the Black Box[23] vehicles the Hedge Fund Sellers were about to sell to KRS.

252.   In 2009–10, as KRS's Trustees tried to deal with the huge investment losses with a disrupted Board and decimated staff, the KRS Plans' internal demographics continued to deteriorate: more retirees, living longer, fewer new plan members, lower pay increases, and much lower investment returns than the published 7.75% AARIR.  Trustees realized that, even if the KRS Funds could somehow earn 7.75% per year going forward forever, the Plans were going to face a serious liquidity squeeze.

253.   By 2010, the KRS Trustees and Officers were caught in a tightening financial/actuarial vise. Having suffered over $6.6 billion in investment losses in seven years (which would penalize returns at least until 2014), they now had to find a way to pay ever increasing numbers of longer-living retirees, with fewer and fewer new plan members contributing wage assessments, all in a "zero" interest rate environment.  They and their investment, actuarial and fiduciary advisors realized that the Plans would

---

[23] "Black Box" hedge funds are vehicles where the "investor" knows little if anything about the contents of the vehicle or how the money is being "invested."  This secrecy is usually based on a claim by the hedge fund seller/manager that the methods, strategies and fees of the fund are sophisticated, secret and successful and are thus proprietary and cannot be disclosed for fear of losing claimed competitive advantages.

likely not have the money to pay the promised and legally-obligated pensions even assuming the Funds earned the published, but now known by them to be completely unrealistic, AARIR of 7.75% per year, every year, forever going forward.  All defendants also realized that if they honestly and in good faith factored in and disclosed realistic actuarial assumptions and estimates and investment returns, the admittedly underfunded status of the Plans would skyrocket by billions of dollars overnight, that there would be a huge public outcry, that their stewardship and services to the Funds would be vigorously criticized, and that they would likely be investigated, ousted, and held to account.

### 3.    The KRS Trustees and the Defendants Choose to Cover Up and Play Catch Up

254.    Contrary to their obligations of truthful disclosure in "easily understood" language as mandated by the Kentucky pension statute, Trustees, with the knowing assistance of all the Defendants, chose to cover up the true extent of the KRS financial/actuarial shortfalls and take longshot imprudent risks with KRS Funds to try to catch up for the Funds' prior losses and deceptions.  They misled, misrepresented and obfuscated the true state of affairs inside KRS from at least 2009 forward.

255.    The Trustees had also chosen to spread the $2.2 billion in investment losses in 2001–02 over the following five years, and did the same with the $4.4 billion in losses in 2008–09.  With these huge losses already in place, the trustees were facing a severe crisis caused by their reckless assumptions.  Trustees and other Defendants made representations in KRS Annual Reports to members and Kentucky taxpayers directly contrary to the actual actions of Trustees and other Defendants, stating that: "(i) ... the Board follows a policy of thoughtfully growing our asset base while protecting against

undue risk and losses in any particular investment area.  The Board recognizes its fiduciary duty … to invest the funds in compliance with the Prudent Person Rule; (ii) "its investment decisions … [are] the result of conscious exercise of discretion … and that proper diversification of assets must be maintained"; (iii) "through these policies" that KRS has been able to provide "significant returns" … while "holding down," [and] "minimizing investment expenses"; (iv) and that the KRS Annual Reports to members and taxpayers "would provide complete and reliable information as a means for determining compliance with statutory provisions and as a means of determining responsible stewardship of KRS funds."

### 4.  The KRS Trustees Are Targeted by the Hedge Fund Sellers

256.  As Trustees searched for a way out of the serious financial/actuarial crisis they knew the Plans were in, they presented a tempting target for the Hedge Fund Seller Defendants.  "Hedge funds" is a term that encompasses private (not publicly traded) investment vehicles often structured as limited partnerships, employing what are called "alternative investment strategies" as opposed to conventional investments, such as equities, bonds and mutual funds.  But the Hedge Fund Sellers sold the KRS Trustees something far more exotic, risky, toxic and expensive than an ordinary hedge fund. They sold them hedge funds that invest in *other hedge funds*.  Hedge fund sellers like to call these hedge funds "absolute return assets" or "absolute return strategies," indicating they always provide positive returns — which they most certainly do not.  These funds are also sometimes referred to as "funds of funds" or "funds of hedge funds" vehicles. More accurately they are called "Black Boxes" because the investor does not know what these downstream funds put the investors' money into, how they invest this money, what the true fees are or how they are shared among the various funds involved in the

chain of funds.  Further, the investor does not have any way to objectively and independently monitor the investing practices of the downstream funds or to determine or accurately measure the value of their holdings.  "Black Boxes" are secretive and opaque because of the layers of secrecy placed between the investor and the investment, as downstream fund managers claim their methods, strategies and fees are "propriety," "secret" and cannot be shared.  When Trustees were sold these vehicles, they lacked adequately trained, experienced staff with expertise in fund of hedge funds to assist them.

257.    Hedge fund sellers, managers, and consultants, like Hedge Fund Sellers here, have found a lucrative victim in the trustees of many public pension funds, as was documented in "All That Glitters Is Not Gold: an analysis of US public pension investments in hedge funds," ROOSEVELT INSTITUTE, Nov. 16, 2015.  This extensive study concluded that the poor investment returns of hedge funds cost the eleven public pension funds studied $8 billion in lost investment income while the excessive fees of the hedge funds cost the pension funds $7 billion.  The study found that hedge funds provided no protection (or hedge) against volatility and downside loss.  And for every $1 of investment returns, the hedge fund fees were an astonishing $0.57.  The Report concluded:

> Our analysis suggests that, despite promises of better and less correlated returns, hedge funds failed to deliver significant benefits to any of the pension finds we reviewed. Instead, our findings suggest that hedge funds collected billions in disproportionately high fees that do not appear justified by performance, while costing public pension funds — and the public employees and taxpayers who fund them — additional billions in lost investment revenue.

* * *

> Indeed, our findings suggest that all 11 pension funds
> included in our analysis would have performed better having
> never invested in hedge funds in the first place. This has
> important implications not only for pension fund trustees,
> who have a fiduciary duty to prudently seek investments that
> provide the highest long-term returns for the lowest cost to
> the pension fund, but also for public employees, public
> employee unions, retirees and taxpayers ... [who] should be
> concerned about this overall negative impact that hedge
> funds are exerting on public pension funds.

258.   In August 2011, Trustees were sold $1.2–$1.5 billion (in three extremely large commitments, each between $400 and $500 million) in Black Box fund of hedge funds vehicles.  Reflecting what Trustees had been told, KRS's Chief Investment Officer ("CIO") announced that these investments were "Absolute Return" assets, an "absolute return strategy" which would "reduce volatility" ... [get KRS to] an expected rate of return of 7.75% ... [and which] lowers our risk."  According to KRS's investment advisor RVK, Trustees had decided on the "most effective asset allocation strategies for each pension and insurance plan ... in order to lower risk, control the level of illiquidity in the portfolios and generate a return expected to exceed the actuarial assumed rate of return 7.75%" [and] "with new allocations to the ... absolute return buckets ... going forward the portfolio is more diversified than ever."

259.   The Black Box hedge funds were placed in each of the KRS Pension and Insurance Plans — spread across the available universe of funds.  At least $240 million in Black Box investments were initially placed in the insurance trusts.  The balance was divided among the pension plan trusts.  Later hedge fund purchasers were similarly allocated in both the pension and insurance trusts.

260.   These unsuitable "investments" did not lower risk, reduce illiquidity, or generate sufficient returns to enable KRS to even approach, let alone exceed, the

assumed rate of 7.75% on an ongoing basis.  They did generate excessive fees for those Hedge Fund Sellers, poor returns and ultimately losses for the Funds, in the end damaging KRS.

261.    These funds of hedge funds Black Boxes were sold to KRS by sophisticated, high-powered financial firms, headquartered in Wall Street and Los Angeles and operating all over the world: KKR, KKR/Prisma, Blackstone and PAAMCO (each defined below in Section III, collectively referred to as the "Hedge Fund Sellers").[24]  Each of these firms targeted underfunded public pension funds like KRS.  To them, KRS was a potential buyer of the exotic, high-fee and high profit hedge fund vehicles they sold. The Hedge Fund Sellers nicknamed these vehicles the "Daniel Boone Fund," "Henry Clay Fund," and "Newport Colonels Fund" ("Colonels" Fund") because they were specially designed and created for Kentucky.

262.    These funds of hedge funds were extremely high-risk, secretive, opaque, high-fee and illiquid vehicles.  They were the largest, single one time "investments" (individually or collectively of one asset class) ever made by KRS.  Trustees took this gamble even though these "Black Boxes" had no prior history of investment performance, and, because of their secrecy, were impossible for Trustees to properly monitor, accurately value or even calculate the total fee burden.

263.    During 2016–17, the funded status of the KRS Plans plunged even further. Investigative journalists and an independent investigation revealed losses, excessive fees

---

[24] "Hedge Fund Sellers" as used in this Complaint means KKR, Kravis, Roberts, Prisma, Reddy, Blackstone, Schwarzman, PAAMCO and Buchan for all periods after 2011 and refers to Prisma, Reddy, Blackstone, Schwarzman, PAAMCO and Buchan for periods prior to 2012. It should be understood that events prior to 2012 are at this point only alleged to be the responsibility of KKR, Kravis or Roberts to the extent KKR may have acquired the liabilities of Prisma upon its acquisition of Prisma.

and the past use of outmoded, unrealistic, and false actuarial assumptions.  KRS has

slashed its AARIR to much lower levels.  In 2017, three of the highest elected officials of

the Commonwealth, the Governor (Matt Bevin), the House Speaker (Jeff Hoover) and

the Senate President (Robert Stivers) jointly wrote:

> "The biggest cause of the shortfall was erroneous actuarial
> assumptions made by past members of the boards of these
> systems, which led to significant underfunding ...
>
> ... [P]ast assumptions were often manipulated by the prior
> pension boards in order to minimize the "cost" of pensions to
> the state budget. Unreasonably high investment expectations
> were made and funding was based on false payroll numbers.
>
> The result was to provide a false sense of security and justify
> smaller than necessary contributions to the pension plans.
> This was a morally negligent and irresponsible thing to do."

### B.    Accountability Required

264.    The huge underfunding and near financial collapse of the Plans has

occurred despite Kentucky taxpayers pouring billions of dollars into KRS in recent

years, causing an increasingly large drain on the Kentucky Treasury and contributing to

significant curtailments of social and educational spending.  The T/Os, as part of their

course of misconduct with the other Defendants, have operated KRS in violation of law.

They failed to follow legal mandates regarding the safeguarding and prudent investment

of trust monies for which they were responsible, consisting of both pension funds and

tax dollars, wasting billions of tax dollars and damaging KRS and its Pension Funds.

Because of the KRS fiasco, Moody's and Standard & Poors have slashed Kentucky's

credit rating, leaving Kentucky with the worst, or one of the worst, credit ratings of any

state.

### 1. The KRS Trustees Are Sold the Black Box Fund of Hedge Funds

265.     The deteriorating status of the KRS Plans caught the attention of the Hedge Fund Sellers.  Because they targeted pension plans, they had sophisticated knowledge of pension plan finances and because of internal information they obtained about KRS they knew the KRS Trustees and Officers were dealing with a much more serious situation than was known by the public.  These Hedge Fund Sellers targeted KRS to sell it custom-designed "Black Box" funds of hedge funds that they portrayed as capable of producing the high investment returns with safe diversification while providing down-side protection — just what the desperate KRS Trustees were searching for.  In fact, the Black Box vehicles were secretive, opaque, illiquid, impossible to properly monitor or accurately value, high-fee, high-risk gambles with no historical record of performance, where KRS was "locked in" for years and Hedge Fund Sellers had complete discretion to pick the investments and then to value them.  They were completely unsuitable investments for the KRS Funds given the KRS Plans' particular financial/actuarial situation.

266.     Recent events should have alerted Trustees to the great danger of being sold "high yield/high return" exotic "investment" vehicles by Hedge Fund Sellers with "checkered pasts."  In 2009, the KRS trustees put trust monies into its first hedge fund type investments.  Connecticut based Arrowhawk Capital Partners was a hedge fund seller — a startup with no investment record.  The trustees entrusted it with $100 million.  Arrowhawk was a flop.  Under a cloud of controversy over its fees and lack of experience, it quickly folded.  In 2009, the trustees made a multi-million dollar "investment" in The Camelot Group.  Its owner was indicted for siphoning $9.3 million

to pay for personal extravagances.  That fund also collapsed.  Other contemporaneous events were front page news that should have been red flags to Defendants (the infamous Madoff scandal involving another New York-based investment manager who lost billions of investors' money in "*secret*" Black Box investment strategies.  The fund of hedge funds that Hedge Fund Sellers were creating and selling themselves had a "checkered past" of questionable legitimacy as investments whose existence arose from the infamous "Fund of Funds" scandals involving Bernie Cornfeld and Robert Vesco, where investors lost billions.  Notorious hedge fund blowups included Long Term Capital, Galleon and others.

267.    In an echo of the earlier Arrowhead and Camelot disasters, shortly after Trustees had been persuaded to hand over a $1.2 billion three of the Hedge Fund Seller Defendants (KKR/Prisma, Blackstone and PAAMCO) to put into Black Boxes, one of the top personnel of one Black Box was implicated in criminal conduct. Hedge Fund Seller Blackstone had placed KRS trust monies (Henry Clay Fund) in a hedge fund run by SAC Capital, a business controlled by Steve Cohen, a Wall Street colleague well known to the Schwarzman and Hill, even though Cohen and SAC Capital were being investigated for financial misconduct at the time Blackstone gave some of its share of the KRS Trust Funds to Cohen.  Top SAC Capital traders were later criminally convicted and Cohen and SAC Capital were severely punished.  Having again recklessly put KRS Trust monies in exotic vehicles sold to them by sophisticated Hedge Fund Sellers and again been burned, Trustees did not — as they should have — entirely remove their investments in the Black Boxes and put this money in safer, lower cost, more prudent investments handled by more reputable dealers.  Nor did any of Defendants insist that they to do that.

268.   KKR/Prisma, along with Kravis and Roberts are regularly involved in complex financial transactions involving entities and/or individuals who owe fiduciary duties to others.  The same is true of Blackstone and Schwarzman.  Blackstone and KKR/Prisma have stated in government filings that because of the way they conduct their business activities, they face "substantial litigation risk."  Blackstone stated that the volume of such litigation has "been increasing."  Because of the aggressive tactics they use in financial transactions to gain unfair advantage for themselves, they or entities they control or operate have been sued on multiple occasions for misconduct — breach of fiduciary duty — in transactions involving pension funds, trusts and other investors, to whom they owed fiduciary duties. Kravis, Roberts and Schwarzman also regularly attempt to evade or dilute the fiduciary duties they would otherwise owe to these types of investors, even taking such steps for investors in KKR and Blackstone.

269.   Schwarzman and Hill were also both top executives at Lehman Brothers, which was later implicated as having a significant role in one of the largest Wall Street frauds of all time, and directly causing the 2008–09 financial meltdown with consequent loss of billions in individual and institutional equity and a torrent of litigation alleging fraud.  Both KKR and Blackstone have been fined by a government regulator for dishonesty and misconduct in their fiduciary capacity in connection with their fees charged to buyers of alternative investments like hedge funds.  Buchan and the other founders of PAAMCO had been sued for financial deception and dishonesty and found liable upon summary judgment as detailed earlier — acts of deception and dishonesty that when exposed got PAAMCO fired by other public pension funds due to the risk of continuing to do business with them.  These individuals and the exotic and secretive vehicles they were selling had "checkered pasts" that should have been red

flags to Trustees, and should have resulted in investigation with no investment, rather than investment without investigation.

270.    Had Trustees been properly trained and educated and had they been skeptical and careful and properly counseled by their advisors and staff, the consideration of making an extraordinarily huge onetime, first of its kind, Black Box blind bet on what these Hedge Fund Sellers were trying to sell them on, in light of these facts, should have caused Trustees not to deal with Hedge Fund Sellers and not to buy what the Hedge Fund Sellers were selling, and to instead deal with other more reputable entities , offering more conventional, less high-risk, less high-fee, more transparent investments with a track record of performance.  If the $1.5 billion had been placed in a no/low-fee stock index fund like the S&P or DJIA, the $1.5 billion would have turned into at least $3 billion over the next seven years.  If Trustees had simply stayed with the existing 2009 asset allocations, the Funds would have enjoyed investment results that would have left it far better funded than they are now, an opportunity for gains and income that is now lost due to imprudent investments.

271.    Dealing with and relying on (i) the Hedge Fund Sellers, with "checkered pasts" of their own or of the entities through which they operated, and who had been sued for breaches of duty and fraud in other complex financial and investment transactions and who even had to warn investors in other government filings of the "substantial litigation risk" their way of doing business exposed them to,  and (ii) the advisors who led Trustees to believe that these "Black Boxes" could make up for past investment losses and help overcome the underfunding of the KRS Pension Plans and help restore them to financial health — and with the approval of its Fiduciary Advisor

and Investment Advisors, the Trustees recklessly gambled but it was KRS, its Plans and the Commonwealth who paid, and are paying, the cost.

272.    The Black Boxes did not provide the investment returns Trustees needed for KRS to return to or exceed on the average its AARIR of 7.75%, did not provide safe diversification, provided very weak absolute and very bad relative investment returns and ultimately lost millions of dollars in 2015–16 — the very losses the "hedges" with their supposed "reduced volatility" and "safe diversification" would supposedly protect against.  According to the investigative report issued by Consulting Group PFM ("PFM") in 2017, "a roughly 10% allocation to hedge funds in the KRS Retirement System Plans had a negative impact on overall plan returns."  Further, the ongoing selloff of these hedge funds "is likely to result in improved performance and lower fees going forward."  PFM reported that "asset allocation," including this 10% allocation to the "hedge funds" (and an 8–10% allocation to Real Return assets) "has been the primary detractor of relative KRS performance."

273.    Kravis and Roberts, in addition to their own personal involvement in the KKR business, in law and in fact controlled all operations of KKR, KKR/Prisma (after its acquisition in 2012), and KKR/Prisma/PAAMCO at relevant times.  As the responsible corporate officers, they had a duty to properly train all officers and employees who act as their agents and servants in the duties of good faith, care, loyalty, absence of self-dealing, compliance with applicable public pension laws and trust laws in states where they go to sell billions of dollars in hedge fund products, with external codes of conduct and care (such as the CFA) and internal codes of conduct and care, and with fiduciary duties owed by, respectively, KKR, KKR/Prisma and KKR/Prisma/PAAMCO officers, agents and employees, when selling or continuing to hold products and services.

Blackstone and KKR have a "Code of Business Conduct and Ethics" (Blackstone) and a "Code of Ethics" (KKR) which all of its employees must adhere to on pain of dismissal desires of and which were personally approved by Kravis, Roberts and Schwarzman and for which they are responsible for overseeing.  Further, Kravis and Roberts have a duty to supervise all officers, agents and employees and in the exercise of their fiduciary duties to KRS, and their duties of good faith, care, loyalty, code compliance, and the absence of self-dealing, a duty consistent with the *Caremark* corporate law duties to exercise appropriate attention and monitor subordinates' behavior, "including the compliance with applicable statutes and regulations," but here not limited or circumscribed by any business judgment rule defense.  This they failed to do when dealing with KRS, to the damage of KRS.

274.    Schwarzman, in addition to his own personal involvement in the Blackstone business, in law and in fact controlled all operations of Blackstone at relevant times.  As the responsible corporate officer, he has a duty to properly train all officers and employees who act as its agents and servants in the duties of good faith, care, loyalty, absence of self-dealing, compliance with applicable external codes of conduct and care (such as the CFA) and internal codes of conduct and care, and fiduciary duties owed by Blackstone officers, agents and employees, when selling or continuing to hold products and services.  Further, Schwarzman has a duty to supervise all officers, agents and employees and in the exercise of their fiduciary duties to KRS, and their duties of good faith, care, loyalty, code compliance, and the absence of self-dealing, a duty consistent with the *Caremark* corporate law duties to exercise appropriate attention and monitor subordinates' behavior, "including the compliance with applicable statutes and regulations," but here not limited or circumscribed by any

business judgment rule defense.  This he failed to do when dealing with KRS, to the damage of KRS and Kentucky taxpayers.

275.    Buchan, in addition to her own personal involvement in the PAAMCO business, in law and in fact controlled all operations of PAAMCO at relevant times.  As the responsible corporate officer, she had a duty to properly train all officers and employees who acted as its agents and servants in the duties of good faith, care, loyalty, absence of self-dealing, compliance with applicable external codes of conduct and care (such as the CFA) and internal codes of conduct and care, and fiduciary duties owed by PAAMCO officers, agents and employees, when selling or continuing to hold products and services.  Further, Buchan had a duty to supervise all officers, agents and employees and in the exercise of their fiduciary duties to KRS, and their duties of good faith, care, loyalty, code compliance, and the absence of self-dealing.  This she failed to do when dealing with KRS, to the damage of KRS.

### 2.    The Hidden/Excessive Fees

276.    In addition to being unsuitable investments, the purchase and holding of Black Box vehicles violated Trustees' duties to administer the Pension/Trust Funds in the retirement system in an "efficient and cost-effective manner for the taxpayers of the Commonwealth of Kentucky" and to operate KRS by incurring only "reasonable expenses."  These speculative hedge fund vehicles contained double fees, many of which were hidden and impossible to measure accurately.  The Hedge Fund Sellers were already charging very high and excessive fees to oversee and manage the funds of hedge funds they sold to KRS, on top of similarly high/excessive fees being charged by each of the hedge funds in which the Daniel Boone, Henry Clay and Colonels fund monies were placed.

277.    Prisma, Blackstone, PAAMCO and later KKR/Prisma charged annual "management fees" based on assets under management, plus "incentive fees" based on returns over very modest "hurdle rates."  The underlying hedge fund managers also charged even more substantial management and incentive fees, some part of which found its way back into the pockets of Prisma, Blackstone, PAAMCO and later KKR/Prisma.  A former KRS trustee who was on the Board during the relevant period calculated that in one two-year period, KRS paid Blackstone's sub-managers about $40.5 million in fees; based on then similar fee structures, KKR/Prisma got about $38.9 million in fees and PAAMCO received $33 million in fees in just two years.  KRS paid over $150 million in fees in connection with the Henry Clay, Daniel Boone and Colonels funds during one 27-month span.

278.    No one yet knows the true or total amount of these fees. According to the PFM report, the KRS internal records on fees paid to investment managers are contradictory and in disagreement, and the KRS records "do not include any performance-based fees or other hidden costs."  Thielen (former Executive Director of KRS) has admitted he did not know how much money was paid out in fees to the underlying funds.  That information, he said was "proprietary" and even kept from him. In fact, and despite the Kentucky Pension Law's mandate to the contrary, Peden, the then-CIO, said "the agency only cares about the net return on investment — after fees are subtracted," *i.e.,* they did not care about the costs and expenses of the $1.2–1.5 billion plunge they took into Black Boxes.  KRS and Kentucky's taxpayers have paid for the Trustees' willful neglect of their clear duty to avoid unreasonable expenses and to manage the Funds in a cost-efficient manner.

279.    As to these fees, a former KRS Trustee has stated: "These funds can't get them from anywhere besides public pension plans. Corporate plans are too smart to pay these outrageous fees.  The only stupid people are the taxpayers of Kentucky for letting these people get away with this."

280.    A report by CEM Benchmarking, Inc. ("CEM") (a global benchmarking firm specializing in cost and performance of investment and administration) found the Kentucky Retirement Systems annual investment expenses in 2014 were actually more than 100 percent higher than what the system reported: $126.6 million instead of the $62.4 million Trustees reported.  This number will be much higher when the true level of fees paid in connection with Black Box funds of hedge funds is known.  According to a former KRS trustee:

> KRS has squandered pension holders' money by paying high fees for riskier investments with lower returns than unmanaged stock market index funds.  He said his reading of the CEM report is that KRS' investment underperformance of the last five years comes to about $1.5 billion, a third of which stems from hidden fees.

### 3.    The True Risks and Nature of the Black Boxes

281.    Although no such disclosures were ever made to KRS members/ beneficiaries or Kentucky taxpayers, in different contexts and where they were legally required to tell the truth about the nature of the "fund of funds" hedge fund vehicles they sold and the true nature of the risks associated with them, the Hedge Fund Sellers laid it bare.  The Hedge Fund Sellers are required to make filings with government agencies that disclose the true nature and risks of the products they sell. They are subject to civil, even criminal liability, if these filings are false or misleading.

282.   The quotes below from KKR/Prisma are taken from filings signed by

Kravis and Roberts. KKR/Prisma warned:

> Hedge funds, including those in which our fund of funds are invested and the hedge funds we offer to fund investors may make investments or hold trading positions in markets that are volatile and which may become illiquid.  Timely divestiture … can be impaired by decreased trading volume, increased price volatility, concentrated trading positions, limitations on the ability to transfer positions in highly specialized or structured transactions to which they may be a party. It may be impossible or costly for hedge funds to liquidate positions rapidly ….
>
> ***Moreover, these risks may be exacerbated for fund of funds such as those we manage***.
>
> <div align="center">*   *   *</div>
>
> Investments by one or more hedge funds … are subject to ***numerous additional risks*** including the following:
>
> •   … [T]here are few limitations on the execution of investment strategies of a hedge fund or fund of funds ….
>
> •   Hedge funds may engage in short selling, which is subject to theoretically unlimited loss ….
>
> •   We may enter into credit default swags (or CDS) as investments or hedges. CDS involve greater risks ….
>
> <div align="center">*   *   *</div>
>
> ***Valuation methodologies for certain assets in our funds*** … ***can be subjective and the fair value of assets established to such methodologies may never be realized, which could result in significant losses for our funds*** ….
>
> There are no readily ascertainable market prices for a substantial majority of illiquid investments for our investment vehicles ….
>
> <div align="center">*   *   *</div>
>
> Risk of Loss. Investing in securities involves risk of loss that investors in KKR Prisma Funds and Accounts should be prepared to bear.  There can be assurance that the investment objectives of KKR Prisma Fund or Account,

including risk monitoring and diversification goals, will be
achieved, and results may vary substantially over time.

 ...  Investments made by KKR Prisma Funds and Accounts
may involve a high degree of business and financial risk that
can result in substantial loss.

In all it took KKR/Prisma over 15 pages of single-spaced type to describe the true nature

of, and risks associated with, its Black Box fund of fund vehicles.

283.   The quotes below from Blackstone are taken from filings by Blackstone.

Blackstone warned:

***Valuation methodologies for certain assets in our
funds can be subject to significant subjectivity and
the fair value of assets established** ...[,] **which could
result in significant losses for our funds**.*

There are often no readily ascertainable market prices for
illiquid investments ....

Because there is significant uncertainty in the valuation of,
or in the stability of the value of illiquid investments, the fair
values of such investments as reflected in an investment
fund's net asset value do not necessarily reflect the prices
that would actually be obtained by us on behalf of the
investment fund when such investments are realized.

Many of the hedge funds in which our funds of hedge funds
[invest] ... may choose to use leverage as part of their
respective investment programs. The use of leverage poses a
significant degree of risk and enhances the possibility of a
significant loss in the value of the investment portfolio.

*      *      *

Investments by our funds of hedge funds in other hedge
funds, ... are subject to numerous additional risks, including
the following:

·   Certain of the funds are newly established funds without
    any operating history or are managed by management
    companies or general partners who may not have as
    significant track records as an independent manager.

·   Hedge funds may engage in short selling, which is subject
    to the theoretically unlimited risk of loss ....

- Hedge fund investments are subject to risks relating to investments in commodities, futures, options and other derivatives, the prices of which are highly volatile and may be subject to theoretically unlimited risk of loss in certain circumstances ....

- Hedge funds are subject to risks due to potential illiquidity of assets.

Moreover, these risks may be exacerbated for our funds of hedge funds.

In all it took Blackstone 15 pages of single spaced type to describe the true nature of, and risks associated with, its Black Box hedge fund vehicles.

284.    In a government filing on Form ADV, PAAMCO made similar risk disclosures, requiring a total of 12 pages to set forth all the risks of its hedge funds products.

285.    If the KRS trustees actually ever read or understood these risks, they were even more willfully reckless to commit $1.2–1.5 billion, which was 10% of the Trust Funds, and all at one time on these fund of hedge funds. The Hedge Fund Sellers should never have sold these products, no matter what "warning" was buried in the paperwork, and the Investment Advisor and Fiduciary Advisor never should have permitted the sale of these products to KRS as they were absolutely unsuitable investments for a pension fund in the particular situation KRS was in, and violated the applicable laws, codes and standards. The true nature and extent of the risk of these so-called "investments" was never disclosed to the KRS members or beneficiaries, or Kentucky taxpayers in any, let alone "easily understood," language, and this failure of disclosure to KRS members and beneficiaries and the Commonwealth, was known to the other Defendants because they received and reviewed KRS's Annual Reports.

### C.   In 2015–16, KKR, Cook and Rudzik Working with Peden Get Inside KRS, Take over Its Absolute Return Portfolio and Exploit KRS for Their Own Gain

286.    The course of misconduct, aiding and abetting, common enterprise and conspiracy that originated in 2008–11, when Defendant Cook (then a senior executive of Prisma) and Peden (then a member of the KRS investment staff) worked together to help engineer the initial Black Box purchases, including the conflicted $400+ million Prisma Daniel Boone Fund, continued in 2015–16 when KKR Prisma's Cook and Michael Rudzik worked in concert with Peden, by then KRS's Chief Investment Officer (CIO), to deliver control over KRS's entire $1.6 billion hedge fund portfolio to KKR — a Wall Street behemoth whose numerous interests conflicted with the interests of KRS and its members — and then allow KKR Prisma and its top executives to leverage that position for their own self-interested benefit, all to the detriment of KRS, its members, and the taxpayers.  This was no random match; Peden had worked for Cook and Rudzik when all three had been employed by Aegon, then Prisma, and they had maintained their close relationship thereafter when Peden went on staff at KRS.  The plan these three cooked up was to replace KRS's Director of Absolute Return — the single KRS staff person with direct responsibility for its entire $1.6 billion hedge fund portfolio – with KKR Prisma's own man Rudzik, who would work inside KRS as a quasi-staffer and take charge of the hedge fund portfolio as (in all but name) Director of Absolute Return.  The co-conspirators planned to use this effective control to increase KRS's investment in the Prisma Daniel Boone Fund by $300 million, while divesting the other two Black Boxes, BAAM's Henry Clay Fund and PAAMCO's Newport Colonels Fund — even though Prisma's was by far the worst-performing of the three original Black Box funds, trailing the other two by more than 20% since inception.  Diverting the other two Black Boxes

would free up funds to invest in Daniel Boone and in other hedge funds beholden specifically to KKR Prisma.  Finally, with Peden's approval and active assistance, KKR/Prisma/Reddy/Rudzik planned to leverage their position as overseer and gatekeeper of KRS's large and growing direct hedge fund portfolio (a planned $800 million of direct hedge fund investments, including the purchase of hundreds of millions in new hedge fund investments on the conflicted recommendation of KKR Prisma) to their own self-dealing benefit, all without meaningful supervision other than Peden himself.

287.    KKR acquired Prisma and its hedge fund business in 2012 after negotiations that began in 2010.  KRS's conflicted $400+ million investment in the Prisma Daniel Boone Fund helped "dress up" Prisma for sale to KKR.  With KKR's acquisition of Prisma, Cook and Rudzik became managing directors at KKR.  They sold their ownership interests in Prisma to KKR for millions of dollars, most of which was to be paid out over time in contingent performance-based "earnout" payments.  The size of these performance-based earnout payments would depend on the growth in revenues and assets under management (AUM) at Prisma.  Reddy, Cook, and Rudzik were among a handful of former Prisma owners in line to receive these contingent payments.  The former Prisma owners had split $100 million in 2012, another $123 million in 2014, and were working toward the 2017 payout, which was to be the final performance-based contingent payment.  At year-end 2015, the contingent 2017 payments were valued at almost $50 million.  Each of these men had a very substantial personal stake in the growth of Prisma's asset base.  They planned to, and did, use KRS's hedge fund portfolio to increase KKR Prisma's revenue and AUM and thus increase the likelihood of

achieving KKR's performance metrics and of receiving their 2017 performance payments.

288.   In mid-November 2014, Peden was promoted to CIO of KRS.  He was contacted by his old boss and long-time friend and business colleague Cook ("Congratulations Mr. CIO").  The two met at an IHOP on December 3, 2014 to discuss a strategic hedge fund partnership in which KKR Prisma would provide a dedicated portfolio manager to manage and monitor all KRS hedge fund investments — in effect, to do the job that previously had been filled by an internal and non-conflicted KRS staffer (Director of Absolute Return).  The partnership they discussed would also entail upsizing KKR Prisma's Daniel Boone Fund by several hundred million dollars, while getting KRS out of the other two Black Box funds of hedge funds.  The presentation prepared by Cook mentioned that one material benefit to "partnering with KKR Prisma" would be access to and the support of KKR's global infrastructure.  The presentation was intended to be secret; it was labeled "Confidential and Proprietary" and stated that it was "confidential" and could not be disclosed.

289.   This plan was driven in no small part by the desire of Cook, Rudzik, and Reddy to increase their own final KKR earnout payments.  Peden was a key and active leader/participant in this scheme.  As part of the plan, Peden made it look like he could not find a qualified replacement for Schilling as Director of Absolute Return, creating a rationale for bringing KKR Prisma in to, in effect, fill that role.

290.   After more "confidential" (secret) communications among at least Cook, Rudzik, and Peden, and the preparation of another KKR presentation approved by Peden, the KRS I.C. agreed on May 5, 2015 to the KKR Prisma "Strategic Partnership" proposal first proposed by Cook.  The full KRS Board subsequently approved this action

by the I.C.  Reddy and Rudzik made the presentation to the I.C., and Peden "strongly" endorsed the plan and helped push it through the I.C.  Neither the Investment Committee nor the Board addressed or waived the various conflicts of interest.  The arrangement was subsequently formalized in a non-public (secret) Advisory Services Agreement ("ASA"), which was signed by Peden and Thielen, then the Executive Director of KRS.  The ASA itself was not presented to or approved by the either the Board or the Investment Committee.  The ASA explicitly approved self-dealing by KKR Prisma, to benefit it and the persons entitled to receive the earnout payments, including among others Cook, Rudzik, and Reddy.

291.    The "Strategic Partnership" allowed Rudzik and his team of KKR employees to take up positions inside KRS while still on KKR's payroll, purportedly to assist KRS staff gain "in-house" hedge fund expertise so it could "build out its direct hedge fund portfolio" and thereby reduce the huge fees and low returns the Black Box fund of hedge funds carried.  However, the real intent and effect of this "Strategic Partnership" was to hand control over KRS's entire $1.6 billion portfolio of absolute return investments to KKR/Prisma/Cook/Rudzik/Reddy and then permit them to manipulate that position for their own personal financial benefit and that of KKR and KKR Prisma.  Placing Rudzik and his KKR Prisma team in charge of overseeing the absolute return investments, with no supervision with the exception of Peden himself, was not a plan to "help" KRS staff — it was a plan to replace inside, unconflicted staff with very conflicted KKR executives working inside of KRS in violation of KRS conflict of interest policies and Kentucky law.  This scheme (including the secret ASA, with its unlawful approval of self-dealing) reflected anything but the sole interest, exclusive benefit fiduciary regime imposed by Kentucky law.

167

292.    Peden falsely told the Investment Committee and the Board that KKR Prisma was willing to perform these "advisory" services for free, because doing so "makes for a stronger relationship with the client [KRS]."  But the ASA revealed that the real "consideration" flowing to KKR included a large increase in KRS investment dollars into KKR Prisma's Daniel Boone Fund, and "the opportunity for [KKR Prisma] to expand its industry knowledge and ***develop further business relationships with third parties through the provision of services under this Agreement***," *i.e.*, use KRS's assets to benefit  its business.  Thus, Peden not only arranged for KKR Prisma to get hundreds of millions more in its Daniel Boone Black Box, but also for KKR/Prisma/Cook/Rudzik to become the gatekeeper (without effective staff oversight) of KRS's entire $800 million direct hedge fund portfolio, and to leverage that gatekeeper position to extract improper self-dealing benefits.  That KKR/Prisma could also use the arrangement to cause KRS to divest funds managed by KKR/Prisma's competitors was an added bonus.

293.    With Rudzik and other KKR employees inside KRS and with Peden's influence as CIO, these co-conspirators used their influence to persuade the KRS Trustees to agree to sell off the two better-performing Black Boxes — Blackstone (Henry Clay Fund) and PAAMCO (Newport Colonels Fund) — and to use a large part of the sale proceeds to invest $300 million more in KKR Prisma's Daniel Boone Fund, even though the Daniel Boone Fund was the worst performer of the KRS Black Boxes.  The Daniel Boone Fund's since-inception returns trailed the other two Black Boxes by almost 23% when the Investment Committee initially approved the Strategic Partnership with Prisma.  And the I.C. made the final decision to invest substantially more in the Daniel Boone Fund at the end of a year in which Daniel Boone lost more than 8% of its value —

a one-year loss of more than $40 million.  Peden falsely told the I.C. and the Board that KKR Prisma was willing to perform these "advisory" services for free, because doing so "makes for a stronger relationship with the client [KRS]."  But the ASA revealed that the real "consideration" flowing to KKR and KKR Prisma included a large increase in KRS investment dollars into KKR Prisma's Daniel Boone Fund, and "the opportunity for [KKR Prisma] to expand its industry knowledge and develop further business relationships with third parties through the provision of services under this Agreement," *i.e.*, use KRS's assets to benefit  its business.  This concession was worth many millions of dollars to KKR and KKR Prisma in terms of (at least) information, access and deal flow.  Thus, Peden not only arranged for KKR Prisma to get hundreds of millions more in its Daniel Boone Black Box, but also for KKR/Prisma/Cook/Rudzik to become the gatekeeper (without effective staff oversight) of KRS's entire $800 million direct hedge fund portfolio, and to leverage that gatekeeper position to extract improper self-dealing benefits.  That KKR/Prisma could also use the arrangement to cause KRS to divest funds managed by KKR/Prisma's competitors was an added bonus.  It strains credulity to assume under these circumstances that KKR Prisma was chosen for this role entirely on merit, as it was decidedly not best-in-show.  Of the $300 million in fresh cash directed to the Prisma Daniel Boone Fund as a result of the I.C. and Board decisions in May 2016, about half ($150+ million) was directed by KKR Prisma into its own proprietary fund, KKR Apex Tactical Fund, a new fund KKR had just launched.  The materially higher fees that flowed to KKR Prisma as a result of directing KRS dollars in its own fund provided additional revenue and AUM to KKR Prisma, thus also benefitting Cook, Rudzik, Reddy, and the others potentially entitled to the contingent KKR earnout payments.  In addition, KRS invested $285 million more in other hedge funds

recommended by and/or related to KKR Prisma.  KKR Prisma thus gained tremendous leverage over the managers of the $285 million of new hedge funds they recommended, as well as over the existing direct hedge fund managers who knew that KKR/Prisma/Rudzik could recommend they be divested at any time.

294.    Allowing these KKR executives inside KRS while they remained employed and paid by, and loyal to, KKR was a clear violation of KRS's conflict of interest policy and Kentucky law, even more so since these conflicts were never vetted, no rules were created to avoid or mitigate them, and no information barriers were erected to prevent the conflicted misuse of information.  The added power that the secret ASA explicitly created as a means of exploiting these conflicts for the benefit of Rudzik, Cook, Peden and KKR only exacerbated the conflicts.



295.    At the same time that KKR/Rudzik were moving inside KRS to take control of its hedge fund investment portfolio, the fund of hedge funds industry was "***an industry in crisis***."  Fund of hedge fund sellers like KKR Prisma were suffering over $262 billion in outflows/redemptions in less than 12 months, a remarkable loss of 30% of the entire industry's assets under management.  The industry was imploding —

swamped by an unprecedented tsunami of redemptions — and KKR/Prisma was being badly hurt.  By gaining not only an additional $300 million more in assets under management (including $150+ million into its own newly launched fund), but the economic benefits from running the rest of the $1.6 billion portfolio as well, with a free hand to reap profits and benefits for itself, KKR Prisma ***helped itself at the expense of KRS at a time when the hedge fund industry was badly stressed***.

296.    While many other public pension funds and other institutional investors were redeeming their hedge fund holdings, and foregoing new hedge fund investments, the tight grip that Peden, Rudzik and KKR Prisma had on KRS's hedge fund portfolio ensured that KRS remained fully invested in hedge funds and in fact adding to its positions.

297.    These "investments" were not made "solely'" in the interests of the members and the beneficiaries of KRS, but to benefit KKR Prisma, Peden, Rudzik and Cook.  This violated the KRS Conflict of Interest rules, and it also violated the Kentucky Pension Law:

> § 61.650(1)(c) BOARD OF TRUSTEE FUNDS:
>
> A trustee, officer, employee, ***or other fiduciary*** shall discharge duties with respect to the retirement system:
>
> 1. ***Solely in the interests*** of the members and beneficiaries;
>
> 2. For the ***exclusive purpose*** of providing benefits to members and beneficiaries....

298.    The additional $300 million Daniel Boone investment — like the original conflicted deal in 2010-11 — was a disaster.  As of 9/30/19, Prisma's 3-year return of 3% was materially worse than the 3-year return of more than 4.5% on KRS's fixed income portfolio, and was dwarfed by the 12%+ 3-year return on KRS's U.S. equity portfolio.

And KRS was forced to pay more than 2% annually in Management Fees to achieve this 3% growth.

299.    Having engineered the plan to embed KKR Prisma inside KRS (in order to expand its influence over KRS's absolute return portfolio earlier in 2015), between December 2015 and January 2016, Cook, Rudzik and Peden began — behind the scenes — to cover their flanks by secretly maneuvering to get Cook appointed to the KRS Board. Peden worked with Rudzik and others with influence to engineer the appointment of Cook (a just-retired KKR Prisma partner with a multi-million dollar stake in KKR and huge performance-based payout) to the KRS board, and David Eager as Vice Chairman of the KRS Board.  They succeeded, and Cook was appointed to the KRS Board in early June 2016, literally just days after Peden had used his position and information advantage to approve motions to (in Peden's words) "clean up the February 2016 and May 2015 Strategic Partnership decisions to make clear that Prisma Daniel Boone [would] be 50% of the Absolute Return portfolio," thereby upsizing Prisma Daniel Boone by $300+ million at Investment Committee and Board meetings that took place on May 5 and May 19, 2016, respectively.

300.    Eager was appointed to the KRS Board and joined the Investment Committee in time for its May 5, 2016 meeting, at which Eager made and voted in favor of the motion described in the preceding paragraph.  He made and voted in favor of the same motion at the May 19, 2016 Board meeting.  In so doing, Eager – who had long been involved in the pension advisory business – either acted without having fully informed himself of the situation as outlined above by Peden (*i.e.*, that the May 2016 motions Eager made were related to and intended to "clean up" the May 2015 and February 2016 Strategic Partnership decisions, implemented through the unlawful

Advisory Services Agreements), or with full information about these matters and the attendant conflicts and self-dealing.  In either event, Eager knowingly or recklessly violated his own fiduciary duties.

301.    However, political change had swept through Kentucky, driven in no small part by the increasingly obvious problems at KRS.  This resulted in the appointment of other, new Trustees who were not tied to KKR Prisma, Cook, Peden and/or Rudzik, economically or personally.  In short order, these new Trustees would disrupt the ongoing conspiracy.

302.    In August 2016, Eager resigned from the Board and became KRS's interim executive director, *i.e.*, CEO of KRS.  After that meeting, the new KRS Trustees publicly disclosed the clearly suspicious $300 million KKR/Prisma Daniel Boone hedge fund purchase to **loud public outrage**.  *See* John Cheves, *Kentucky Pension System Doubling Down on Hedge Fund that Lost Money*, LEXINGTON HERALD LEADER, Aug. 29, 2016, *available at* https://www.kentucky.com/news /politics-government/article98676912.html (last visited Dec. 30, 2020) ("One of the biggest investments held by the $14.9 billion Kentucky Retirement Systems is a hedge fund that's also one of its worst performers — and yet the financially troubled agency is doubling down.").

303.    Cook (by this point having been appointed to the KRS Board) and Peden both publicly defended this conflicted investment: Cook said he would "abstain from action related to Prisma because he still has a financial holding in the company," but still publicly defended the new Prisma/Daniel Boone investment in press interviews: "Well, obviously, everyone would like to make more and particularly not lose.  But that doesn't necessarily mean it's a bad investment, and it certainly doesn't mean that,

looking forward, it's a bad investment … [and] there may be a lot of opportunity"; Peden feigned innocence, saying, "[w]e essentially use [KKR Prisma employees inside KRS] as an extension of our staff, "like having a free staff member" and that ***his long relationship with Prisma and KKR allowed him to use his*** "*discretion*" ***and*** "***made it unnecessary to do a competitive process***."  After Cook was elected to chair the Investment Committee in September 2016, he did nothing to expose or stop the improper and conflicted KKR Prisma presence inside KRS, or disclose or push for termination of the improper ASA and the self-dealing it purported to permit.  Nor did Eager (as Executive Director) or Peden (as Chief Investment Officer).  All three breached their duties in this and other regards.

304.    In October 2016 — literally just weeks after the additional $300+ million had gone into Daniel Boone Fund, and after another $285 million into other hedge funds chosen by Prisma – at special called Investment Committee meeting with the new KRS Chair (Farris) and new Investment Committee Chair (Harris) (both of whom understood hedge funds) in place — the Investment Committee took a fresh look at KRS's hedge fund exposure.  The Committee, with Cook recused and forced to abstain due to his obvious conflict of interest, voted unanimously to "exit[] the 10% allocation to absolute return/hedge funds" — or as one journalist put it, to "***end its controversial investments in hedge funds***."  Peden was instructed to draw up (with new Trustee Ramsey) a plan to redeem (sell off) all $1.6 billion in hedge funds as quickly as legally possible.  (Soon thereafter Peden, who apparently tried to slow the redemption plan, was fired.)  Reflecting this new direction by informed, unconflicted Trustees, a presentation at the November 2. 2016 Investment Committee meeting observed that "Hedge Funds as a stand-alone self-diversifying allocation make little sense for KRS

[because of] high fees [and] unattractive NET returns."  This informed criticism hit the mark.  KRS's "investments" in the so-called "absolute return" Black Boxes did not lower risk, reduce illiquidity, or generate sufficient returns to enable KRS to even approach, let alone exceed, the 7.5% rate of return that KRS and its consultant RVK expected from the Absolute Return investments. They *did* however generate excessive fees for the Hedge Fund Sellers, and poor returns and ultimately losses for the KRS Funds, in the end causing substantial damage to KRS.

305.    As of 9/30/2019, the "absolute return" investments had in fact returned only 3.49% annually, net of fees, since inception – less than half the expected rate of return.  Prisma itself had returned only 3.35% net of fees.  As of that date, Prisma's net returns lagged cash for the most recent one-year period, barely outperformed cash (1.95% vs. 1.34%) over 5 years, and substantially underperformed KRS's fixed income investments over 5 years.  These net returns fell far short of expectations.

306.    The fees KRS has paid in connection with the Black Boxes — though never publicly quantified or fully disclosed — have been truly astronomical, especially in comparison to these very disappointing net returns.  In connection with funds of hedge funds like these, fees are paid at two levels — fees are paid to the fund of funds manager (here, Prisma, PAAMCO, and Blackstone), and fees are also paid to the managers of the individual underlying hedge funds.  Moreover, two different kinds of fees are paid at both levels: "Management Fees," representing a percentage of total assets under management paid annually regardless of performance, and "Incentive Fees," representing a percentage of annual profits based on performance.  The total fees — Management Fees plus Incentive Fees, at both levels, are the relevant measure — as total fees impact and constitute a drag on net returns.  The chart below depicts total fees

charged with respect to each of the Black Boxes, according to an internal KRS staff report dated August 15, 2011.

| | Total Management Fees off the top | Total Incentive Fees |
|---|---|---|
| | % of total assets annually | % of profits annually |
| Prisma | 2.52 | 24.7 |
| PAAMCO | 1.95 | 19.7 |
| BAAM | 2.12 | 29.8 |
| **Average** | 2.2 | 24.73 |

307.   As shown in the chart, ***total Management Fees alone were 2.2% per annum***.  With a $1.4 billion initial investment in the Black Boxes, this means that Management Fees alone were almost $31 million in the first year, and they escalated from there based on the size of the Absolute Return portfolio as a whole.  ***In other words, from late 2011 through 2016, KRS paid as much as $165 million or more in hedge fund Management Fees***.

308.   Incentive Fees were sky high too — KRS was required to pay the hedge funds almost 25% of profits (subject to certain adjustments) — in other words, ***to split profits 3-to-1, on top of the Management Fees***.  These Incentive Fees have never been publicly disclosed, but ***a rough estimate is that KRS may have paid as much as another $100 million or more in Incentive Fees to the hedge fund managers***, ***on top of the approximately $165 million in Management Fees***.

309.   All told, ***it is likely that KRS paid as much*** (***or more***) ***in total fees as it received in net returns on its hedge fund investments***.  These astronomical fees not only represented a drag on annual returns; the compounding

effects of year after year of huge, excessive fees has made matters much worse.[25]  As one KRS staff memo tartly observed, "it is no surprise that the best performing fund of funds in the Absolute Return portfolio has the lowest fees, and vice versa."

310.    These fees have largely been hidden from KRS members and the public. The Court should order the Hedge Fund Sellers to provide a complete accounting of all fees paid — Management Fees and Incentive Fees, both at the fund of funds level, and at the underlying manager level.  This information should have been made public years ago.  In 2016, Governor Bevin issued an Executive Order requiring KRS to post on its website information reflecting "all … fees and commissions for … each individual manager, including underlying individual managers in fund [of] funds and … shall include any profit sharing, carried interest, or other partnership incentive arrangements or agreements."  KRS, under Eager's leadership, has never disclosed these fees.  The 2016 Comprehensive Annual Financial Report, for example, stated that Management Fees for the Absolute Return portfolio totaled $9.13 million.  In fact, however, Management Fees for fiscal 2016 — including Management Fees paid to the underlying hedge fund managers in the Black Box funds of funds — came to $30 million or more. In other words, the 2016 CAFR understated Management Fees for the Absolute Return portfolio by $20 million or more.  Whether the "lay" members of the Board understood that Management Fees had been drastically unstated, Executive Director Eager and Investment Committee Chair Cook — both career professionals with long experience in pension fund investing — surely did, especially since the ink on Executive Order 2016-

---

[25] Over the next 5 years, assuming even a 5.5% rate of expected return, the estimated $265 million paid out in hedge fund fees could have earned $75 million or more had the excessive fees not been taken out of KRS.

340, which required reporting of fees charged by underlying managers in funds of funds, was barely dry.

311.    Unfortunately, before Farris, Harris, Ramsey and the others intervened to disrupt the ongoing drain, the KKR/Prisma/Cook/Peden/Rudzik plan largely succeeded.  Due to the pernicious "lock-up" provisions hedge fund sellers put into their contracts, they get to keep a client's money — and pocket huge fees — for years after they get it, no matter how badly the hedge fund performs.  So while Farris and others had stopped the ongoing misconduct, it was too late for KRS.  Due to disadvantageous "lock-up" provisions, KKR Prisma, KKR Apex Tactical Fund, and other hedge funds related in some way to KKR got to keep hundreds of millions of investment dollars for many more months.  These May 2016 Cook/Peden/Rudzik-engineered KKR Prisma-conflicted hedge fund investments from KRS helped KKR's hedge fund business through a very rough patch of over $262 billion in hedge fund redemptions, and generated millions in fees and other benefits.

312.    The Trustees who voted at Investment Committee and Board meetings to approve the formation of the "Strategic Partnership" with KKR Prisma (May 2015), to approve making the "Strategic Partnership" permanent (February 2016), to approve the $300 million upsize of the Prisma Daniel Boone Fund (May 2016), and/or to approve other actions in connection with the "Strategic partnership" were (i) uninformed as to the material facts (and thus acting in breach of their duties); (ii) uninformed as to the material facts because Peden and/or his co-conspirators misled them; or (iii) knew about the material facts (including inter alia any or all of the conflicts of interest) and voted in disregard of the material facts and in breach of their fiduciary duties.

313.    As a key part of the ongoing course of misconduct and conspiracy in late 2015 and early 2016, Peden and Rudzik worked together behind the scenes to engineer the appointment of Cook to the KRS Board.  None of Cook, Peden, or Rudzik disclosed their prior wrongdoing as alleged, and in particular failed to disclose the very serious conflict of interest created by the self-dealing provisions of the still-secret ASA — a conflict that continued to benefit Cook after he became a member of the KRS Board. Cook got appointed on June 17th, just days after the May 19, 2016 conflicted investments had been finally approved.

314.    Because they are trustees and because they watch over the life savings (Trust Funds) of members and over taxpayer contributions to the Trust Funds in a non-profit enterprise, where the trust beneficiaries and taxpayers are ***involuntary participants***.  Neither the Trustees nor those who worked with them to disadvantage or damage KERS are entitled to shield their actions and/or misconduct by the so-called "Business Judgment Rule" defense applicable to for-profit public corporations where shareholders can sell their shares and walk away if they are dissatisfied with the stewardship.

### D.    Defendants' False and Misleading Statements and Reassurances — and Obfuscations — to KRS Members

315.    As required by the Kentucky Pension Law, every year the trustees published a Comprehensive Annual Report for KRS members, government officials and taxpayers.  It is the primary means of communication by the trustees to KRS members and Kentucky taxpayers.  It was required to be in "easily understood language" to allow KRS members and beneficiaries, government officials and taxpayers to be informed as

to the true financial and actuarial condition of the KRS Funds and the stewardship of the trustees.

316.    The police, clerks and social workers, the firefighters, sheriffs and the like, who are members of the KRS Plans are not required to be forensic accountants or actuaries or lawyers with fiduciary and trust expertise.  They are not required to be private eyes, searching through 180-page-long, two-pound Annual Reports to ferret out if Trustees, who are supposed to be looking after them, are telling them the truth as the Kentucky Pension Law requires them to do.  The Annual Reports published by the trustees during the relevant time period did not give a true, accurate or "fair presentation" of the actual financial and actuarial condition of the KRS Plans in "easily understandable" language.  Instead, over the past several years the Defendants have worked together as part of their concerted common course of conduct and enterprise to make or permit to be made, false statements, reassurances and obfuscations to KRS members and beneficiaries and Kentucky taxpayers.

317.    Trustees promised that the KRS Annual Reports would:

Provide complete and reliable information … as a means of determining compliance with statutory provisions, and as a means of determining responsible stewardship of KRS funds.

318.    The KRS Website year after year represented:

The Board of Trustees is charged with the responsibility of investing the Systems assets … the Board follows a policy of thoughtfully growing our asset base while protecting against undue risk and losses in any particular investment area.  The Board recognizes its fiduciary duty not only to invest the funds in compliance with the Prudent Person Rule, but also to manage the funds in continued recognition of the basic long-term nature of the Systems.  In carrying out their fiduciary duties the Trustees have set forth clearly defined investment policies, objectives and strategies for the pension and insurance portfolios.

319.   The KRS Annual Reports constantly reassured KRS beneficiaries and

Kentucky taxpayers how the trustees carefully safeguarded and invested the KRS assets:

> The Board of Trustees of the Kentucky Retirement Systems
> has a statutory obligation to invest KRS' funds in accordance
> with the "prudent person rule."  The prudent person rule
> states that fiduciaries shall discharge their investment duties
> with the same degree of diligence, care and skill that a
> prudent person would ordinarily exercise under similar
> circumstances in a comparable position.
>
> The Board has interpreted this to mean that the assets of the
> systems should be actively managed — that is, investment
> decisions regarding the particular securities to be purchased
> or sold shall be the result of the conscious exercise of
> discretion.  The Board has further recognized that proper
> diversification of assets must be maintained.  It is through
> these policies that KRS has been able to provide significant
> returns over the long-term while minimizing investment
> related expenses.

320.   For seven straight years, from 2010 to 2016, in various and multiple

communications to KRS members and Kentucky taxpayers, Trustees created a mosaic of

false and misleading statements and reassurances that were intended to and did give a

false sense of security as to the Funds and the quality of their stewardship.  Trustees

misrepresented that, in performing their fiduciary duties, the Board "follows a policy of

preserving capital," by "protecting against undue losses in any particular investment

area" "by means of clearly defined investment policies."  Trustees consistently

misrepresented their investment procedures and practices when they stated (i) "the

Board follows a policy of thoughtfully growing our asset base while protecting against

undue risk and losses in any particular investments"; (ii) the "portfolios are diversified

on several levels ... through the use of multiple asset classes[that] represent an efficient

allocation to achieve overall return and risk characteristics"; (iii) "portfolios within each

of the asset classes are diversified through investment strategies"; and (iv) with "new

allocations to the … absolute return buckets — going forward the portfolio is more diversified than ever."

321.    Contrary to assurances that the "absolute return" assets and strategies would provide safe diversification and reduced risk and volatility, the funds of hedge funds did not safely increase diversification but rather were a reckless blind bet.  The three $400-plus million plunges into the Black Box funds of hedge funds were the three largest single investments in the history of KRS.  These were over-concentrated plunges into essentially identical vehicles with no track record and therefore no way to forecast reliably any future performance.  For fiduciary investors to put $400 million, let alone $1.5 billion, all at one time into an unknown investment vehicle with no track record is extremely reckless.  Fiduciary investors test out strategies — they do not plunge into the deep end with a blindfold on.  In total, the $1.2 billion plunge (later $1.5 billion) was the largest one-time investment in a single asset class in the history of the KRS Funds.  By comparison, KRS's largest individual domestic equity investments were in the $50–$75 million range and in international equity the largest investment was in the $24–$35 million range.  Even in the safe fixed-income area, the largest KRS investment was about $175–$225 million.

322.    As Trustees were searching to find a way to quickly boost investment returns in 2009–10, what was put in KRS Annual Report for 2010 about its internal "asset/liability" study was obfuscation at best, deliberate deception at worst:

> Toward the end of the fiscal year, the Board made an
> important decision to commission RVK to conduct asset-
> liability studies for the KRS, CERS, and SPRS pension and
> insurance plans.  The studies … were done because the
> severe market downturn in 2008 into early 2009
> significantly lowered the funded ratio across all investment
> plans it became evident to the Board that it was necessary to

better align the asset allocation decisions of the plans with the future and growing corresponding liabilities.

* * *

The studies revealed several plans, the KRS Non-Hazardous Pension Plan, face the possibility of converting to a pay-as-you-go model.  Using "what if' scenarios, analysis shows that under very weak investment market conditions coupled with the consistent underfunding of the pension contributions over the next 10 years, the pension fund could deplete its assets in an attempt to meet escalating benefit payments. The asset-liability study assisted the Board with deciding on the most effective asset allocation strategies for each pension and insurance plan under its purview in order to lower risk, control the level of illiquidity in the portfolios, and generate a return expected to exceed the actuarially assumed rate of return of 7.75% ....  As of 2010–2011 ... the Board has been transitioning to the new ... asset allocations — in a prudent manner.

* * *

 ... We expect the Board's continued high standard of care for these assets and commitment to diversification to allow the System to meet its long-term goals and objectives.

323.    In August 2011, just after Trustees were persuaded to put the first $1.2

billion in the Black Boxes, T.J. Carlson (the CIO of KRS) stated:

The new allocation is part of the system's new absolute-return asset class ....  "The main reason (for the new absolute-return strategy) is to reduce volatility in the portfolio overall ...  [and] to get our expected rate of return of 7.75%.  Absolute return helps us maintain our expectations but lowers our risks."

324.    RVK's letter to KRS members and Kentucky taxpayers in the 2011 Annual

Report again reassured:

The Systems investment policies as well as the performance of its assets are regularly monitored ... by RVK Kuhns & Associates, Inc.  These evaluations include reviews of the investment management firms ....

* * *

> We expect the Board's continued high standard of care for these assets and commitment to diversification to allow the Systems to meet its long-term goals and objectives.

325. After Trustees had put $1.5 billion into the Black Box vehicles, in the KRS 2012 Annual Report, RVK stated in a letter signed by Gratsinger:

> Questions surrounding how pension funds will meet their expected return targets and thus fund their liabilities are valid. Many funds are faced with the need to boost returns in this environment and have turned to alternative investments ... absolute return strategies.... KRS has also moved in this direction. New target asset allocations were approved ... in response to recently completed asset liability modeling studies. These new asset allocation guidelines ... call for ... new allocations to the ... absolute return buckets, so going forward the portfolio is more diversified than ever.

326. Each of RVK's reports in the 2012, 2013, 2014 and 2015 KRS Annual Reports to members and taxpayers, which were signed by Gratsinger, continued to falsely reassure KRS beneficiaries and taxpayers:

> KRS portfolios are diversified on several levels. Portfolios are diversified through the use of multiple asset classes ... and represent an efficient allocation to achieve overall return and risk characteristics. The individual asset classes are diversified through the use of multiple portfolios ... Finally, portfolios within each of the asset classes are diversified through the selection of individual securities.

> The System's investment policies are regularly monitored by KRS staff, the Board and R.V. Kuhns & Associates, Inc. These evaluations include reviews of investment management firms ....

> We expect the Board's continued high standard of care for these assets and commitment to diversification to allow the Systems to meet its long-term goals and objectives.

327. Trustees caused key false reassurances by the investment advisor RVK to be blown up and featured in the Annual Reports with extra prominence:

184

> *"An uncertain market environment demands careful attention and thoughtful treatment of the assets entrusted to the Board's care by the Systems' employee participants. We expect the Board's continued high standard of care for these assets and commitment to diversification to allow the Systems to meet its long-term goals and objectives."*
>
> *Rebecca A. Gratsinger*
> *CEO, Principal*
> *R.V. Kuhns & Associates*

328. The KRS Annual Reports for the past several years contained a presentation of the actuarial position of the KRS Plans certified by Cavanaugh Macdonald in a report/letter signed by Cavanaugh Macdonald. From 2011 to 2015, the Cavanaugh Macdonald actuarial reports each represented that these "reports describe the current actuarial condition of the Kentucky Retirement System":

> The Board of Trustees in consultation with the actuary sets the actuarial assumption and methods used in the valuations … These assumptions have been adopted by the Board … in accordance with the recommendations of the actuary.
>
> \*   \*   \*
>
> **Progress towards Realization of Funding Objectives**. The progress towards achieving the intended funding objectives, both relative to the pension and insurance funds, can be measured by the relationship of actuarial assets of each fund to the actuarial accrued liabilities. This relationship is known as the funding level and in the absence of benefit improvements, should increase over time until it reaches 100%.
>
> \*   \*   \*
>
> Based on the continuation of current funding policies by the Board, adequate provisions are being determined for the funding of the actuarial liabilities of the Kentucky Employee Retirement System, … as required by the Kentucky Revised Statutes. The funding rates established by the Board are appropriate for this purpose.

329. Even though they were under a duty to provide accurate, truthful information regarding the KRS Plans' financial and actuarial condition in the Annual

Reports in a manner that was "easily understood by the members, retired members and the public," during the relevant time period the most ever disclosed by Trustees and/or Officers, the Investment, Actuarial and Fiduciary Advisors and the Hedge Fund Sellers was deep within the 180+ page long reports. That information was that the "Absolute Return" "investments" had "excellent potential to generate income" and "may" have a "higher degree of risk." "May" is not "do." "May" is a statement of the obvious and a highly misleading one given the accompanying false assurances that these "investments" provided "safety and less volatility," "increased diversification," had "excellent potential for increased income," and that they would "help get KRS to" or enable it "to exceed" its 7.75% AARIR — all part of Trustees' continued "adherence to high standards." In truth, these Black Boxes were secretive, opaque, illiquid vehicles, toxic "investments" that carried excessive and hidden fees, were impossible to accurately monitor or value, had no prior track record of performance and carried a very high and unacceptably large risk of losses.

## X.   JURISDICTION, VENUE, NONREMOVABILITY AND STATUTE OF LIMITATIONS/LACHES

330.   This Court has subject matter jurisdiction over the claims pursuant to KY. REV. STAT. § 23A.010.

331.   Venue is proper in this Court because the claims asserted herein arose in Franklin County, Kentucky.

332.   This action is not removable to federal court for many reasons, including:

a.     There is not complete diversity of citizenship. All Plaintiffs and Defendants Rudzik and Cook reside in, and are citizens, of the Commonwealth of Kentucky.

b.     This suit involves a local controversy vital to Kentucky workers over the Kentucky Retirement Systems and its Trust Funds, a component unit of the Commonwealth of Kentucky and the public employee pension and insurance plans it oversees: The Kentucky Employee Retirement System, County Employees Retirement System and State Police Retirement System.

c.     This action is not a class action. It does seek any relief for the named Plaintiffs individually or collectively as a class. The action is an entirely derivative one for KRS and/or its Funds.

d.     The injuries pleaded by Plaintiffs are not damages for which recovery is sought for them or could be sought for them in this action brought derivatively for KRS.  The injuries are pleaded to establish standing only.

e.     Plaintiffs assert only claims arising under Kentucky law, including Kentucky's pension, trust, and other laws. Plaintiffs do not assert any claims under federal law or regulation, and to the extent any claim or factual assertion herein may be construed as stating a federal claim, Plaintiffs disavow that claim. KRS, its trustees and its Funds are not subject to federal regulation.

f.     Breaches of duty and misconduct occurred in Kentucky and involve the operations and functioning of Pension and Insurance Plans located in and organized under Kentucky law. More than 94% of the members and beneficiaries of these pension plans reside in Kentucky.

333.    The Court has personal jurisdiction over each Defendant.  Each Defendant has purposefully availed itself or themselves of the privilege of doing business in Kentucky on a regular, systematic and persistent basis, directly and through its or their agents, obtaining large amounts of fees, commissions and personal economic benefits over a period of several years.  The Court has personal jurisdiction over those Defendants not residing in Kentucky pursuant to KY. REV. STAT. § 454.210, as each meets the statutory definition of a "person," and these claims arise from the actions of each "directly or by an agent" in that each Defendant regularly transacted and/or solicited business in the Commonwealth and/or derived substantial revenue from goods used or consumed or services rendered in the Commonwealth and/or contracted to supply good or services in the  Commonwealth and/or caused injury by an act or omission in the Commonwealth and/or caused injury in the Commonwealth by an act or omission outside the Commonwealth.  In addition, the exercise of specific personal jurisdiction over any defendant resident outside Kentucky is consistent with the U.S. Constitution's "due process" clause.

334.    The Kentucky jurisdictional contacts of the corporate Hedge Fund Seller Defendants are also attributable to the individual controlling persons/top executives of those Hedge Fund Sellers due to their direct personal control and domination of those entities — which are actually and *de facto* their personal instrumentalities as detailed herein.

335.    The Hedge Fund Sellers and their top executives purposely availed themselves of the privilege of seeking and doing business in Kentucky, specifically with the two largest pension funds — indeed the two largest economic entities in Kentucky,

over a period of several years collecting hundreds of millions in fees for their entities, a meaningful portion of the profits from which flowed to the top executives personally.

336.    Any Hedge Fund Seller employee who traveled to Kentucky on behalf of a Hedge Fund Seller was the agent of both the Hedge Fund Seller and the top executives of that Hedge Fund Seller and reported to them directly or through a committee they controlled.  Upon information and belief, Schwarzman, Kravis, Roberts, Hill, Reddy and/or Buchan all signed contracts and other legal documents with both KRS and The Kentucky Teachers Retirement System ("KTRS") relating to investments, including in the case of KRS the hedge fund investments involved in this case, which were structured as limited partnerships using detailed contracts, signed in Kentucky and to be performed in part in Kentucky.

337.    As part of the Hedge Fund Sellers' persistent seeking of and then doing business in Kentucky, in addition to the sale Black Box funds of hedge funds involved in this case, they have been selling other similarly risky and expensive "alternative investments" to both KRS and KTRS, and then continuing to do business in Kentucky to oversee and service these investments on an ongoing basis collecting millions of fees each year.

338.    As of June 30, 2016, KTRS was holding the following investments previously sold to them by KKR/Prisma and Blackstone and serviced and overseen by them on an ongoing basis, for the previous several years:

| | |
|---|---|
| Blackstone Partners VII, LP | $50 Million |
| Blackstone Partners VIII, LP | $19 Million |
| KKR & Co., European Fund III | $49 Million |
| KKR & Co., European Fund IV | $16 Million |
| KKR & Co. Fund 2006 | $14 Million |

339.    Blackstone also sold to KRS and then serviced Blackstone Capital Partners V and VI Funds, in amounts ranging from $13 Million to $64 Million.

340.    Privately owned jet planes of Kravis and Roberts in the case of KKR/Prisma and Schwarzman in the case of Blackstone were used by their respective companies to fly their agents to Kentucky, for which the companies were charged and for which Kravis, Roberts and Schwarzman were reimbursed, in amounts, on information and belief, often in excess of $5 million per year.  Thus each of Kravis, Roberts and Schwarzman personally profited from Kentucky business.

341.    Given the foregoing the Hedge Fund Seller Defendants should have had reason to anticipate being "haled" into court here.  And there is no undue-burden in requiring the Hedge Fund Sellers and their executives to defend a suit in Kentucky. Kravis, Roberts, and Schwarzman each have the power to require their companies to pay any expense in connection with litigation, and they each have the ability to appear anywhere in the United States at no personal expense to themselves.  They each have indemnity agreements with their respective companies to pay for their travel, their expenses and their legal fees, they have each previously retained counsel in Kentucky and defended suits in Kentucky and other states.  They each are also indemnified by their respective companies for any verdict or judgment against them

342.    KRS, a governmental unit, is a directly targeted victim of the Hedge Fund Sellers alleged misconduct specifically directed at Kentucky entities and causing injury in Kentucky. The Kentucky Pension and Trust law is applicable.  Ninety-five percent (95%) of KRS members live in Kentucky.  There is a compelling Kentucky interest in asserting jurisdiction over all Defendants and having this case adjudicated in Kentucky's.

343.   The named Plaintiffs are individual members of KRS.  They do not have the means to sue in New York and Los Angeles in separate lawsuits.  Plaintiffs want to sue where they live, to achieve effective relief in as inexpensive as way as possible.

344.   The judicial system will benefit from this dispute being litigated in a state court familiar with the state laws in issue, where it can be coordinated with existing litigation before the same judge in one courthouse and in a manner so as to avoid splitting the case into pieces with Defendants being sued in New York and California as well as Kentucky. Separate lawsuits in different states would give rise to duplication, inefficiencies, and unnecessary expenses.

345.   The separate states of the United States have a compelling public interest in overseeing their public pension plans, assuring the solvency of those plans, and in preventing vendors and service providers from injuring those plans, for the ultimate goal of protecting their public workers.  When allowed by their jurisdiction, as it is in Kentucky, this includes exercising the full reach of their "long arm" statutes consistent with due process to permit the assertion of the legal rights of their citizens in their state courts.  It is fair to all concerned to have the Hedge Fund Seller Defendants answer for their alleged conduct in the state where those profits were taken by the billions in investments sold to KRS, by conspiracies alleged to have occurred with others in Kentucky, rather than to instead force innocent Kentucky entities to chase them through the courts of other states.

346.   The two Kentucky Public Pension plans are the two largest economic entities in Kentucky.  They were a tempting source of potential revenue and profit for sellers of investment products.  They were specifically targeted as customers by the Hedge Fund Sellers and their top executives, whose tortious conduct injured KRS in

Kentucky.  The size of the Black Box sales — $400–$500 million for each of three Black Box funds — was extraordinarily large and the fees generated were similarly large enough that Kravis, Roberts, Schwarzman, Hill, Reddy and Buchan undoubtedly received a meaningful personal economic benefit from these transactions.  Because of the size of these sales, in selling their respective funds of hedge funds vehicles to KRS and dealing with KRS thereafter, KKR/Prisma, Blackstone and PAAMCO's top executives, or their designees and agents, handled the sales process to KRS and the ongoing "servicing" of the account, which included their personal presence in Kentucky in connection with these KRS investments, "over a period of years."

347.    KKR/Prisma (Kravis and Roberts) and Blackstone (Schwarzman) have made, or arranged to have made, political contributions to politicians in Kentucky for both state and federal office, for the purpose of improving their prospects of obtaining business from KRS and KTRS. Blackstone and KKR have employed lobbyists as their agents in Kentucky to assist them in obtaining KRS and KTRS business.  These acts were intended to help influence KRS to plunge into the high-risk high-fee and unsuitable investments they were selling.  Blackstone paid $2.35 million to a controlled entity, Park Hill Group, to help get the KRS business. Park Hill Group is a firm that is a "placement agent" of the kind implicated in KRS's earlier "suspicious payments" scandal.

348.    This action is brought on behalf of KRS by members and beneficiaries asserting claims for injunctive relief and monetary damages against Trustees and Officers and other third parties named as Defendants.  No monetary damages are sought from the Commonwealth.

349.    In 2013, KRS, its members and beneficiaries and all Kentucky taxpayers were assured by the elected officials then in power that legislation had been passed that

"fully honor[ed] the commitments made to state workers and retirees ... [and] address[ed] the financial uncertainty that threatened our State's credit rating." Defendants' actions and failures to act are not barred by any statute of limitations or laches.  The wrongdoing of all Defendants is ongoing and has been concealed sufficiently to suspend the running of any limitations period.  Plaintiffs have never been sent a report that adequately described the existence of a claim for breach of trust against Trustees or of any claims against the other Defendants, or that informed them of any time limit within which to file a claim.

350.  The wrongs complained of are continuing and ongoing well into 2020 in terms of egregious ongoing misconduct that continues to this day.  Certain Trustees — despite KRS filing a notice of support of these derivative claims when they were originally filed — are working behind the scenes to weaken and even block the claims to protect themselves individually — a continuing breach of their fiduciary and trust duties. Defendants have actively concealed their wrongdoing and violations of law for years, including publishing a KRS Annual Report, in which they are each identified, and of which they were each aware.  And, as late as 2016, the KRS Annual Reports were certified by the Government Finance Officers Association as "satisfying applicable legal requirements."  In 2013 legislation was passed to strengthen the KRS Pension Funds. KRS beneficiaries and Kentucky taxpayers were assured: "As a result of this legislation, we fully honor the commitments made to state workers and retirees ... [and] address the financial uncertainty that threatened our State's credit rating."  The statute of limitations cannot run against KRS when that entity has been under the control of the wrongdoers.  This action was filed within five years of discovery of the violation of the rights of KRS and its Plans.  None of the Plaintiffs nor any member of any of the Plans

has ever been sent a report that adequately described the existence of a claim for breach of trust against Trustees and that informed them of any time limit to file a claim.

## XI.   CAUSES OF ACTION FOR THE BENEFIT OF KRS

### Count I
### Against the Hedge Fund Sellers and the
### Investment, Actuarial and Fiduciary Advisors
### for Breaches of Statutory, Trust Fiduciary and Other Duties to KRS

351.   Plaintiffs incorporate by reference the allegations set forth in this Complaint.

352.   The Hedge Fund Sellers and the Investment, Actuarial and Fiduciary Advisors were all fiduciaries to KRS under the language of the Kentucky Pension Law, because (i) their roles gave them constant access to non-public information of KRS and its Pension Funds, (ii) they held themselves out to be very sophisticated, highly qualified experts with extensive experience and expertise in their respective fields, (iii) they knew the KRS Trustees were dealing with internal turmoil and staff turnover and new and inexperienced investment staff and investment advisors and would be unusually dependent upon their professed, superior experience, expertise, and sophistication in their respective areas of expertise, and (iv) in the case of the Hedge Fund Sellers and RVK, both were also acting as investment advisors and/or investment managers for KRS.

353.   Each of these Defendants by their actions and inactions, as alleged herein, acted in a negligent manner and failed to exercise due care and failed to fulfill their statutory and other duties, including their fiduciary and trust duties, to KRS and its Funds and to Kentucky.

354.    KRS, its Pension/Trust Funds and the Commonwealth have sustained and will continue to sustain significant damages, as alleged in Count I.  The damages alleged herein are applicable to each of Counts I, II, III and IV, and consist of any and all provable damages to KRS and the Commonwealth, which include, at a minimum, the following: (i) damages for the losses incurred by KRS as a result of breaches of fiduciary trust and other duties, including unsuitable investments, the loss of trust assets, the loss of prudent investment opportunities and the loss of positive investment returns; (ii) disgorgement of fees from appropriate Defendants which each received from the sale of, the continued holding of, and the management of, unsuitable hedge fund products, and the providing of certification of fiduciary standards; and (iii) the increased costs to the Commonwealth of restoring KRS and its Pension/Trust Funds to properly funded status, after years of concealment of the true financial condition of KRS and the waste of its funds.

355.    Defendants' negligent actions and failures to act were a substantial factor in causing the damages alleged herein.

356.    As a result of the misconduct alleged herein, all Defendants named in this Complaint are liable to KRS and the Commonwealth for damages in an amount to be proven at trial.

### Count II
### Against All Defendants for Participating in a Joint Enterprise and/or a Civil Conspiracy, Including One or More of a Scheme, Common Course of Conduct and Concerted Actions

357.    Plaintiffs incorporate by reference all the allegations set forth in the Complaint.

358.    Each Defendant knowingly played an important and indispensable part in a scheme, civil conspiracy, concerted actions, common course of conduct, and joint enterprise for their own, and their joint, economic gain to the damage of KRS and the Commonwealth.  Defendants worked together, knowing the roles of the others and each taking the specific overt acts alleged herein within their special areas of expertise and knowledge to further the civil conspiracy.  Each Defendant profited from participation in the scheme.  In order for the scheme to succeed as it did, it required the continuing, conscious mutually supportive and overt acts of each Defendant.  Had any one of them complied with their duties to KRS or the Commonwealth, the damages could have been mitigated or avoided.

359.    Each of the out-of-state Defendants participated in a years-long conspiracy, scheme, and common course of concerted conduct and enterprise with in-state Kentucky residents and actors, involving repeated travel into Kentucky by themselves or their agents for business purposes, thus subjecting themselves to the personal jurisdiction of Kentucky courts.

360.    After the huge losses of 2001–02 and 2008–09, the internal asset/liability study revealed a dangerous mismatch and a looming liquidity threat. While concealing the true state of affairs, Trustees searched for some kind of high-yield "home run" investment to rescue themselves from and to cover up their own failed stewardship.

361.    Rather than face the public outcry, uproar, political firestorm and inquiries that would have resulted had they told the truth in 2010–11 as the law required them to do — rather than honestly disclosing the true facts and seriousness of KRS's financial/actuarial situation, so that proper and prudent steps could be taken then to rescue the funds, secure increased state funding at that time and assure the KRS

Pension funds were prudently invested going forward — Defendants obfuscated, misled and falsely reassured KRS's Pension members and beneficiaries and bet billions on speculative "absolute return" and "real return" "investment" strategies that failed.

362.   The Hedge Fund Sellers sold the high-fee, high-profit Black Box vehicles to Trustees even though they and RVK knew the extremely high-risk, high-fee, speculative vehicles were unsuitable investments for KRS given its particular financial/actuarial situation.  Then, even though the Kentucky Pension Law required Defendants to tell the truth — the complete unvarnished truth — in "easily understood" language to KRS retirees and beneficiaries, the Defendants did not do so.

363.   Each Defendant made or permitted to be made statements they knew were false and/or misleading assurances and obfuscations to KRS members and beneficiaries through the KRS Annual Reports, which created a false sense of security, a false sense of good stewardship and a false sense of legal compliance.  These statements include:

- Trustees were "performing their fiduciary duties." "Investment decisions" were "the result of the conscious exercise of discretion;" "proper diversification of assets must be maintained" and Trustees' policies "provide significant returns over the long term while minimizing investment related expense."

- Trustees "follow a policy of preserving capital" by protecting against ... undue losses in a particular investment area."

- KRS portfolios "are diversified through the use of multiple asset classes" ... "which represent an effective allocation to achieve overall return and risk diversification."

- "The Board decid[ed] on the most effective asset allocation strategies ... to lower risk, control the level of illiquidity in the portfolios, and generate a return expected to exceed the actuarially assumed rate of return of 7.75%.

- "The main reason (for the new absolute-return strategy) is to reduce volatility in the portfolio overall ... [and] to get our expected rate of

return of 7.75%.  Absolute return helps us maintain our expectations but lowers our risks."

- "The Board follows a policy of thoughtfully growing our asset base while protecting against undue risk and losses in any particular investments;" (ii) the "portfolios are diversified on several levels ... though multiple asset classes [that] represent an efficient allocation to achieve overall return and risk characteristics;" (iii) "portfolios within each of the asset classes are diversified through both investment strategies and the selection of individual securities."

- "[N]ew allocations to the ... absolute return buckets [mean] going forward the portfolio is more diversified than ever and represent an efficient allocation to achieve overall return and risk characteristics.

- "We expect the Board's continued high standard of care for these assets and commitments to diversification to allow the System to meet its long-term goals and objectives."

- "Based on the continuation of current funding policies by the Board, adequate provisions are being determined for the funding of the actuarial liabilities of the Kentucky Employee Retirement System ... as required by the Kentucky Revised Statutes. The funding rates established by the Board are appropriate for this purpose" ....

- "The relationship of actuarial assets of each fund to the actuarial accrued liabilities," *i.e.*, "the funding level" should increase over time until it reaches 100%.

- Because of Trustees' "outstanding stewardship," KRS had received an award — "Certificate of Achievement" from the Government Finance Office Association of the United States" for "Excellence in Preparation of its financial reports" and for publishing an "easily readable and efficiently organized document" which satisfies "applicable legal requirements."

364.  The Hedge Fund Sellers reviewed and were aware of the contents of KRS Annual Reports and knew that the information was incomplete, false and/or misleading. They also knew that if the true nature and risks of these high-risk, high-fee vehicles were disclosed in the KRS official Annual Reports, an uproar would have resulted, their predatory business model could have been exposed, and the unsuitable "Daniel Boone," "Henry Clay," and "Colonels" investments would have been terminated, costing them

millions and millions of dollars a year in fees, and resulted in very harmful publicity.  So, they let the deception continue because it served their selfish economic purposes to do so.

365.   The Actuarial Defendants reviewed and were aware of the contents of KRS Annual Reports and knew that the information therein regarding the actuarial assumptions and liabilities and investment returns was incomplete, inaccurate and false and misleading.  They also knew if the true actuarial facts and liabilities and AARIR were disclosed in the KRS Annual Reports, an uproar would have resulted, independent investigations could have been called for and the Actuarial Defendants could have been terminated, costing them an important client and needed fees and seriously threatening their high volume public pension fund client business model.  So, they let the deception continue because it served their selfish economic purposes to do so.

366.   The Investment Advisor Defendants reviewed and were aware of the contents of the KRS Annual Reports and knew that the information therein regarding the KRS investment policies, practices, AARIR, KRS's "Absolute Return" strategies, *i.e.*, the Black Boxes, was incomplete, false and misleading.  They also knew if the true nature of KRS's investment policies and practices, the risk of the AARIR and risks of these high-risk, high-fee vehicles were disclosed in the KRS Annual Reports, an uproar would have resulted, independent investigators could have been called for and the Investor Advisor Defendants could have been fired, costing them an important client and needed fees and seriously threatening their high volume public pension client business model.  So, they let the deception continue because it served their selfish economic purposes to do so.

367.    The Fiduciary Advisor reviewed was aware of the contents of KRS Annual Reports and knew that the information therein regarding the matters alleged in this Complaint was incomplete, false and misleading.  Ice Miller also knew if the true nature and risks of these high-risk, high-fee vehicles and the false actuarial assumptions and estimates were disclosed in the KRS Annual Reports, an uproar would have resulted, an independent investigation could have followed and the Fiduciary Advisor could have been terminated, costing them an important client and needed fees, and seriously threatening their high-volume, public pension fund client driven business model.  So, they let the deception continue because it served their selfish economic purposes to do so.

368.    Because they misled rather than tell the truth, Defendants' actions and failures to act alleged in this Complaint are one or more of a civil conspiracy, course of common conduct, and/or a concerted action.  The associated false statements created what top Kentucky officials termed a "false sense of security" leading to "smaller than necessary [government] contributions," because instead of complying with the law and telling the truth they "manipulated … actuarial assumptions" used "unreasonably high investment expectations …  while using "false payroll numbers" — which was "morally negligent and irresponsible conduct."

369.    Defendants' actions and failures to act alleged in this Complaint are also a joint enterprise, a course of common conduct, and a concerted action, consisting of an agreement, express or implied, a common purpose, a shared pecuniary interest, and an equal right to a voice in the control of the enterprise.  The false statements made by Defendants created what top Kentucky officials termed a "false sense of security" leading to "smaller than necessary [government] contributions," because instead of

complying with the law and telling the truth they "manipulated ... actuarial assumptions" used "unreasonably high investment expectations ... while using "false payroll numbers" — which was "morally negligent and irresponsible conduct."

370.    KRS, its Pension/Trust Funds and the Commonwealth have sustained and will continue to sustain significant damages, as alleged in Count I.

371.    Defendants' actions and failures to act made with knowledge of the facts, and Defendants' negligent actions and failures to act, were all substantial factors in causing the damages alleged herein.

372.    As a result of the misconduct alleged herein, these Defendants are liable to KRS and the Commonwealth for damages in an amount to be proven at trial.

**Count III**
**Against the Hedge Fund Sellers and Actuarial,**
**Fiduciary and Investment Advisors for Aiding and**
**Abetting Breaches of Statutory, Fiduciary and Other Duties**

373.    Plaintiffs incorporate by reference all the allegations set forth in the Complaint.

374.    Each of the Officers, Hedge Fund Sellers, and the Actuarial, Fiduciary and Investment Advisors knew that the Trustees and/or other Defendants owed fiduciary obligations to KRS.

375.    Each of the Hedge Fund Sellers, and the Actuarial, Fiduciary and Investment Advisors knew that Trustees' conduct and/or other Defendants' conduct as alleged in this Complaint breached those fiduciary duties to KRS.

376.    Each of the Hedge Fund Sellers, and the Actuarial, Fiduciary and Investment Advisors gave Trustees and/or other Defendants substantial assistance or

encouragement in effectuating such Trustees' and/or other Defendants' breach of their fiduciary duties, by the actions or failures to act as alleged in this Complaint.

377.    The overt acts of Defendants that constitute substantial knowing assistance are the same overt acts alleged as part of Defendants' participation in the scheme, civil conspiracy and concerted common course of conduct and enterprise detailed Throughout this Complaint.

378.    Defendants named in this Count had actual knowledge of the existence of Trustees' and Officers' fiduciary duties to KRS, and knowingly provided substantial assistance to the Trustees in the breaches of their fiduciary duties to KRS.

379.    As a direct and proximate result of the Defendants' breaches of fiduciary duty and of trust, aided and abetted by the other Defendants named in this Count, KRS and the Commonwealth have been damaged.

380.    KRS, its Pension/Trust Funds and the Commonwealth have sustained and will continue to sustain significant damages, as alleged in Count I.

381.    As a result of the misconduct alleged herein, these Defendants are liable to KRS and the Commonwealth for damages in an amount to be proven at trial.

<div align="center">

**Count IV**
**Against the Hedge Fund Sellers and the Investment,**
**Actuarial and Fiduciary Advisors for Punitive Damages**

</div>

382.    Plaintiffs incorporate by reference all the allegations set forth in the Complaint.

383.    The acts and omissions of each of the Hedge Fund Sellers and the Investment, Actuarial and Fiduciary Advisors constitute willful and wanton conduct, gross negligence, and/or malice and oppression, for which Plaintiffs are entitled to

recover punitive damages due to the disregard for the rights of KRS, its Pension Funds and the Commonwealth.

384.    The restrictions on recovery of punitive damages against a principal or employer attempted by the Legislature as set forth in KY. REV. STAT. 411.184(3) are unconstitutional and should be determined to be null and void.

385.    The Attorney General has been notified of this proceeding.

386.    In the alternative, each Defendant authorized, ratified or should have anticipated the acts and omissions of its employees, agents, both actual and ostensible, and servants, all as alleged herein.

387.    As direct and proximate result of these Defendants' grossly negligent, willful, reckless wanton conduct, KRS and the Commonwealth are entitled to punitive damages, as determined by the jury.

<div align="center">

**Count V**
**Against KKR, Prisma, Cook, Rudzik, Reddy**
**and Kravis and Roberts for Damages, Equitable Relief and**
**Declaratory Judgment in Connection with the Advisory Services Agreement**

</div>

388.    Plaintiffs incorporate by reference all the allegations set forth in the Complaint.

389.    The conduct of these Defendants in connection with the proposal, negotiation and execution of the ASA caused damages to KRS in an amount to be proved at trial.

390.    Plaintiffs seek a judicial declaration to the effect that the ASA, and in particular its provision for self-dealing with KRS assets, was and is unlawful and unenforceable.

391.    Plaintiffs seek equitable relief in connection with the ASA, including without limitation accounting for and disgorgement of all benefits or proceeds derived from self-dealing conduct.

## XII.   PRAYER FOR RELIEF

WHEREFORE, the Tier 3 Plaintiffs, on behalf of and derivatively for KRS and its Trust Funds, demand judgment as follows:

1.    Declaring that the Tier 3 Plaintiffs may maintain this action on behalf of KRS and that they are appropriate representatives;

2.    Determining and awarding to KRS and its pension and insurance funds and trusts the damages sustained by them as a result of the violations set forth above from each of the Defendants individually, proportionally and/or jointly and severally, together with interest thereon, as appropriate under Kentucky law;

3.    In addition, or in the alternative, to damages, awarding to KRS and its pension and insurance funds and trusts equitable relief, to include equitable monetary relief, as appropriate;

4.    Directing or requiring, under the Court's equitable powers, that appropriate credits be made to account for and make up for the diminished upside sharing suffered by Plan participants receiving Tier 3 benefits and for lost earnings thereon — or adjusting benefits to be paid to Tier 3 participants who have already retired or otherwise left service — as this Court shall direct;

5.    Determining and awarding punitive damages against the Hedge Fund Sellers, Investment, Actuarial and Fiduciary Advisors and each of their principals/officers named as Defendants;

6.      Ordering a full and complete accounting of all (a) fees or other  payments made to any person in connection with the Black Box funds of hedge funds sold to KRS and managed by KKR/Prisma, Blackstone and PAAMCO; (b) fees paid to any sub-funds associated with the Black Box funds of hedge funds; (c) any fee or profit or compensation sharing, splitting or other economic arrangements between the Hedge Fund Sellers, their executives and the Black Box sub-funds or any third person involved in these absolute return strategies or assets;

7.      Granting such relief as later specifically requested or found proper pursuant to KY. REV. STAT. § 386B.10-010 which provides "Remedies for Breach of Trust," including appointing a Special Fiduciary to oversee and safeguard any net recovery obtained via this action for KRS to assure any recovery (after court-awarded fees/expenses) is used solely to benefit KRS and its pension and insurance funds as appropriate;

8.      Imposing a constructive trust upon and/or ordering disgorgement of all fees or compensation paid to, profits earned by, or improper advantage gained by Hedge Fund Sellers and the Investment, Actuarial and Fiduciary Advisors, including but not limited to fees, compensation, profits or other advantages in connection with the wrongdoing described in section IX.C. above;

9.      Awarding Plaintiffs' Counsel reasonable fees and expenses, honoring the fee agreements with the named Plaintiffs who have brought this action on behalf of and for the benefit of KRS and the Commonwealth of Kentucky;

10.     Using the Court's equitable powers to fashion such relief as is justified and necessary to benefit KRS and/or restore to KRS that which it is entitled to; and

11.     Granting such further or other legal and equitable relief as the Court deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff demands a trial by jury on all issues so triable.

Dated:  January 6, 2021                    Respectfully submitted,

 s/ Jeffrey M. Walson
Jeffrey M. Walson (KBA 82169)
WALSON LAW-CONSULTANCY-MEDIATION
P.O. Box 311
Winchester, KY 40392-0311
Telephone:    (859) 414-6974
Email:        jeff@walsonlcm.com

Michelle Ciccarelli Lerach (KBA 85106)
James D. Baskin
(*Pro Hac Vice* to be Submitted)
Francis A. Bottini, Jr.
(*Pro Hac Vice* to be Submitted)
Albert Y. Chang
(*Pro Hac Vice* to be Submitted)
BOTTINI & BOTTINI, INC.
7817 Ivanhoe Avenue, Suite 102
La Jolla, CA 92037
Telephone:    (858) 914-2001
Email:        mlerach@bottinilaw.com
              jbaskin@bottinilaw.com
              fbottini@bottinilaw.com
              achang@bottinilaw.com

*Counsel for Plaintiffs Tia Taylor, Ashley Hall-Nagy and Bobby Estes*

## VERIFICATION

I, TIA TAYLOR, declare as follows:

1.      I am one of the plaintiffs named in this verified complaint (the "Complaint").

2.      I have reviewed the allegations made in this Complaint.

3.      As to the allegations in the Complaint of which I have personal knowledge, I believe them to be true.  As to those allegations of which I do not have personal knowledge, I rely upon my counsel and their investigation and believe them to be true.

4.      Having received a copy of this Complaint and having reviewed it with my counsel, I authorize its filing.

5.      I declare under penalty of perjury under the laws of the Commonwealth of Kentucky that the foregoing is true and correct.  Executed this 31st day of December , 2020.

_____
TIA TAYLOR

COMMONWEALTH OF KENTUCKY      )
                              )  ss.
COUNTY OF ___CLARK___         )

SWORN TO AND SUBSCRIBED before me, a Notary Public in the State and County aforesaid, this 31st day of December , 2020.

Notary Public: _____

My Commission Expires: ___September 30, 2023___

## VERIFICATION

I, ASHLEY HALL-NAGY, declare as follows:

1.     I am one of the plaintiffs named in this verified complaint (the "Complaint").

2.     I have reviewed the allegations made in this Complaint.

3.     As to the allegations in the Complaint of which I have personal knowledge, I believe them to be true. As to those allegations of which I do not have personal knowledge, I rely upon my counsel and their investigation and believe them to be true.

4.     Having received a copy of this Complaint and having reviewed it with my counsel, I authorize its filing.

5.     I declare under penalty of perjury under the laws of the Commonwealth of Kentucky that the foregoing is true and correct. Executed this 5th day of January, 2021.

_Ashley Hall Nagy_
ASHLEY HALL-NAGY

COMMONWEALTH OF KENTUCKY    )
                                                            )  ss.
COUNTY OF  CLARK                          )

SWORN TO AND SUBSCRIBED before me, a Notary Public in the State and County aforesaid, this 5th day of January, 2021.

Notary Public: _Lori Stone_

My Commission Expires:    September 30, 2023

# VERIFICATION

I, BOBBY ESTES, declare as follows:

1.     I am one of the plaintiffs named in this verified complaint (the "Complaint").

2.     I have reviewed the allegations made in this Complaint.

3.     As to the allegations in the Complaint of which I have personal knowledge, I believe them to be true.  As to those allegations of which I do not have personal knowledge, I rely upon my counsel and their investigation and believe them to be true.

4.     Having received a copy of this Complaint and having reviewed it with my counsel, I authorize its filing.

5.     I declare under penalty of perjury under the laws of the Commonwealth of Kentucky that the foregoing is true and correct.  Executed this 6th day of January_____, 2021.

_____
BOBBY ESTES

COMMONWEALTH OF KENTUCKY   )
                            )  ss.
COUNTY OF  CLARK_____      )

SWORN TO AND SUBSCRIBED before me, a Notary Public in the State and County aforesaid, this 6th day of January____, 2021.

Notary Public: _____

My Commission Expires:  September 30, 2023

# CERTIFICATE OF SERVICE

The above signature certifies that, on January 6, 2021, the foregoing was served via email in accordance with any notice of electronic service or, in the absence of an electronic notification address, via email or mail as indicated below, to:

| | |
|---|---|
| Abigail Noebels | anoebels@susmangodfrey.com |
| Barry Barnett | bbarnett@susmangodfrey.com |
| Steven Shepard | sshepard@susmangodfrey.com |
| Ryan Weiss | rweiss@susmangodfrey.com |

*Counsel for Defendants KKR & Co., L.P., Henry Kravis, and George Roberts*

| | |
|---|---|
| Peter E. Kazanoff | pkazanoff@stblaw.com |
| Paul C. Curnin | pcurnin@stblaw.com |
| David Elbaum | david.elbaum@stblaw.com |
| Michael J. Garvey | mgarvey@stblaw.com |
| Sara A. Ricciardi | sricciardi@stblaw.com |
| Michael Carnevale | michael.carnevale@stblaw.com |

*Counsel for Defendants Prisma Capital Partners, L.P., Girish Reddy, Pacific Alternative Asset Management Company, LLC, and Jane Buchan*

| | |
|---|---|
| Barbara B. Edelman | barbara.edelman@dinsmore.com |
| Grahmn N. Morgan | grahmn.morgan@dinsmore.com |
| John M. Spires | john.spires@dinsmore.com |

*Counsel for Defendants KKR & Co., L.P., Henry Kravis, George Roberts, Prisma Capital Partners, L.P., Girish Reddy, Pacific Alternative Asset Management Company, LLC, and Jane Buchan*

| | |
|---|---|
| Donald J. Kelly | dkelly@wyattfirm.com |
| Virginia H. Snell | vsnell@wyattfirm.com |
| Jordan M. White | jwhite@wyattfirm.com |
| Brad S. Karp | bkarp@paulweiss.com |
| Lorin L. Reisner | lreisner@paulweiss.com |
| Andrew J. Ehrlich | aehrlich@paulweiss.com |
| Brette Tannenbaum | btannenbaum@paulweiss.com |

*Counsel for Defendants The Blackstone Group L.P., Blackstone Alternative Asset Management, L.P., Stephen A. Schwarzman and J. Tomilson Hill*

| | |
|---|---|
| Philip Collier | pcollier@stites.com |
| Thad M. Barnes | tbarnes@stites.com |
| Jeffrey S. Moad | jmoad@stites.com |

*Counsel for Defendants R.V. Kuhns & Associates, Inc, Rebecca A. Gratsinger, and Jim Voytko*

| | |
|---|---|
| Margaret A. Keeley | mkeeley@wc.com |
| Ana C. Reyes | areyes@wc.com |
| Alexander Zolan | azolan@wc.com |

Susan Pope    spope@fbtlaw.com
Cory Skolnick    cskolnick@fbtlaw.com
*Counsel for Defendant Ice Miller, LLP*

Charles E. English, Jr.  benglish@elpolaw.com
E. Kenly Ames    kames@elpolaw.com
Steven G. Hall    shall@bakerdonelson.com
Sarah-Nell H. Walsh  swalsh@bakerdonelson.com
Kristin S. Tucker   ktucker@bakerdonelson.com
Robert G. Brazier   rbrazier@bakerdonelson.com
*Counsel for Defendants Cavanaugh Macdonald Consulting, LLC, Thomas J. Cavanaugh, Todd B. Green and Alisa Bennett*

Glenn A. Cohen   gcohen@derbycitylaw.com
Lynn M. Watson   watson@derbycitylaw.com
*Counsel for Defendant William Cook*

Perry M. Bentley   perry.bentley@skofirm.com
Connor B. Egan   connor.egan@skofirm.com
Christopher E. Schaefer christopher.schaefer@skofirm.com
Chadler M. Hardin  chad.hardin@skofirm.com
Paul C. Harnice   paul.harnice@skofirm.com
Sarah Jackson Bishop sarah.bishop@skofirm.com
Matthew D. Wingate matthew.wingate@skofirm.com
*Counsel for Nominal Defendant Kentucky Retirement Systems*